# 20-3499

## In the United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,
APPELLEE,

*v.*

REZA ZARRAB, AKA RIZA SARRAF, CAMELIA JAMSHIDY, AKA KAMELIA JAMSHIDY, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, AKA CAN SARRAF, AKA KARTALMSD, MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,
DEFENDANTS,

TÜRKIYE HALK BANKASI A.S., AKA HALKBANK,
DEFENDANT-APPELLANT.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:15-CR-867-10 (THE HONORABLE RICHARD M. BERMAN, J.)*

**BRIEF OF DEFENDANT-APPELLANT ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES**

ROBERT M. CARY
JOHN S. WILLIAMS
SIMON A. LATCOVICH
EDEN SCHIFFMANN
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
650 Fifth Avenue, Suite 1500
New York, NY 10019
Phone: (202) 434-5000
Email: rcary@wc.com

*Attorneys for Defendant-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for the undersigned certifies as follows:  Appellant Türkiye Halk Bankasi A.Ş. is 91.49% owned by the non-party Turkish Wealth Fund, which is part of and owned by the Turkish state.  No publicly held corporation owns 10% or more of the stock of non-party Turkish Wealth Fund.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ...................................................3

STATEMENT OF THE ISSUE............................................................4

STATEMENT OF THE CASE ..............................................................5

    A.    Halkbank and Its Sovereign Functions ...........................5

    B.    The Government's Allegations.........................................8

    C.    Procedural History ..........................................................10

STANDARD OF REVIEW ...................................................................12

SUMMARY OF ARGUMENT.............................................................12

ARGUMENT .........................................................................................16

I.    Halkbank, a Part of the Turkish State, Is Entitled to Absolute Immunity from Criminal Prosecution.......................................................16

    A.    Absolute Immunity Has Long Been the Rule in Criminal Cases..............16

    B.    Entities Owned and Controlled by the Sovereign Are Entitled to the Sovereign's Immunity. ......................................................22

    C.    Halkbank Is Entitled to Türkiye's Immunity ................................33

II.    Even if the Now-Defunct Restrictive Theory as Understood at Common Law Had Applied in Criminal Proceedings, Halkbank Would Still Be Entitled to Immunity. ......................................................38

    A.    The Restrictive Theory Maintained Immunity for the "Public" Acts Halkbank Is Accused of Taking in This Case. ...................................39

    B.    The Restrictive Theory Maintained Immunity for Halkbank's Acts in Sovereign Turkish Territory. ......................................................41

III.    The Executive Is Not Entitled to Deference on Immunity Issues in Criminal Cases.......................................................43

A. Deferring to the Executive in Criminal Proceedings Is Unprecedented...................................................................44

B. Deferring to the Executive in a Criminal Case the Government Has Brought Offends Core Principles of Divided Government and Fundamental Fairness...............................................................46

C. Even if This Case Were Brought by a Private Litigant, Deference Would Be Unwarranted. ...................................................48

IV. Criminal Prosecutions of Sovereign Entities Embroil Federal Courts in International Disputes and Open the Door to Destabilizing Prosecutions in State Courts and Around the Globe. ...................................................53

CONCLUSION ...............................................................................57

# TABLE OF AUTHORITIES

Page

## CASES

*Amkor Corp. v. Bank of Korea*, 298 F. Supp. 143 (S.D.N.Y. 1969) ....................................51

*Arango v. Guzman Travel Advisors*, 761 F.2d 1527 (11th Cir. 1985) ..................................24

*Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. 904 (1824) ...........................29

*Berizzi Brothers Co. v. The Pesaro*, 271 U.S. 562 (1926) ....................................*passim*

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ........................................ 13, 32, 33, 37

*Bradford v. Director General of Railroads of Mexico*,
278 S.W. 251 (Tex. Civ. App. 1925) ................................................32

*Chambers v. Mississippi*, 410 U.S. 284 (1973)...............................................48

*Coale v. Société Co-op. Suisse des Charbons*, 21 F.2d 180 (S.D.N.Y. 1921) ............................30

*Coleman v. Tennessee*, 97 U.S. 509 (1878) ................................ 17, 18, 23, 50

*Compania Espanola de Navegacion Maritima, S.A. v. The Navemar*,
303 U.S. 68 (1938) ................................................29, 31, 50

*Crane v. Kentucky*, 476 U.S. 683 (1986) .................................................48

*Dow v. Johnson*, 100 U.S. 158 (1879).............................................. 17, 18, 23, 50

*Dunlap v. Banco Central Del Ecuador*, 41 N.Y.S.2d 650 (Sup. Ct. 1943) ............................32

*Enmund v. Florida*, 458 U.S. 782 (1982) ...................................................54

*Ex parte Peru*, 318 U.S. 578 (1943) ........................................49, 51, 52

*F. W. Stone Engineering Co. v. Petroleos Mexicanos of Mexico, D. F.*,
42 A.2d 57 (Pa. 1945) ................................................ 31, 32

*Federal Land Bank of St. Louis v. Priddy*, 295 U.S. 229 (1935)....................................33

*Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021) ..............................16

*FHA v. Burr*, 309 U.S. 242 (1940) .......................................................32

iv

## Cases—continued:

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ................................................................ 28, 31

*Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485 (2019) ............................ 17

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006) ................................ 16, 43

*Garcia v. Akwesasne Housing Authority*, 268 F.3d 76 (2d Cir. 2001) .................................... 33

*Goar v. Compania Peruana de Vapores*, 688 F.2d 417 (5th Cir. 1982) ........................... 1, 22

*Guaranty Trust Co. of New York v. United States*, 304 U.S. 126 (1938) ............................... 47

*Heaney v. Government of Spain*, 445 F.2d 501 (2d Cir. 1971) ........................... 14, 39, 41, 52

*In re Grand Jury Investigation of the Shipping Industry*,
186 F. Supp. 298 (D.D.C. 1960) ................................................................ 28, 45

*In re Grand Jury Proceeding Related to M/V Deltuva*,
752 F. Supp. 2d 173 (D.P.R. 2010) ................................................ 29

*In re Grand Jury Subpoena*, 912 F.3d 623 (D.C. Cir. 2019) ................................ 29

*In re Investigation of World Arrangements*, 13 F.R.D. 280 (D.D.C 1952) ........................ *passim*

*Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198 (2d Cir. 1971) ...................... 51

*Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108 (2013) ................................................ 42, 43

*L'Invincible*, 14 U.S. (1 Wheat.) 238 (1816) ................................................ 23

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) ................................ 32, 33

*Mason v. Intercolonial Railway of Canada*, 83 N.E. 876 (Mass. 1908) ...................... 24, 32, 45

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) ............................................ 49, 50, 51

*McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963) .................... 18

*Medellin v. Texas*, 552 U.S. 491 (2008) ........................................................ 47, 55

*National City Bank of New York v. Republic of China*, 348 U.S. 356 (1955) ............ 16, 18, 43

## Cases—continued:

*Oliver American Trading Co. v. Government of the United States of Mexico*,
 5 F.2d 659 (2d Cir. 1924)..................................................................... 30, 45

*People v. McLeod,* 1 Hill 377 (N.Y. Sup. Ct. 1841)...................................55

*Permanent Mission of India v. City of New York*, 551 U.S. 193 (2007) ...................................24

*Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365 (2d Cir. 2023) ..............12

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) ........................... 47, 49, 50, 52

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ....................... 12, 16

*Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui"*,
 639 F.2d 872 (2d Cir. 1981) ................................................................. 1, 22

*Samantar v. Yousuf*, 560 U.S. 305 (2010) .................................................17, 24, 51

*Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812)..................................*passim*

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .................................................. 18, 19

*Stern v. Marshall*, 564 U.S. 462 (2011) .....................................................48

*Thacker v. TVA*, 139 S. Ct. 1435 (2019) ....................................................32

*The Adriatic*, 258 F. 902 (3d Cir. 1919) ....................................................31

*The Maipo*, 259 F. 367 (S.D.N.Y. 1919) .............................................. 30, 31

*The Pesaro*, 277 F. 473 (S.D.N.Y. 1921) ....................................................46

*The Roseric*, 254 F. 154 (D.N.J. 1918) .......................................................31

*Türkiye Halk Bankasi A.Ş. v. United States*, 143 S. Ct. 940 (2023)................................*passim*

*United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020)......................................10

*United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199 (S.D.N.Y. 1929)..............42

*United States v. Gilliam*, 994 F.2d 97 (2d Cir. 1993) ..............................................54

**Cases—continued:**

*United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997) .....................................44

*United States v. Pink*, 315 U.S. 203 (1942) ........................................................55

*United States v. Texas*, 143 S. Ct. 1964 (2023) ..................................................48

*United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021)...................*passim*

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ................................ 18, 50

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*,
336 F.2d 354 (2d Cir. 1964) ......................................................................*passim*

*Wulfsohn v. Russian Socialist Federated Soviet Republic*, 138 N.E. 24 (N.Y. 1923) ...............42

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ........................................... 44, 53

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ........................................47

## FOREIGN CASES

*Agent judiciare du Trésor v. Malta Maritime Authority and Carmel X*, Cour de
cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004,
Bull. Crim., No. 04-84.265 (Fr.) ....................................................................27

*Jones v. Saudi Arabia* [2006] UKHL 26 [31] ......................................................21

## FEDERAL CONSTITUTION, STATUTES, AND REGULATION

U.S. Constitution, Article II...................................................................... 44, 53

18 U.S.C. § 3231 .................................................................................... 3, 11

28 U.S.C.
§ 1291 ...........................................................................................3
§ 1603(a).....................................................................................11, 13, 24
§ 1603(b)................................................................................ 11, 13, 24, 30
§ 1603(d)........................................................................................39
§ 1604 ..........................................................................................24

31 U.S.C. § 9101 ......................................................................................33

**Federal Constitution, Statutes, and Regulation—continued:**

31 C.F.R. § 535.701 (2022)......................................................................57

## FOREIGN CONSTITUTION AND STATUTES

Constitution of the Republic of Türkiye
    art. 165............................................................................... 6, 34
    art. 166.................................................................5, 35, 37, 41
    art. 167........................................................................................35

Foreign States Immunities Act 87 of 1981 (S. Afr.)
    § 1(2)............................................................................................26
    § 2(3)............................................................................................20

Foreign States Immunity Law, 5769-2008 (Isr.)
    § 1................................................................................................26
    § 2................................................................................................20

State Immunity Act 19 of 1979, ch. 313 (Sing.)
    § 16..............................................................................................26
    § 19..............................................................................................20

State Immunity Act 1978, c. 33 (UK)
    § 14..............................................................................................26
    § 16..............................................................................................20

State Immunity Act, R.S.C. 1985, c S-18 (Can.)
    § 2................................................................................................26
    § 18..............................................................................................20

State Immunity Ordinance, No. 6 of 1981, § 17 (Pak.)....................20

Turkish Law No. 2284.................................................................................5

Turkish Law No. 4603.................................................................................6

## OTHER AUTHORITIES

4 William Blackstone, *Commentaries on the Laws of England* (1769) ....................................20

Emer de Vattel, *The Law of Nations* (Joseph Chitty trans., 1883)..............................17, 18

**Other Authorities—continued:**

Federalist No. 47 (James Madison) (Clinton Rossiter ed. 1961) ............................... 46, 47

Hazel Fox & Philippa Webb, *The Law of State Immunity* (3d ed. 2015) ........ 18, 19, 20, 54

Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction of National Courts," *in Research Handbook on Jurisdiction and Immunities in International Law* (Alexander Orakhelashvili ed., 2015) ............................................................................21

G.A. Res. 59/38, ¶ 2 (Dec. 2, 2004) ..................................................................................20

*Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Governmental Rels. of the Comm. on the Judiciary*, 93rd Cong. 39 (1973) .........................24

R. Y. Jennings, The Caroline *and* McLeod *Cases*, 32 Am. J. Int'l L. 82 (1938)...............56

*Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Administrative Law and Governmental Relations of the H. Comm. On the Judiciary*, 94th Cong. 27 (1976) ................................................................46

Tate Letter, *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711 (1976) (appendix 2 to opinion of White, J.) ....................19, 38, 47

Thomas Marois & Ali Riza Güngen, *Credibility & Class in the Evolution of Public Banks: The Case of Turkey*, 43 J. Peasant Studs. 1285 (2016)................................... 6, 35

Thomas Marois & Ali Riza Güngen, *Reclaiming Turkey's State-Owned Banks* (Mun. Servs. Proj., Paper No. 22, 2013) ..........................................................................6

*Public Banks & Covid-19: Combatting the Pandemic with Public Finance* (David A. McDonald et al. eds., 2020) ..........................................................................6

Restatement (Second) of Foreign Relations Law (1965)
    § 66 cmt. a.............................................................................................................. 30, 33
    § 66 cmt. c......................................................................................................................33
    § 66(g) .............................................................................................................................25
    § 69 .......................................................................................................................38, 42, 52

**Other Authorities—continued:**

Restatement (Third) of Foreign Relations Law (1987)
  pt. IV, ch.5A, intro. note ................................................17
  § 451 .........................................................................25
  § 461 cmt. a..............................................................21
  § 461 cmt. c..............................................................21

Restatement (Fourth) of Foreign Relations Law § 452 (2018)........................................25

U.N. Convention on State Immunities
  art. 2(1)(b) .................................................................25
  art. 6(2)(b) .................................................................37

# INTRODUCTION

Throughout world history, no sovereign has criminally tried another sovereign or its instrumentality in its courts. The Supreme Court has remanded this matter to determine whether common-law sovereign immunity—the basis for that historical precedent—protects Halkbank from criminal prosecution and vacated the portion of this Court's opinion that addressed that topic. *Türkiye Halk Bankasi A.Ş. v. United States*, 143 S. Ct. 940 (2023) ("S. Ct. Op.") at A.280-81. Before the Supreme Court, the government acknowledged that prosecuting a sovereign would be in "derogation of … common law immunity." Transcript of Oral Argument, No. 21-1450 (S. Ct. Jan. 17, 2023) ("S. Ct. Tr.") at A.207; *see id.* at A.199, 217-18, 224. That principle, now uncontested, should resolve this case.

Since the Founding, our Nation's courts have recognized the "perfect equality and absolute independence of sovereigns"—a principle that has "given rise to a class of cases" in which sovereigns are entitled to immunity. *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 137 (1812) (Marshall, C.J.). Instrumentalities receive their sovereign's immunity. "No principle of common law, ancient or modern, ever allowed actions against foreign sovereigns or their instrumentalities." *Goar v. Compania Peruana de Vapores*, 688 F.2d 417, 426 (5th Cir. 1982) (Wisdom, J.); *see Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui"*, 639 F.2d 872, 879 (2d Cir. 1981) (Friendly, J.).

As the Republic of Türkiye has made clear, Halkbank is an integral part of the Turkish state, serving core sovereign functions and purposes. Sovereigns, including

Türkiye, act through agencies and instrumentalities. To deny those entities immunity is to deny the immunity afforded the sovereign itself. Centuries of caselaw, international law and practice, Restatements, and treatises all speak to this point. Halkbank is an entity owned and controlled by the government of Türkiye, created pursuant to a specific statute passed shortly after the founding of the Republic that authorized the bank's formation. The prosecution is charging Halkbank with crimes allegedly undertaken at the Turkish government's direction within Turkish sovereign territory.

This prosecution clearly violates the absolute immunity from criminal prosecution to which sovereign entities are entitled at common law. Even under the restrictive theory of immunity that once existed only in civil cases, Halkbank would be entitled to immunity.

The government asserts, however, that courts must defer to the government's choice to indict the bank regardless of whether Halkbank would otherwise be entitled to immunity. But courts do not defer to the Executive in cases involving criminal process against a sovereign. And with good reason. Neither the decisions of the Supreme Court nor of this Court require deference here. To defer to the Executive on criminal sovereign immunity is to extinguish criminal sovereign immunity. Departing from the global consensus of absolute criminal immunity for sovereigns and their instrumentalities would invite terrible and uncontrollable consequences. The indictment against Halkbank should be dismissed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231.  A.114.  Halkbank timely filed an interlocutory appeal from the district court's denial of its motion to dismiss.  A.103, 119.  This Court continues to have jurisdiction under the collateral-order doctrine pursuant to 28 U.S.C. § 1291.  *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) ("2d Cir. Op.") at A.130-33.

## STATEMENT OF THE ISSUE

Whether Halkbank, an integral part of the Turkish state, is immune from criminal prosecution under the common law.

## STATEMENT OF THE CASE

This case now concerns a single question: whether Halkbank is entitled under common law to the same immunity from criminal prosecution that the government concedes Türkiye itself enjoys. The district court (Judge Richard M. Berman) concluded Halkbank was not immune, A.109-12, and this Court affirmed, A.122-48. The Supreme Court granted certiorari and affirmed aspects of this Court's decision, but vacated the judgment in regards to common-law immunity and remanded. A.264-89.

### A.    Halkbank and Its Sovereign Functions

Halkbank—which translates as either "Public Bank" or "People's Bank"—is a state-owned bank that, as stated by the Republic of Türkiye, is "an integral part of the Turkish state" and is treated as "an arm of the state, indistinguishable from the government itself." Brief for Republic of Türkiye as Amicus Curiae at 2, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (S. Ct. Nov. 21, 2022) ("Türkiye Br.").

The Turkish Constitution requires the Turkish government to take "[m]easures to increase national savings and production," "to promote investment and employment," and "to ensure stability in prices and balance in external payments." Turk. Const. art. 166. Consistent with these obligations, the Turkish Parliament in 1933 passed the "Halkbank and Public Funds Law," Law No. 2284, to create the bank. Türkiye Br. 3. The bank has always been majority-owned by the Turkish government. Today, Türkiye owns 91.49% of Halkbank's shares. *Id.* at 5; *see supra* p.i.

The Turkish Constitution subjects Halkbank, as a "state economic enterprise[]," to mandatory legislative oversight. Turk. Const. art. 165; Türkiye Br. 4. The bank is audited by government agencies tasked with overseeing governmental entities and is subject to the state Ombudsman. Türkiye Br. 7. The Minister of Treasury and Finance oversees Halkbank and exercises the government's ownership interest under Turkish Law No. 4603. *Id.* Türkiye's central government "determines the Bank's management," appoints both Halkbank's Board of Directors and senior management, and "determine[s] the procedures and principles for Halkbank's structure." *Id.* at 5, 6-7.

Since its inception, Halkbank has played "an active and influential role in financing national development and state-building processes" in Türkiye. Thomas Marois & Ali Riza Güngen, *Reclaiming Turkey's State-Owned Banks* 6 (Mun. Servs. Proj., Paper No. 22, 2013). State banks like Halkbank were "decisive in [Türkiye's] state-led development plans after 1960," "played a key role in stabilizing [Türkiye] amidst the 2008-2009 global crisis," and still "function as nationwide institutional conduits of government policy." Thomas Marois & Ali Riza Güngen, *Credibility & Class in the Evolution of Public Banks: The Case of Turkey*, 43 J. Peasant Studs. 1285, 1285, 1294, 1299-1302 (2016).

Türkiye has consistently relied on Halkbank to manage various social service programs. *Public Banks & Covid-19: Combatting the Pandemic with Public Finance* 333-47 (David A. McDonald et al. eds., 2020). For example, Halkbank issues loans to shop owners and craftspeople using funds provided directly from the Turkish Treasury.

Türkiye Br. 4.  In recent years, the Turkish government, through Halkbank, has made hundreds of billions of Turkish lira available to small- and medium-sized businesses. *See Turkish Government to Launch New Credit Guarantee Fund to Ease Tradespeople's Access to Financing*, Hürriyet Daily News, Feb. 6, 2017, https://tinyurl.com/4yupst8x.  Halkbank provides loans using public funds to Organized Industrial Zones and Small Industrial Areas of Türkiye.  Türkiye Br. 4.  Only state banks like Halkbank offer state-sponsored emergency financing to the public "in cases of natural disasters and state[s] of emergencies," such as earthquakes.  *Id.* at 5.  And during the pandemic, the Turkish government made interest-free or low-interest credit cards available for millions of tradespeople through Halkbank.  *Turkey Mulls New Support Measures for Businesses Hit by Covid-19 Restrictions*, Daily Sabah, Nov. 25, 2020, https://tinyurl.com/34kdpnjy.

The Turkish government further relies on state banks, including Halkbank, to collect taxes.  Türkiye Br. 4.  State banks exclusively collect Turkish customs revenues, which amount to over 20% of Türkiye's tax income.  *01.01.2020 Tarihinden İtibaren Bankalar Vasıtasıyla Yapılacak Vergi Tahsilatlarına İlişkin Duyuru*, Gelir İdaresi Başkanlığı (Dec. 15, 2019), https://tinyurl.com/2p9bkz74 (Republic of Türkiye Directorate of Revenue announcement stating that customs payments will be made through public banks); Firat Kozok, *Turkey Customs Taxes to Be Collected by Government Banks Only*, Bloomberg Law News (Mar. 3, 2020).  Halkbank thus engages in "purely governmental functions."  Türkiye Br. 4.

## B.    The Government's Allegations

The indictment alleges that, at the Turkish government's direction, Halkbank engaged in a conspiracy with Turkish government officials and others to violate U.S. sanctions targeting Iran.  *See* S. Ct. Op. at A.268.  Halkbank denies that it engaged in any illegal activity whatsoever, but summarizes the government's allegations below. Halkbank is immune from prosecution even if one were to assume that all the indictment's allegations are true.

Between 2012 and 2016, U.S. laws targeting Iran exempted Türkiye, which had long relied on Iranian oil and gas, from being sanctioned for purchasing Iranian oil and gas.  2d Cir. Op. at A.125 n.2.  Following bilateral engagement with the United States designed to balance diplomatic pressure on Iran with Türkiye's oil needs, Türkiye designated a Turkish state bank to hold Iran's oil and gas proceeds and to limit Iran's use of the proceeds to approved purposes.  *See* A.23; 2d Cir. Op. at A.125-26 nn.2-3, 144 & n.62.  More specifically, the indictment alleges that Türkiye's "national oil company and gas company" purchased Iranian oil and gas, and that Halkbank held the proceeds in accounts belonging to the Central Bank of Iran, the National Iranian Oil Company, and the National Iranian Gas Company.  A.20; 2d Cir. Op. at A.125.

The indictment alleges that Türkiye's Economy Minister—Halkbank's then-governor—met with Turkish-Iranian businessman Reza Zarrab in 2012.  A.33-34. Zarrab allegedly proposed moving Iran's funds out of Halkbank in a way that would later give Iran access to its escrowed funds.  A.31-33.  According to the indictment, the

Economy Minister "directed that the … scheme should be conducted through Halkbank." A.37.

The indictment alleges that "[h]igh-ranking government officials in … Turkey participated in and protected this scheme," directing Halkbank to continue, accelerate, and modify its conduct. A.20, 37-38, 43-45, 49, 51-52. Halkbank's then-general manager allegedly met with Türkiye's "then-Prime Minister, [Economy Minister], and other Turkish government officials," who allegedly ordered Halkbank to accelerate the export scheme. A.43-44. After Turkish police interrupted Zarrab's operation, "the then-Prime Minister of Turkey and his associates … [allegedly] instructed Halkbank to resume the scheme." A.51-52. The indictment emphasizes that the scheme allegedly "benefit[ted] the Government of Turkey" by "artificially inflat[ing] Turkey's export statistics." A.34-35.

According to the indictment, a small number of Halkbank employees carried out the Turkish government's alleged directive by helping transfer Iranian funds to Zarrab company accounts at Halkbank. *See* A.31-33. The employees allegedly conspired to accept false documentation in Türkiye claiming that Zarrab was using the funds for private Iranian gold purchases or humanitarian transactions. A.32-33, 45. In actuality, the government claims, Zarrab or his agents took the gold to Dubai. A.33, 44. There, they allegedly exchanged the gold for currency "to fund the activities of the Government of Iran and Iranian companies and persons." A.32-33. When the United States made sanctionable private gold sales to Iran in 2013, Zarrab, after meeting with

the Turkish Economy Minister again, allegedly began masking the transactions as permissible humanitarian trade. A.45-53. The indictment also alleges that certain Halkbank employees made misrepresentations to U.S. Treasury officials about Halkbank's activities. A.52.

The indictment claims that about 5% of the Iranian funds originally held at Halkbank eventually cleared through U.S. banks after first being transferred out of Halkbank to other banks in Türkiye, then to Dubai, and then around the world. A.21, 44, 52. The indictment does not allege that Halkbank transferred even a penny from Iranian accounts to U.S. banks.

### C. Procedural History

1. In 2016, Zarrab was arrested by U.S. authorities for sanctions violations. In 2017, the government charged Türkiye's former Minister of Economy and three former Halkbank executives. ECF No. 1-2 at 59. Zarrab later entered into a favorable plea agreement in exchange for testifying against one former Halkbank executive, who was tried and convicted in 2018. *United States v. Atilla*, 966 F.3d 118, 121 (2d Cir. 2020).

In 2019, the government charged Halkbank with conspiracy to defraud the United States, conspiracy to violate the International Emergency Economic Powers Act, bank fraud, conspiracy to commit bank fraud, money laundering, and conspiracy to commit money laundering. A.53-59.

2. In August 2020, Halkbank moved to dismiss the indictment on sovereign-immunity grounds. It argued the district court did not have subject-matter jurisdiction

to adjudicate a criminal case against a foreign sovereign; the Foreign Sovereign Immunities Act ("FSIA") afforded it absolute criminal immunity; and, if the FSIA did not apply, it was entitled to common-law immunity. *See* D. Ct. ECF No. 645 at 1; D. Ct. ECF No. 646 at 7-13. The prosecution opposed. It did not dispute that Halkbank qualified as a "foreign state" under the FSIA, *see* 28 U.S.C. § 1603(a)-(b), and never argued Halkbank lacked sovereign status at common law, but nevertheless contended that neither U.S. statutory nor common law afforded Halkbank immunity, *see* D. Ct. ECF No. 659 at 8, 11-22.

The district court denied the motion to dismiss, A.103, and this Court affirmed, A.148. This Court concluded that 18 U.S.C. § 3231 afforded the trial court subject-matter jurisdiction and that there was no immunity under the FSIA. As to common-law immunity, the Court proceeded on the assumption that Halkbank was a Turkish instrumentality before concluding that "any foreign sovereign immunity at common law … had an exception for a foreign state's commercial activity." *Id.* at A.146-47. The Court alternatively held that common-law immunity determinations "were the prerogative of the Executive" and the decision to prosecute "necessarily manifested the Executive Branch's view that no sovereign immunity existed." *Id.* at A.147.

3. The Supreme Court granted certiorari on October 3, 2022. Before that Court, the prosecution conceded that "at the time of the founding[,] one state [could not] set up its criminal courts to adjudicate the sovereign actions of another country." S. Ct. Tr. at A.216-17. The government acknowledged "a strong customary

international law principle against prosecuting a state qua state" and that it "would not endeavor" to indict Türkiye. *Id.* at 199. And it stated expressly that indicting a state would amount to a "derogation of what we understand to be common law immunity." *Id.* at 207. The government nevertheless contended that prosecuting an instrumentality was permissible at common law and that the courts must defer to the Executive's decision to indict Halkbank.

The Supreme Court affirmed in part, vacated in part, and remanded. The Court held that district courts have subject-matter jurisdiction over criminal cases brought against foreign sovereigns, and that the FSIA does not apply in criminal cases. A.269-80. As to common law, however, the Supreme Court vacated this Court's denial of Halkbank's common-law foreign sovereign immunity and remanded to this Court for further consideration of the parties' arguments. *Id.* at 280-81.

## STANDARD OF REVIEW

This Court reviews questions of law de novo. *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 66 F.4th 365, 369 (2d Cir. 2023).

## SUMMARY OF ARGUMENT

I. Halkbank is entitled to absolute immunity from criminal prosecution.

A. At the Founding, sovereigns "enjoyed absolute immunity from all actions in the United States," *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018), both civil and criminal. That principle reflected the absolute equality and independence of sovereigns, and was based on each nation's reciprocal self-interest. The restrictive

theory of immunity that developed in the mid-Twentieth Century, under which sovereigns receive immunity in civil cases for "public" but not "private" acts, has never applied in criminal cases. As the government concedes, sovereigns remain absolutely immune from criminal jurisdiction to this day.

B. It is a fundamental principle of sovereign immunity that instrumentalities enjoy their sovereigns' immunity. That was the common-law rule, *e.g.*, *Berizzi Bros. v. The Pesaro*, 271 U.S. 562, 574 (1926), and was continued in the FSIA, 28 U.S.C. § 1603(a)-(b). The handful of criminal sovereign immunity cases against instrumentalities agree, upholding criminal immunity for a British-government-controlled oil company and a Maltese port operations corporation. For more than two centuries, an entity "owned and operated by a government" has qualified as a sovereign instrumentality. *Berizzi Bros.*, 271 U.S. at 573; *see, e.g.*, *Schooner Exchange*, 11 U.S. at 144. That standard is consistent with how courts treat domestic instrumentalities: federal and state-owned corporations are "part of the Government." *Biden v. Nebraska*, 143 S. Ct. 2355, 2367 (2023) (internal quotation marks omitted).

C. Halkbank easily meets the common-law standard for sovereign immunity. Halkbank is owned and controlled by the Turkish state. Though there is no public-purpose requirement, the Turkish Legislature created Halkbank to serve sovereign, public needs, and Halkbank continues to do so. Türkiye regards Halkbank as "an integral part of the Turkish state," and treats it as "an arm of the state, indistinguishable

from the government itself." Türkiye Br. 2. Halkbank is entitled to the same absolute immunity from prosecution the government concedes Türkiye itself would receive.

II.     The restrictive theory never applied in criminal cases and has long been displaced by the FSIA. But, even under that now-defunct theory, Halkbank would be immune in this case.

A.     The common-law restrictive theory distinguished between "public" and "private" acts. As this Court explained, that division did not fall along strictly commercial/non-commercial lines. The doctrine retained immunity for commercial activities involving sensitive political considerations—for example, "a contract by a foreign government for the purchase of bullets for its army." *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971). Here, the indictment alleges that the Turkish government commanded Halkbank to take certain acts for public purposes. The indictment thus focuses on exactly the sort of "internal administrative acts" the restrictive theory protected at common law. *See id.* at 503 (citation omitted).

B.     The restrictive theory also retained immunity for a sovereign's acts taken in the sovereign's own territory. Because the bank transfers alleged in the indictment took place in Türkiye, Halkbank's alleged involvement in those transfers would remain immune even if the restrictive theory applied.

III.     The Executive requests deference from this Court on whether Halkbank is entitled to immunity, but it would be unprecedented to grant deference in a criminal case. Granting deference on sovereign immunity in criminal cases would mean there is

no sovereign immunity in criminal cases.  It would also rob the co-equal branches of their coordinate roles, and deny Halkbank a fair day in court.  In fact, granting deference to the Executive in a case like this one—where the immunity Halkbank seeks has been previously recognized—would expand deference beyond that afforded in civil cases.

IV.    Opening the door to criminal prosecutions of sovereigns will pointlessly embroil courts in international disputes.  While the government brings this case, jurors will pass on guilt and the court will impose the sentence, both standing in moral judgment over a sovereign state and an entity it owns and controls.

The government has yet to explain what benefit justifies the immense imposition it seeks to make upon the Judiciary.  The government has more potent tools to manage its relationship with foreign sovereigns than criminal prosecution.  Sovereign states and their instrumentalities cannot go to prison, and appropriate fines are available in civil actions.  It is no wonder then that for nearly 250 years, the government has made do without criminally prosecuting sovereign entities.

Once prosecutions of sovereigns begin, the government will not be able to control the consequences.  Abandoning absolute criminal immunity will embolden state and local prosecutors to prosecute sovereigns and instrumentalities.  Despite the government's assurances, it is far from certain the Executive could stem the tide.  And neither the Executive nor Congress could stop the cycle of recrimination that would begin if this Court sanctions the first criminal trial of a foreign sovereign.  The decision

whether to open Pandora's Box and abrogate common-law criminal immunity belongs to Congress, not the Executive.

## ARGUMENT

## I. Halkbank, a Part of the Turkish State, Is Entitled to Absolute Immunity from Criminal Prosecution.

At common law, sovereigns enjoy absolute immunity from criminal prosecution. *See, e.g.*, S. Ct. Tr. at A.207 (prosecuting a sovereign would be a "derogation of … common law immunity"). That principle extends to sovereign instrumentalities, which have always been held to have the same immunity as the sovereign itself. Halkbank is a quintessential sovereign entity entitled to the same immunity as the sovereign that owns and controls it. Under centuries of precedent, prosecuting Halkbank is tantamount to prosecuting the Republic of Türkiye. Because this prosecution violates common law, the indictment should be dismissed.

### A. Absolute Immunity Has Long Been the Rule in Criminal Cases.

1. Sovereign immunity is derived "from standards of public morality, fair dealing, [and] reciprocal self-interest." *Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 362 (1955). At common law, sovereigns "enjoyed absolute immunity from all actions in the United States," *Rubin*, 138 S. Ct. at 821; *accord Garb v. Republic of Poland*, 440 F.3d 579, 585 (2d Cir. 2006), meaning they were "categorically immune from suit" even for commercial acts, *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 713 (2021). As "the founding era's foremost expert on the law of nations" explained, one sovereign

could not "set himself up for a judge of [another sovereign's] conduct, and to oblige him to alter it." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019) (quoting Emer de Vattel, *The Law of Nations* 155 (Joseph Chitty trans., 1883)). Immunity was subject to "no exceptions." Restatement (Third) of Foreign Relations Law pt. IV, ch.5A, intro. note (1987).

Chief Justice Marshall first recognized in *Schooner Exchange* that even though "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute," 11 U.S. at 136, "every sovereign is understood to wa[i]ve the exercise of a part of [its] complete exclusive territorial jurisdiction" in the "class of cases" involving other sovereigns and their instrumentalities, *id.* at 137. Chief within that "class of cases" was a "universally understood" "exemption … from arrest or detention." *Id.* The "perfect equality and absolute independence" enjoyed by all sovereigns impelled the Court to recognize a sovereign's absolute immunity from this nation's territorial jurisdiction. *Id.* Without such immunity, a sovereign's entrance into this country would result in "jurisdiction incompatible with his dignity, and the dignity of his nation." *Id.* The common-law rule extending from *Schooner Exchange* was "virtually absolute immunity to foreign sovereigns." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010).

Although immunity most often arose in civil cases, sovereigns were understood also to be "exempt from … criminal jurisdiction." *Dow v. Johnson*, 100 U.S. 158, 165 (1879). Sixty years after *Schooner Exchange*, the Supreme Court in *Coleman v. Tennessee*, 97 U.S. 509 (1878), relied on Chief Justice Marshall's analysis in discussing the "well

settled" rule that a foreign army in a friendly country is "exempt from the civil *and criminal* jurisdiction of the place." *Id.* at 515 (emphasis added). A year later, the Court asserted the same in *Dow*, 100 U.S. at 165. These decisions demonstrate that at common law, sovereigns and their instrumentalities were "exemp[t] … from all [foreign] jurisdiction," *The Law of Nations, supra*, at 486, a conclusion only reinforced by the absence of any attempt to indict or prosecute a sovereign during that era. At the Founding and for the centuries since, "criminal actions were never brought" against sovereigns. S. Ct. Tr. at A.184 (Kagan, J.). Put simply, "the [United States] does not prosecute states." Hazel Fox & Philippa Webb, *The Law of State Immunity* 244 (3d ed. 2015) (quotation marks omitted).

The absolute immunity afforded sovereigns at common law was based in part on "reciprocal self-interest." *Nat'l City Bank*, 348 U.S. at 362. Had our government adopted a different rule, it would have "invit[ed] retaliatory action from other nations." *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963). Moreover, "extending virtually absolute immunity to foreign sovereigns" at common law was consistent with the conduct of other nations. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). "When the United States declared their independence, they were bound to receive the law of nations, in its modern state of purity and refinement." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004) (internal quotation marks and emphasis omitted). That included adopting "the general norms governing the behavior of

national states with each other." *Id.* One of those norms was—and remains—absolute immunity in criminal cases.

2. In the mid-Twentieth Century, courts began recognizing certain limited exceptions to immunity in civil cases. The shift was urged by the Tate Letter, in which the Acting Legal Adviser at the State Department, Jack Tate, advised that the State Department, based on its review of international practice, would begin adhering to the "restrictive theory" of sovereign immunity. Tate Letter, *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711, 714 (1976) (appendix 2 to opinion of White, J.). As the Tate Letter observed, the restrictive theory was justified on the ground that it was "necessary" to "enable persons doing business with [sovereigns] to have their rights determined in the courts," given "the widespread and increasing practice on the part of governments of engaging in commercial activities." *Id.*; *see Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964) (purpose of restrictive theory is "to try to accommodate the interest of individuals doing business with foreign governments in having their legal rights determined by the courts"). That is, the restrictive theory was from the outset a theory of civil law, justified in part by the United States government's willingness to subject itself to "suit in the[] same courts in both *contract and tort*." Tate Letter, *Alfred Dunhill*, 425 U.S. at 714 (emphasis added).

The restrictive theory never applied in criminal cases. The movement in "civil proceedings from an absolute to a restrictive [theory] of State immunity left untouched the position [of absolute immunity] in criminal proceedings." Fox & Webb, *supra*, at

91.   "The exercise of criminal jurisdiction directly over another State infringes international law's requirements of equality and non-intervention." *Id.* "[N]either state [has] any superior jurisdiction to resort to upon earth for justice." 4 William Blackstone, *Commentaries on the Laws of England* 68 (1769).

Statutes codifying the restrictive theory around the world are unanimous on this point.   "Without exception," every nation that has codified the restrictive theory has limited its application to civil cases, whether expressly or by implication.   Fox & Webb, *supra*, at 92.   For example, the South African restrictive theory statute expressly states that it "shall not be construed as subjecting any foreign state to … criminal jurisdiction."   Foreign States Immunities Act 87 of 1981 § 2(3) (S. Afr.).[1]   And the Supreme Court has now concluded that the FSIA codified the restrictive theory for "civil actions against foreign states and their instrumentalities," meaning criminal immunity remains subject to the common law.   S. Ct. Op. at A.273, 281-82.   Likewise, the U.N. Convention on Jurisdictional Immunities of States and Their Property, which (although not in force) "authoritative[ly]" reflects the international law of state immunity, Fox & Webb, *supra*, at 2, adopts the restrictive theory for civil suits but "does not cover criminal proceedings," G.A. Res. 59/38, ¶ 2 (Dec. 2, 2004).

---

[1] *See also, e.g.*, State Immunity Act 1978, c. 33, § 16(4) (UK); State Immunity Act, R.S.C. 1985, c S-18, § 18 (Can.); Foreign States Immunity Law, 5769-2008, § 2 (Isr.); The State Immunity Ordinance, No. 6 of 1981, § 17(2)(b) (Pak.); State Immunity Act 19 of 1979, ch. 313, § 19(2)(b) (Sing.).

The international statutes confirm that the shift towards the restrictive theory occurred only in regards to civil litigation, not criminal prosecution. Indeed, throughout this entire litigation, the government has not identified any case in the United States or anywhere else in which a government has criminally tried a foreign sovereign.

The traditional rule therefore still controls in criminal cases: "[a] state … cannot be prosecuted." Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction of National Courts," *in Research Handbook on Jurisdiction and Immunities in International Law* 205, 207 (Alexander Orakhelashvili ed., 2015); *see also* Restatement (Third) of Foreign Relations Law § 461 cmts. a, c (a foreign state "would not be prosecuted under normal criminal process"; and "[a] state itself is generally not subject to the criminal process of another state"). As a leading English case states, "[a] state is not criminally responsible in international or English law, and therefore cannot be directly impleaded in criminal proceedings." *Jones v. Saudi Arabia* [2006] UKHL 26 [31] (op. of Bingham, L.).

The government itself has adopted that position in other cases. It previously argued in the Southern District that "criminal proceedings [are] categorically different for immunity purposes" because international law "does not recognize the concept of state criminal responsibility." U.S. Statement of Interest 30, *Matar v. Dichter*, No. 05-cv-10270 (S.D.N.Y. Nov. 17, 2006) (cleaned up). And it has asserted the same abroad. When the United States faced potential criminal liability in Spain, for instance, the United States asserted immunity because "no criminal proceedings can be started

against sovereign states." U.S. Br. add. 38, *SerVaas Inc. v. Mills*, 661 F. App'x 7 (2d Cir. Sept. 9, 2014) (No. 14-385).

The government now concedes that "there is a strong customary international law principle against prosecuting a state qua state," and that doing so would be "in derogation of what we understand to be common law immunity." S. Ct. Tr. at A.199, 207. Having conceded this principle, the government instead argues that the common law does not extend criminal immunity to a foreign sovereign's *instrumentalities*. As explained below, this argument has no support in case law or international law.

### B. Entities Owned and Controlled by the Sovereign Are Entitled to the Sovereign's Immunity.

It is a fundamental principle of common law that a sovereign's immunity extends to other sovereign entities, including agencies and instrumentalities. *See, e.g.*, *Schooner Exchange*, 11 U.S. at 144; *Goar*, 688 F.2d at 426; *Ruggiero*, 639 F.2d at 879 (Friendly, J.) ("under the common law in 1791," "a suit against a foreign government or an instrumentality thereof" simply "could not be maintained at all"). The common law of sovereign immunity was shaped by cases about sovereign instrumentalities. The government has pointed to no authority for the proposition that this well-accepted principle operates differently in the criminal context, and the few criminal cases in the United States and abroad involving sovereign instrumentalities confirm that instrumentalities receive their sovereigns' immunity.

1.     At common law, this Nation's courts readily extended sovereigns' immunities to their instrumentalities.  That practice began at the outset and continued through the enactment of the FSIA.

In *Schooner Exchange*, Chief Justice Marshall held that "a public armed ship"—an instrumentality "under the immediate and direct command of the sovereign" and "employed by him in national objects"—was entitled to the same immunities owed to France.  11 U.S. at 144.  Four years later, in *L'Invincible*, the Court held the same as to a vessel operated by French privateers.  14 U.S. (1 Wheat.) 238, 252 (1816).  That the vessel belonged to "private adventurers" was immaterial; "the commission under which [the privateers] acted was the same" as that presented in *Schooner Exchange* and "the same sovereign power which could claim immunities in [*Schooner Exchange*] equally demand[ed] them in" the case of the *L'Invincible*.  *Id.*

These holdings were affirmed a century later in *Berizzi Bros.*  There, despite a State Department suggestion of non-immunity, the Court afforded immunity to a "merchant ship[] owned and operated by a government."  271 U.S. at 573-74.  "[A]ll ships held and used by a government for a public purpose," the Court concluded, received immunity.  *Id.* at 574.  Although many of the earliest cases involved ships, the courts have readily applied the principle to a broad range of instrumentalities, ranging from military units to separately established commercial corporations.  For instance, the Supreme Court's analysis in *Dow* and *Coleman* recognized that foreign armies are entitled to the sovereign's civil and criminal immunity.  *Dow*, 100 U.S. at 165; *Coleman*, 97 U.S.

at 515. And in *Mason v. Intercolonial Railway of Canada*, the Supreme Judicial Court of Massachusetts afforded immunity to the Intercolonial Railway of Canada, "property of his majesty, Edward VII, king of the United Kingdom." 83 N.E. 876, 876-77 (Mass. 1908). The suit was dismissed because a suit against the railroad was "virtually against the king of a foreign country." *Id.* at 877.

As the Eleventh Circuit aptly summarized it, "At common law, suits against foreign sovereigns were not permitted.… The same immunity extended to commercial entities owned by foreign governments." *Arango v. Guzman Travel Advisors*, 761 F.2d 1527, 1534 (11th Cir. 1985). When Congress passed the FSIA, it was therefore well established that sovereign instrumentalities, including corporate instrumentalities, enjoyed the sovereign's immunity. Congress observed that instrumentalities receiving immunity "could assume a variety of forms—a state trading corporation, a transport organization such as a shipping line or airline, or a banking activity." *Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Governmental Rels. of the Comm. on the Judiciary*, 93rd Cong. 39 (1973). Thus, in seeking to codify common and international law of sovereign immunity in the civil context, *Samantar*, 560 U.S. at 319-20; *Permanent Mission of India v. City of N.Y.*, 551 U.S. 193, 199 (2007), the FSIA extended sovereign immunity to instrumentalities by "defin[ing] a 'foreign state' to encompass instrumentalities of a foreign state," S. Ct. Op. at A.272, including "separate legal person[s], *corporate* or otherwise," 28 U.S.C. § 1603(a)-(b) (emphasis added); *see id.* § 1604 (granting immunity).

This practice is reflected in the Restatements of Foreign Relations Law. Both before and since the FSIA's enactment, the Restatements have recognized that a sovereign's immunity extends to sovereign agencies and corporate instrumentalities. Restatement (Fourth) of Foreign Relations Law § 452 (2018) ("For the purposes of foreign sovereign immunity, a foreign state includes the state itself, as well as its political subdivisions, agencies, and instrumentalities."); Restatement (Third) of Foreign Relations Law § 451 (immunity extends to "a state or state instrumentality"); Restatement (Second) of Foreign Relations Law § 66(g) (1965) (immunity extends to "a corporation created under [the sovereign's] laws and exercising functions comparable to those of an agency of the state").

2. International customary and foreign law also extends sovereign immunity to instrumentalities, although the standard for which entities are instrumentalities in other legal systems for civil purposes is different than under U.S. law. The 2004 draft U.N. Convention on State Immunities, for example, extends civil immunity to "agencies or instrumentalities of the State … to the extent that they are entitled to perform and are actually performing acts in the exercise of sovereign authority of the State." U.N. Convention on State Immunities art. 2(1)(b).

Foreign nations that have codified their state-immunity doctrines consistently recognize that foreign sovereign immunity extends to separate entities used by the sovereign as an instrumentality. In the United Kingdom, for instance, "immunities and privileges" in civil cases are extended to a "separate entity" when the proceedings "relate

to anything done by it in the exercise of sovereign authority." State Immunity Act 1978, c. 33, § 14(1)-(2) (UK). Other nations have enacted similar rules.[2]

Each of these rules reflects the fundamental principle that "[a]s a matter of international law, a state is a unitary entity with a single juridical personality," regardless whether "state agencies [and] instrumentalities … possess distinct juridical personalities under domestic law." Brief for Prof. O'Keefe as Amicus Curiae at 5-6, *Türkiye Halk Bankasi A.S. v. United States*, No. 21-1450 (S. Ct. Nov. 21, 2022) ("O'Keefe Br."). Whether a foreign state acts directly in the name of the sovereign or through an instrumentality, the state is "entitled to state immunity under international law." *Id.*

3.       There is no basis to treat instrumentalities differently in the criminal context. It would be anomalous for instrumentalities to not receive the immunity of their sovereign in criminal cases when, in the civil context, the FSIA uses a single operative term—"foreign state"—to cover both sovereigns and instrumentalities. The cases where courts have considered sovereign immunity from criminal jurisdiction at common law support that instrumentalities are entitled to immunity. In two of the three relevant examples, the instrumentalities' immunity was upheld. In the third, the court deferred decision on the immunity question, but did not suggest that an entity's status as an instrumentality made a difference.

---

[2] *See* State Immunity Act, R.S.C. 1985, c S-18, § 2 (Can.); Foreign States Immunity Law, 5769-2008, § 1 (Isr.)); Foreign States Immunities Act 87 of 1981 § 1(2) (S. Afr.); State Immunity Act 19 of 1979, ch. 313, § 16(1) (Sing.).

The only known adjudication of a sovereign instrumentality's criminal immunity from prosecution arose in France in 2004. There, the highest French criminal court upheld a corporate instrumentality's sovereign immunity and ordered an indictment dismissed. *Agent judiciare du Trésor v. Malta Maritime Authority and Carmel X*, Cour de cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004, Bull. Crim., No. 04-84.265 (Fr.). The court concluded that the Malta Maritime Authority—an independent state corporation of the Maltese government charged with operating Maltese ports—was an instrumentality and that "the rule of customary international law which bars proceedings against States before the criminal courts of a foreign State extends to organs and entities that constitute emanations of the State." *Id.*[3]

In *In re Investigation of World Arrangements*, 13 F.R.D. 280 (D.D.C 1952), the government attempted to enforce a grand jury subpoena against "Anglo-Iranian Oil Company, Ltd." for possible criminal antitrust violations. *Id.* at 288. The British government owned only 35% of Anglo-Iranian's capital, but effectively controlled it through super-voting shares. *Id.* at 288-89. Despite the company's separate juridical status and functions as an oil company, which included providing oil for use by the Royal Navy, the court held that "the corporation, Anglo-Iranian Oil Company, is

---

[3] The court's opinion is available only in French, but Prof. O'Keefe provided a translation of the relevant language in his amicus brief before the Supreme Court. O'Keefe Br. 12 & n.7. For the Court's convenience, Halkbank quotes the O'Keefe translation.

indistinguishable from the Government of Great Britain." *Id.* at 291. The court held that "sovereign immunity is extended to Anglo-Iranian," quashed the subpoena, and concluded that "[t]he consequences of a successful prosecution of Anglo-Iranian here would in reality be to charge and find the British Government guilty of violating a law of the United States, which imposes criminal penalties."

Finally, in *In re Grand Jury Investigation of the Shipping Industry*, 186 F. Supp. 298 (D.D.C. 1960), a separate district court considered whether to quash a grand jury subpoena issued to "Philippine National Lines," "an instrumentality of the Philippine Government." *Id.* at 318. The court ultimately declined to decide the immunity issue pending additional factual development, including whether the Philippine National Lines was itself a target of criminal prosecution or whether the grand jury would simply "use the information to indict others." *Id.* at 319-20. The court nowhere suggested that criminal immunity was limited to the state itself rather than instrumentalities.

The government has no authority that instrumentalities are denied sovereign immunity in criminal cases. Before the Supreme Court, the government cited a hodgepodge of authority, U.S. Br. 16-19, No. 21-1450 (S. Ct. Dec. 14, 2022), but none involved any sovereign anywhere in the world criminally trying another sovereign's instrumentality. And none considered the common law of sovereign immunity.

One of the government cases confirms the commonsense understanding, reflected in the FSIA, that a corporation "owned and controlled by a foreign government" is an "instrumentality." *First Nat'l City Bank v. Banco Para El Comercio*

*Exterior de Cuba*, 462 U.S. 611, 620 (1983). Other cases involved waiver, either by the sovereign that controlled the instrumentality, *see Bank of the U.S. v. Planters' Bank of Ga.*, 22 U.S. 904, 907 (1824), or by the instrumentality itself via a plea agreement, Joint Plea Mem. 4-6, *United States v. Armaments Corp. of S. Afr.*, 91-cr-602-1 (E.D. Pa. Feb. 18, 1997); *United States v. Aerlinte Eireann*, 89-cr-647, D. Ct. Doc. 12 (S.D. Fla. Oct. 6, 1989). A few involved the enforcement of grand jury *subpoenas* against sovereign instrumentalities, which do not raise remotely the dignitary harms or stakes of a criminal prosecution. *See, e.g.*, *In re Grand Jury Subpoena*, 912 F.3d 623, 625 (D.C. Cir. 2019) (per curiam); *In re Grand Jury Proceeding Related to M/V Deltuva*, 752 F. Supp. 2d 173, 176-80 (D.P.R. 2010).

None of the cases remotely suggests that the "strong customary international law principle against prosecuting a state" does not apply to a state's instrumentalities. S. Ct. Tr. at A.199. As *Schooner Exchange* and subsequent cases show, the law of sovereign immunity is shaped and formed by cases involving sovereign instrumentalities.

4. Instrumentalities are entitled to foreign sovereign immunity when they are owned and used by the sovereign. This test has been essentially consistent for more than 200 years. In *Schooner Exchange*, the Supreme Court extended immunity to an instrumentality "under the immediate and direct command of the sovereign" and "employed by him in national objects." 11 U.S. at 144. A century later, the Court reaffirmed immunity for an instrumentality "owned and operated by a government." *Berizzi Bros.*, 271 U.S. at 573; *see, e.g.*, *Compania Espanola de Navegacion Maritima, S.A. v.*

*The Navemar*, 303 U.S. 68, 75-76 (1938) (holding that a vessel not "in the possession" of the sovereign not entitled to immunity); *Coale v. Société Co-op. Suisse des Charbons*, 21 F.2d 180, 181 (S.D.N.Y. 1921) (no immunity when foreign state held minority of seats on board of corporation). The FSIA subsequently simplified the standard for civil cases, making a corporation an instrumentality if it was majority-owned and incorporated under the sovereign's laws, 28 U.S.C. § 1603(b)(2)-(3)—readily determinable criteria that capture ownership and control.

Courts sometimes also mentioned the sovereign's use of the entity for a "public purpose." *E.g.*, *Berizzi Bros.*, 271 U.S. at 574. But those courts viewed public purpose broadly. And they were deferential to the sovereign's views as to what qualified as a public purpose. *Id.*; *see* Restatement (Second) of Foreign Relations Law § 66 cmt. a (noting that in determining whether agency or corporation is an instrumentality, "the views of the government creating the [entity] are given great weight"). In *Oliver American Trading Co. v. Government of the United States of Mexico*, 5 F.2d 659 (2d Cir. 1924), for example, this Court granted immunity to the National Railways of Mexico, an entity "in the *possession* of the Mexican government, and [that] has been c*ontrolled* and *operated* by Mexico since 1914." *Id.* at 661 (emphases added). This Court also noted that the railroad was held "for national purposes," *id.*, but clarified that the issue was Mexico used the railroad "in the performance of *what it considers* a governmental function." *Id.* at 667 (emphasis added). In so ruling, this Court was echoing the reasoning of the district court in *The Maipo*, which viewed it as "the business of the Republic of Chile"

whether that government "considers it a governmental function to go into the carrying trade." 259 F. 367, 368 (S.D.N.Y. 1919).

In all events, the Supreme Court has twice concluded that facilitating commerce *is* a public purpose sufficient to be a basis for sovereign immunity. In *Berizzi Bros.*, the instrumentality's purpose was general commerce, or "advancing the trade of [the sovereign's] people." 271 U.S. at 574. Twelve years after *Berizzi Bros.*, in *The Navemar*, the Supreme Court reaffirmed that a merchant ship owned by a sovereign—i.e., "a vessel of a friendly government in its possession and service … , even though engaged in the carriage of merchandise for hire"—is an instrumentality entitled to immunity so long as it is owned and possessed by the sovereign. 303 U.S. at 74. In so holding, the Supreme Court drew on a line of cases holding that vessels engaged in commerce were entitled to immunity. *See, e.g.*, *The Adriatic*, 258 F. 902, 903 (3d Cir. 1919) (charter ship "requisitioned for government service" immune); *The Maipo*, 259 F. at 368 (vessel engaged in "carrying trade" immune because "the Republic of Chile considers [that to be] a governmental function"); *The Roseric*, 254 F. 154, 159 (D.N.J. 1918) (similar).

Although cases frequently involved vessels, corporations are classic sovereign instrumentalities. As the Supreme Court stated in *First National City Bank*, a "*typical* government instrumentality*" is "run as a distinct economic enterprise" from the state. 462 U.S. at 624 (emphasis added) (Cuban instrumentality). Thus, in *F. W. Stone Engineering Co. v. Petroleos Mexicanos of Mexico, D. F.*, the Supreme Court of Pennsylvania afforded immunity to Petroleos Mexicanos, a corporation "wholly owned and

controlled by [the Mexican] Government … for the purpose of operating and developing for oil properties in Mexico." 42 A.2d 57, 59 (Pa. 1945). The court found it "irrelevant … that the foreign instrumentality conduct[ed] a commercial enterprise which, it was contemplated, would show a profit" and of no "significance that the governmental instrumentality [was] a separate corporation." *Id.* at 60. The "attendant right to sovereign immunity" attached. *Id.* at 58; *see also Mason*, 83 N.E. at 877 (Canadian railway); *Bradford v. Dir. Gen. of R.Rs. of Mex.*, 278 S.W. 251, 251-52 (Tex. Civ. App. 1925) (director of government-owned "corporations [that] owned the railroads" immune); *Dunlap v. Banco Central Del Ecuador*, 41 N.Y.S.2d 650, 652 (Sup. Ct. 1943) (defendant corporation five-elevenths owned by government and "engaged in private banking transactions" received immunity at least for work on behalf of Ecuador).

These cases are consistent with the treatment of domestic instrumentalities, as the Supreme Court recently reaffirmed. Federal- and state-owned corporations are "part of the Government." *Biden*, 143 S. Ct. at 2367 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)). They share their sovereign's status absent waiver, *see Thacker v. TVA*, 139 S. Ct. 1435, 1442 (2019), even when engaged in "commercial and business transactions," *see FHA v. Burr*, 309 U.S. 242, 244-45 (1940).[4]

---

[4] Domestic instrumentalities are often subject to suit in U.S. courts because they have waived their immunity through so-called "sue and be sued" clauses. Such clauses play no role in waiving *foreign* sovereign immunity because "courts considering a bare 'sue and be sued' clause in the contexts of foreign and state sovereign immunity have arrived at the same conclusion: the clause constitutes a waiver of immunity (if at all) *only in the*

The Supreme Court has applied these principles to Amtrak, *see Lebron*, 513 U.S. at 395, and recently to a corporation created by Missouri to participate in the student loan market, *Biden*, 143 S. Ct. at 2365-66 (holding the corporation, MOHELA, "is an instrumentality of Missouri").  There is no bar on instrumentality status for domestic corporations just because they engage in commerce.  The Supreme Court has considered "the organization and functions of federal land banks"—which loan money to farmers, not unlike Halkbank—"and … declare[d] that they are instrumentalities of the federal government, engaged in the performance of an important governmental function."  *Fed. Land Bank of St. Louis v. Priddy*, 295 U.S. 229, 231 (1935); *see* 31 U.S.C. § 9101 (listing 26 categories of U.S.-government corporations).

As a matter of the common law for both foreign and domestic instrumentalities, a corporation owned and controlled by a sovereign is an instrumentality that shares in the sovereign's immunity.

### C. Halkbank Is Entitled to Türkiye's Immunity.

1. Halkbank is entitled to the same immunity as Türkiye at common law because it is owned and controlled by the Republic of Türkiye.  Here, the sovereign's views could not be clearer.  *See* Restatement (Second) of Foreign Relations Law § 66 cmts. a, c (noting that, although "not necessarily conclusive," in determining whether

---

*courts of the sovereign*."  *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 87 (2d Cir. 2001) (collecting cases).

agency or corporation is an instrumentality, "the views of the government creating the [entity] are given great weight"). Türkiye considers the bank "an arm of the state" that is "indistinguishable from the government itself." Türkiye Br. 2. Halkbank should therefore be afforded instrumentality status.

Halkbank is a quintessential sovereign instrumentality—created, owned, controlled, and used by Türkiye to perform sovereign functions. The bank was created by the Turkish Legislature by statute and was created to further the goals of the state, which it has done since its incorporation. *See supra* pp.5-7. There is no dispute that the bank has at all times been wholly or majority-owned by the Turkish government. Türkiye Br. 2-3, 5-6.

Türkiye's control over the bank is also beyond debate. The Turkish state "controls the corporation by reason of its ownership of the greater portion of the voting stock," *In re Investigation of World Arrangements*, 13 F.R.D. at 290, which under Turkish Law No. 4603, are exercised by the Minister of Treasury and Finance, Türkiye Br. 7. But Türkiye's oversight is far more extensive than simply being Halkbank's majority shareholder. The central government appoints the Bank's board members and senior leadership, and "determine[s] the procedures and principles for Halkbank's structure." *Id.* at 5, 6-7. Indeed, the Turkish Constitution *requires* government oversight of Halkbank. The bank is considered a "public institution," subject to mandatory government oversight. Turk. Const. art. 165; *see* Türkiye Br. 4. Halkbank is

unquestionably "under the immediate and direct command of the sovereign." *Schooner Exchange*, 11 U.S. at 144.

2.     To the extent the Court considers a public purpose relevant, Halkbank easily meets that standard given the sovereign activities it is asked to perform.  The Turkish Constitution mandates that its government develop and regulate the financial markets, including through commercial banking.     Article 166 of the Turkish Constitution calls on the Turkish state to play an active role in economic regulation and growth.  Türkiye Br. 3.  The government is to ensure "economic, social and cultural development."  *Id.*  In so doing, the State is specifically charged with regulating and developing conduct related to banking, such as "increas[ing] national savings and production, … stabil[izing] prices and balance in external payments, [and] promot[ing] investment and employment."  Turk. Const. art. 166.  The subsequent article, Article 167, is even more focused on the banking sector, obligating the state to "take measures to ensure and promote the sound and orderly functioning of the markets for money, credit, capital, goods and services."  Turk. Const. art. 167.  Türkiye has chosen to use Halkbank and other state-owned banks to meet those constitutional obligations.

Beyond that, Halkbank regularly performs sovereign functions akin to what government agencies perform in this country, including financing national-development projects, furthering governmental social services programs, and functioning as a "[nationwide] institutional conduit[] of government policy."  *Supra* pp.6-7 (quoting *Credibility & Class, supra*, at 1301-02).  Using funds provided by the

Turkish state, Halkbank extends loans to tradespeople, including shop owners and craftspeople. *Supra* p.5; Türkiye Br. 4. During the pandemic and other national emergencies, Halkbank provided state-sponsored funding and relief to the public. *Supra* p.5. The Turkish government even relies on its state banks to serve as tax collectors, including the collection of customs duties, which constitute over 20% of the government's tax income. *Supra* p.7.

    3. Although consideration of the alleged acts underlying the indictment is not necessary to determine whether Halkbank serves public purposes, those allegations only reinforce that Halkbank is part of the Turkish state, subject to the state's control, and regularly used by the sovereign for public, sovereign purposes. The indictment states plainly that Halkbank is "organized under the laws of" Türkiye and is majority owned by the Turkish state. A.22. It makes clear that Halkbank was the "sole repository of proceeds from the sale of Iranian oil" to Türkiye, selected by the Turkish government for this sovereign undertaking after bilateral engagement between the United States and Türkiye. A.23.

    It further alleges that the Turkish government directed Halkbank's participation in the alleged scheme and that the scheme served public ends for the Turkish state. The Turkish Minister of Economy is alleged to have "directed that the … scheme should be conducted through Halkbank," A.37, and Turkish government officials "approved of and directed" the creation of a fake food scheme, A.45, ordered that Zarrab's

transactions increase, A.43, and "instructed Halkbank to resume the scheme" after it was interrupted by Turkish police, A.51.

Importantly, the indictment specifically claims that the alleged scheme "benefit[ed] the Government of Turkey." A.34. It asserts that a purpose of the scheme was to "artificially inflate Turkey's export statistics, making its economy appear stronger than it in fact was," *id.*, and claims that the transactions resulted in multi-billion dollar increases in Turkish export figures to the UAE and Iran, A.35. These allegations target the conduct of the Turkish government and directly implicate the Turkish Constitution's requirement that the government promote exports in order to maintain "balance in external payments." Turk. Const. art. 166.

To paraphrase the Supreme Court's recent discussion of a state-chartered student-loan corporation, "[b]y law and function, [Halkbank] is an instrumentality of [Türkiye]: It was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State." *Biden*, 143 S. Ct. at 2366. This prosecution, if ultimately successful, would "impair" Halkbank's ability to operate and, in doing so, "is necessarily a direct injury to [Türkiye] itself." *Id.*; *see* U.N. Convention on State Immunities art. 6(2)(b) (stating that immunity attaches to a proceeding when the State "is not named as a party to the proceeding but the proceeding in effect seeks to affect the property, rights, interests or activities of that … State").

## II. Even if the Now-Defunct Restrictive Theory as Understood at Common Law Had Applied in Criminal Proceedings, Halkbank Would Still Be Entitled to Immunity.

In the mid-Twentieth Century, this Nation's courts began applying the restrictive theory of immunity in civil cases, but that change had no effect whatsoever on the immunities owed sovereigns and their instrumentalities from criminal process. That makes sense, as the restrictive theory was driven by a perceived need to let "individuals doing business with foreign governments … hav[e] their legal rights determined by the courts." *Victory Transp.*, 336 F.2d at 360; *see* Tate Letter, *Alfred Dunhill*, 425 U.S. at 714. And it is confirmed by Congress's passage of the FSIA, which codified the restrictive theory but "govern[s]" only "civil actions." S. Ct. Op. at A.273. The restrictive theory thus has no impact on this case.

But even if the restrictive theory at common law remained viable and applied in criminal cases, Halkbank would still be entitled to immunity for two reasons. *First*, at common law, the restrictive theory directed courts in civil cases to distinguish between "*public*" acts, where immunities would attach, and "*private*" acts, where immunities would not. *Victory Transp.*, 336 F.2d at 359 (emphases added). Under this Court's law, Halkbank is being prosecuted for public acts undertaken as part of its sovereign obligations. *Second*, the restrictive theory applied only to a sovereign entity's "activit[ies] *outside* [the] territory" of the sovereign. Restatement (Second) of Foreign Relations Law § 69 (emphasis added). That is, the restrictive theory would only have limited sovereign-immunity protections for actions taken by Halkbank *outside* Türkiye.

## A. The Restrictive Theory Maintained Immunity for the "Public" Acts Halkbank Is Accused of Taking in This Case.

In civil cases at common law, the restrictive theory protected "the interest of foreign governments in being free to perform certain political acts without undergoing the embarrassment or hindrance of defending the propriety of such acts before foreign courts." *Heaney*, 445 F.2d at 503 (quoting *Victory Transp.*, 336 F.2d at 360). That is, unlike any possible "public purpose" element of the standard for determining whether an entity is an instrumentality, which focuses on the entity's general functions, the restrictive theory looked at the entity's "acts." *Id.*

In evaluating whether such acts were public/political, the Court relied on the purpose of the act, observing in *Heaney* that a contract to create adverse publicity was "political or public" and "diplomatic activity," because the contract was for the sovereign's purpose of trying "to oust the second government from an area in which the contracting nation has a putative national interest." *Id.* (quoting *Victory Transp.*, 336 F.2d at 360); *see Victory Transp.*, 336 F.2d at 359 (viewing it as "rather astonishing" that commercial contracts for public purposes would not be subject to immunity). In this regard, common law in this Court differed from the FSIA under which, as this Court's prior opinion emphasized, what controls is "the nature of the course of conduct or particular transaction or act, rather than … its purpose." 2d Cir. Op. at A.142 (quoting 28 U.S.C. § 1603(d)). Instead of applying a strict governmental/commercial distinction, this Court said that even in the absence of a suggestion of immunity, it would uphold

immunity at least for acts in "the following categories: (1) internal administrative acts, such as expulsion of an alien[;] (2) legislative acts, such as nationalization[;] (3) acts concerning the armed forces[;] (4) acts concerning diplomatic activity[; and] (5) public loans." *E.g.*, *Victory Transp.*, 336 F.2d at 360.

Here, Halkbank's alleged conduct plainly constitutes the sort of "public" and "political" acts protected under the restrictive theory at common law—whether the Court focuses on the purposes behind the acts or the acts themselves. Halkbank was engaged in a uniquely sovereign function—the intermediation of the proceeds of sales of oil and gas from Iran to Türkiye—that served numerous public and political purposes, most notably providing needed energy to Türkiye in light of the Republic's relationship with the United States and the United States' relationship with Iran. *See* 2d Cir. Op. at A.143-45 (rejecting similar argument because the FSIA focuses on the nature, rather than purpose, of acts performed).

The indictment further focuses on "internal administrative acts" by the Turkish state taken by government officials and employees at a state-owned bank. The indictment alleges that Türkiye designated Halkbank to be the "sole repository of proceeds from the sale of Iranian oil." A.23. Because sanctions made it "difficult for Iran to access these funds," certain government officials "directed" that Halkbank "allow[] the proceeds … to be used to buy gold for the benefit of the Government of Iran"; "allow[] the proceeds … to be used to buy gold that was not exported to Iran"; and "facilitat[e] transactions" purporting to be for food and medicine. A.20-21, 37.

40

The government alleges that even the directions to transfer funds served political and public ends. Specifically, the indictment asserts that the alleged scheme would "benefit the Government of Turkey" by "artificially inflat[ing] Turkey's export statistics, making its economy appear stronger than it in fact was." A.34. Such conduct is not only indisputably public and political in nature, it also serves the Turkish government's constitutional mandate to maintain preferable trade balances—i.e., "balance in external payments." Turk. Const. art. 166.

The indictment likewise focuses on "acts concerning diplomatic activity," *Victory Transp.*, 336 F.2d at 360, under which the term "diplomatic" is meant "in the broad sense of the word," *Heaney*, 445 F.2d at 503 n.3. The indictment includes a charge based on alleged misrepresentations made to U.S. government officials about Halkbank's actions in safeguarding Türkiye's compliance with the U.S. government's sanctions restrictions. A.20, 40. Those discussions between agents of the U.S. government and employees of a Turkish state-owned bank about the sovereigns' bilateral relations are also the sort of "public" acts this Court's restrictive theory caselaw protects.

## B. The Restrictive Theory Maintained Immunity for Halkbank's Acts in Sovereign Turkish Territory.

The indictment focuses extensively on "activities outside the United States—Halkbank's [alleged] participation in schemes to launder Iranian oil and gas proceeds through non-U.S. transactions." 2d Cir. Op. at A.143-44. Those actions are alleged to

have occurred in Türkiye—i.e., within the territory of the Turkish sovereign. The restrictive theory would not have reached such conduct.

The conceptual core of sovereign immunity law is, as Chief Justice Marshall described it, that "full and absolute territorial jurisdiction [is] alike the attribute of every sovereign." *Schooner Exchange*, 11 U.S. at 137. The question of sovereign immunity is what limitations (if any) does the sovereign put on its sovereignty when it "enters th[e] territory" of another sovereign. *Id.* Thus, when the sovereign "acquir[ed] private property *in a foreign country*," Chief Justice Marshall, "[w]ithout indicating any opinion on the question," posited that the sovereign in that instance "*may possibly* be considered as subjecting *that property* to the territorial jurisdiction." *Id.* at 145 (emphases added).

Later, when courts considered the restrictive theory, they did so as applying to "agencies of foreign governments engaged in ordinary commercial transactions *in the United States*." *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 200 (S.D.N.Y. 1929) (emphasis added); *see Wulfsohn v. Russian Socialist Federated Soviet Republic*, 138 N.E. 24, 25 (N.Y. 1923) (immunity for "an exercise of sovereignty within its own territories"). Accordingly, the restrictive theory of sovereign immunity in civil cases limited a sovereign's immunity from suit for only "commercial activity *outside its territory*." Restatement (Second) of Foreign Relations Law § 69 (emphasis added).

That restriction is consistent with American law's reluctance to "impose the sovereign will of the United States onto conduct occurring within the territorial jurisdiction of another sovereign." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 121

42

(2013).  Here, the government would "impose the sovereign will of the United States onto conduct" *by a sovereign entity* in "the territorial jurisdiction" of *the sovereign. Id.*  Such conduct cannot be squared with sovereign immunity being a "doctrine deeply rooted in the principles of sovereign consent and reciprocity."  *Garb*, 440 F.3d at 585 (citing *Schooner Exchange*, 11 U.S. at 136-37); *see Nat'l City Bank*, 348 U.S. at 362.  As offensive as any criminal prosecution of a sovereign entity is, prosecuting a sovereign entity for actions undertaken in the sovereign's territory is particularly offensive.  One can fairly question how the federal government would react to a foreign government indicting a U.S. agency or instrumentality for actions taken in the United States.

As a result, the restrictive theory would not save the government's charges from dismissal on sovereign-immunity grounds.  The theory has never been relevant in criminal cases, and has been displaced in civil cases by the FSIA.  But the theory would nevertheless result in immunity being applied here.  The bank transfers at issue were between bank accounts in Türkiye—i.e., in the territory of the sovereign whose immunity is being asserted.  And all of the alleged activities were further to public, political, and diplomatic ends of the Turkish state.

III.   **The Executive Is Not Entitled to Deference on Immunity Issues in Criminal Cases.**

Deferring to the Executive on whether an entity is entitled to immunity in a criminal case would mean that there would be no such thing as sovereign immunity in a criminal case.  There would not be a criminal case without the Executive having first

43

made the decision to charge the defendant. Deferring to the Executive on immunity in a criminal case would also be unprecedented. It would violate fundamental separation-of-powers principles and basic notions of fairness, granting the Executive the powers of the Legislative and Judicial Branches and making Halkbank's prosecutor into its judge and jury on a key jurisdictional safeguard. Indeed, applying deference in this case would even exceed the bounds in which deference has been applied in civil cases.

### A. Deferring to the Executive in Criminal Proceedings Is Unprecedented.

1. No court has previously deferred to the Executive on sovereign immunity in a criminal case. The alternative holding in the district court and the vacated portion of this Court's prior decision are the first time courts suggested deference would be appropriate. *See* 2d Cir. Op. at A.147; A.112.[5]

In the only two pre-FSIA cases in which the government attempted to subject sovereign entities to criminal process, the courts did not give the Executive deference.

In *In re Investigation of World Arrangements*, the government sought to enforce a grand jury subpoena against Anglo-Iranian Oil Co. Ltd, an oil company controlled and partly owned by the British government. 13 F.R.D. at 288-89. The court disregarded

---

[5] The Eleventh Circuit appears to have applied deference, at least as an alternative holding, in *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997). But that case involved head-of-state immunity, not sovereign immunity, *id.* at 1211-12, where deference to the Executive has been considered consistent with its Article II recognition powers, *Yousuf v. Samantar*, 699 F.3d 763, 772 (4th Cir. 2012).

entirely that the government was the party that had served the subpoena. Instead, it concluded that "Anglo-Iranian Oil Company ... is indistinguishable from the Government of Great Britain," and that prosecuting Anglo-Iranian "would in reality be to charge and find the British Government guilty of violating a law of the United States, which imposes criminal penalties." *Id.* at 291.

Later, in *In re Grand Jury Investigation of the Shipping Industry*, the State Department had opined that Philippine National Lines was not entitled to immunity because the instrumentality was "engaged in commercial activities." 186 F. Supp. at 318. The district court, however, did not adopt that position. *See id.* at 319. Instead, it reserved decision pending additional factfinding. *Id.* at 319-20.

That is how immunity determinations should be made in all cases involving criminal process, especially prosecutions. Sovereign immunity is a "principle of public *law.*" *Schooner Exchange*, 11 U.S. at 145-46 (emphasis added). For that reason, in *Schooner Exchange*, Chief Justice Marshall acknowledged the Executive's views as to the immunity in question only after first independently determining that, based on the law of nations, the vessel was entitled to immunity. *Id.* at 146-47. For the next 150 years, courts across the country followed suit, independently determining the scope and application of common-law immunity in all cases. *See, e.g.*, *Oliver Am. Trading*, 5 F.2d at 666-67; *Mason*, 83 N.E. at 877.

In so doing, courts—including the Supreme Court—have applied immunity to foreign sovereign litigants over the disagreement of the Executive. Most notably, in

proceedings concerning the Pesaro, a commercial ship owned by the Italian government, the State Department declined to recognize the vessel's claim of immunity, maintaining that "government-owned merchant vessels or vessels under the requisition of governments whose flag they fly employed in commerce should not be regarded as entitled to the immunities accorded public vessels of war." *The Pesaro*, 277 F. 473, 473-74, 479 n.3 (S.D.N.Y. 1921). When the merits of the immunity claim eventually reached the Supreme Court in *Berizzi Bros.*, however, the Court determined that the vessel was entitled to immunity, rejecting the Executive's position. 271 U.S. at 574, 576.

International practice agrees. "In virtually every other country in the world, sovereign immunity is a question of international law decided *exclusively by the courts* and not by institutions concerned with foreign affairs." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Administrative Law and Governmental Relations of the H. Comm. on the Judiciary*, 94th Cong. 27 (1976) (Statement of Monroe Leigh, Legal Adviser, U.S. Dep't of State) (emphasis added).

The government's view that it is entitled to deference in a criminal case against a sovereign entity has no precedent in either U.S. or international practice.

**B.    Deferring to the Executive in a Criminal Case the Government Has Brought Offends Core Principles of Divided Government and Fundamental Fairness.**

1.    The government's request for deference is an attempt to usurp the power of its coordinate branches. No less a source than President Madison wrote in The Federalist No. 47 that "[t]he magistrate in whom the whole executive power resides"

46

can neither "make a law" nor "administer justice in person." Federalist No. 47 at 303 (James Madison) (Clinton Rossiter ed. 1961). Putting those three powers "in the same hands … may justly be pronounced the very definition of tyranny." *Id.* at 301.

Common-law immunity "is a 'rule of substantive law governing the exercise of the jurisdiction of the courts.'" S. Ct. Op. at A.271 (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)). It is "not the Executive Branch[] that makes the law." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). Rather, "making law … requires joint action by the Executive and Legislative branches." *Medellin v. Texas*, 552 U.S. 491, 527 (2008). No matter what powers the Executive may have in the areas of foreign policy, it cannot on its own rewrite an area of law, be it immunity law or any other. *See id.* at 525-26 (holding that the President lacks the authority to "unilaterally convert[] a non-self-executing treaty into a self-executing one").

The Executive similarly has no power to decide questions of immunity in particular cases and controversies. That authority remains vested exclusively in the Judiciary. As the Tate Letter acknowledged, "a shift in policy by the executive cannot control the courts." Tate Letter, *Alfred Dunhill*, 425 U.S. at 714. This does not mean the Executive's views on foreign affairs never receive deference. Courts accept, for example, the President's determination whether to recognize a particular state. But they "draw for themselves [that recognition's] legal consequences in litigations pending before them." *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938). That is

because courts, not the Executive, decide "matters of common law"—"the mundane as well as the glamorous." *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (citation omitted).

2. The government claims not only that the Executive can usurp the roles of the Judicial and Legislative Branches, but also that, in a criminal case presenting the issue of sovereign immunity, it has the powers to enforce the law as prosecutor, to determine the substantive law as judge, and then to find the facts regarding the defense's application as jury. That astonishing assertion is not consistent with fundamental notions of fairness.

Although "the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *United States v. Texas*, 143 S. Ct. 1964, 1971 (2023) (internal quotation marks omitted), it is fundamental to the criminal justice system that defendants are able to meaningfully contest the government's accusations against them, *see Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). That is impossible if the prosecution's charging decision would determine claims of immunity. Applying deference is not a procedure consonant with rudimentary notions of justice.

## C. Even if This Case Were Brought by a Private Litigant, Deference Would Be Unwarranted.

Deference to the Executive in this circumstance would be unprecedented even if this were civil litigation. Although the language in favor of deference in civil cases at

common law is often broadly stated, *e.g.*, *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009), the deference afforded has been narrower and not applicable here.

1.    Deference to Executive determinations is most associated with two Supreme Court cases decided in the middle of World War II.  In *Ex parte Peru*, decided in 1943, the Supreme Court held that immunity would apply to an *in rem* proceeding regarding a steamship belonging to Peru because Peru and the State Department had negotiated a resolution to the dispute.  318 U.S. 578, 579-80, 587, 589 (1943).  The Court further stated in dicta that "courts are required to accept and follow the executive determination *that the vessel is immune*."  *Id.* at 588 (emphasis added).  As the Court observed, however, "the district court, in the absence of recognition of the immunity by the Department of State, had authority to decide for itself whether all the requisites for such immunity existed."  *Id.* at 587 (citing, inter alia, *Berizzi Bros.*, 271 U.S. 562).

Two years later, in *Republic of Mexico v. Hoffman*, the Court considered whether immunity was owed to a vessel owned, but not possessed, by a foreign government. 324 U.S. at 33-34.  Although Mexico sought immunity, numerous cases had held that immunity required both ownership *and* possession, and the State Department agreed. *Id.* at 36-38.  Accordingly, the Court concluded the vessel was not entitled to immunity. *Id.* at 38.  The Court further observed in dicta that courts should not "allow an immunity on new grounds which the government has not seen fit to recognize."  *Id.* at 35; *see id.* at 36, 38.  That is, "the overwhelming weight of authority" required possession as well as ownership, *id.* at 38, and the Court suggested that the fact that "the State Department

49

had declined to recognize the immunity" absent possession was "an important reason" against expanding immunity into an area where it previously had not been recognized at common law, *id.* at 35 n.1.

Here, by contrast, the immunity demanded reflects the historical practice that sovereign entities receive absolute immunity from criminal jurisdiction, *Schooner Exchange*, 11 U.S. at 137; *see Dow*, 100 U.S. at 165; *Coleman*, 97 U.S. at 515, and that entities owned and operated by the sovereign are entitled to immunity, *e.g.*, *The Navemar*, 303 U.S. at 74; *Berizzi Bros.*, 271 U.S. at 574. Halkbank is not asking this Court to extend immunity to "new grounds" at all.

This Court has acknowledged that the language in *Hoffman* "has been variously construed," but the Court has (like others) sometimes expressed in broad terms the amount of deference owed to views expressed by the State Department, saying in dicta that the language in *Hoffman* "means at least that the courts should deny immunity where the State Department has indicated, either directly or indirectly, that immunity need not be accorded," and that "the State Department's failure or refusal to suggest immunity is significant." *Victory Transp.*, 336 F.2d at 358, 360; *see also, e.g.*, *Matar*, 563 F.3d at 14 ("Prior to the enactment of the FSIA, we 'deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities.'" (quoting *Verlinden*, 461 U.S. at 486)).

2.     In practice, however, the deference afforded has been limited.  We are not aware of a decision by the Supreme Court, this Court, or any other federal court of appeals deferring to a denial of immunity by the Executive to reject a previously recognized form of immunity.  In fact, we are not aware of a federal appellate court applying deference to deny immunity at all.[6]  Whether a court should defer to the Executive's *denial* of immunity is a matter of first impression in this Court.

This Court has deferred to the Executive's immunity determinations only when the government has urged the Court to grant immunity.  *See Matar*, 563 F.3d at 14; *Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198, 1199, 1201 (2d Cir. 1971).  The Supreme Court has similarly described "a two-step procedure."  *Samantar*, 560 U.S. at 311.  The first was that the sovereign "could request a suggestion of immunity from the State Department.  If the request was granted, the district court surrendered its jurisdiction."  *Id.* (internal quotation marks and citations omitted).  The sovereign, however, could choose to proceed in court.  "[I]n the absence of recognition of the immunity by the Department of State,' a district court *'had authority to decide for itself* whether all the requisites for such immunity existed."  *Id.* (emphasis added) (quoting *Ex parte Peru*, 318 U.S. at 587).  In those adjudications, "the State Department's failure

---

[6] Some *district* courts in this Circuit have deferred to the State Department's decisions to decline immunity in civil cases.  *See, e.g.*, *Amkor Corp. v. Bank of Korea*, 298 F. Supp. 143, 144 (S.D.N.Y. 1969).

or refusal to suggest immunity" was only "a significant factor to be taken into consideration." *Heaney*, 445 F.2d at 503.

Deferring only to *grants* of immunity makes sense given the purposes of deference. From the beginning, the Supreme Court framed deference as a tool to *avoid* friction with a foreign power. In *Ex parte Peru*, the Court posited that exercising jurisdiction over a foreign sovereign "is so serious a challenge to its dignity, and may so affect our friendly relations with it, that courts are required to accept and follow the executive determination *that the vessel is immune*." 318 U.S. at 588 (emphasis added). Granting immunity at the Executive's request acknowledged "that our national interest will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through diplomatic negotiations rather than by the compulsions of judicial proceedings." *Id.* at 588-89. It goes to reason that those "relations with a friendly foreign power" would be particularly harmed if a court wrongly denied immunity and "violated the rights of another state under international law." Restatement (Second) of Foreign Relations Law § 69 reporter's note 1 (discussing *Ex parte Peru* and *Hoffman*).

Those purposes are obviously not served by deferring to the Executive's *denial* of immunity. In *Hoffman*, the Court suggested deference to a denial of immunity may be justified because creating new "principles" underlying immunity "may be equally embarrassing" to the Executive. 324 U.S. at 35-36. But that justification is, as the Court

acknowledged, limited to the unique circumstance of a court applying immunity in ways foreign to existing law. That obviously is not the case here.

Nor is there a constitutional basis to defer. Deference may be warranted in connection with immunities deriving directly from the Executive's Article II powers to recognize diplomats or governments—i.e., "diplomatic immunity" or "head-of-state immunity." *Yousuf*, 699 F.3d at 772. Outside those contexts, and despite the Executive's assertion that it was entitled to blanket deference, *id.* at 769, the Fourth Circuit held that the Executive's role in civil cases is limited to advising the courts on "the diplomatic effect" of a ruling on immunity. *Id.* at 773. In those instances, "courts respect, but do not automatically follow, the views of the Executive Branch." *Id.*

Deferring to the Executive in a criminal proceeding would be unprecedented. It would essentially mean there is no immunity in criminal cases. In any event, the deference the government seeks here would even be an expansion of the deference it has received from this Court in civil cases.

## IV. Criminal Prosecutions of Sovereign Entities Embroil Federal Courts in International Disputes and Open the Door to Destabilizing Prosecutions in State Courts and Around the Globe.

The common law of sovereign immunity is that sovereign instrumentalities are immune from prosecution. Any other outcome thrusts federal courts into foreign policy matters to no good end.

1. This is not a run-of-the-mill civil case in which a party is asking a federal court to decide whether a sovereign owes money for the widgets it ordered. Here, the

government seeks to affirmatively invoke the Judiciary's power to impose criminal judgment on a foreign sovereign and its instrumentality without the sovereign's consent. Although the government brought the indictment, it is the courts and jurors that will pass judgment.

When jurors find a criminal defendant guilty, they "rebuke the accused for violation of community standards, morals, or principles," "condemn[ing] [the defendant] with the full legal and moral authority of the society." *United States v. Gilliam*, 994 F.2d 97, 101 (2d Cir. 1993). And if the government obtains a conviction, it will ask a federal judge to use his or her power and discretion to impose a criminal sentence and thus evaluate the defendant's "moral guilt." *Enmund v. Florida*, 458 U.S. 782, 801 (1982). Here, the purported "moral guilt" will be that of a sovereign co-equal to the United States government, thus thrusting the court and jurors into an international imbroglio.

It is precisely those concerns that underlie the international consensus against prosecution of sovereigns. Such prosecutions "seek[] to make another State subject to penal codes based on moral guilt." Fox & Webb, *supra*, at 91. The government would have a Southern District court and the jurors it empanels "infringe[] international law's requirements of equality and non-intervention." *Id.*

2. Were this Court to destroy that consensus, the consequences will be impossible to control. If criminal immunity is anything less than absolute, "who knows what a creative state prosecutor might come up with." S. Ct. Tr. at A.202 (Gorsuch, J.); *see id.* 208-09 (Sotomayor, J.) ("I don't know how I would want to leave to the

[vagaries] of individual prosecutors, whether it's federal or state, the right to insult another nation by giving them this unbridled power to initiate [criminal] suits."). From cross-border migration to climate change, world affairs provide plenty of opportunities for state or local prosecutors to bring charges for injuries felt in their jurisdiction. State attorneys general have already tried to *civilly* sue foreign sovereigns for world events. *See, e.g.*, Kathryn Watson, *Missouri and Mississippi Sue China over Coronavirus*, CBS News (Apr. 22, 2020), https://tinyurl.com/4hcx8st3. State and local prosecutors should not be permitted to "defeat or alter our foreign policy." *United States v. Pink*, 315 U.S. 203, 232 (1942). Our "nation as a whole would be held to answer if a State created difficulties with a foreign power." *Id.*

At the Supreme Court, the government said not to worry—if it did not approve of a state-level prosecution, it would simply "file a suggestion of common law immunity." S. Ct. Tr. at A.224. But by its own admission, it has never "handl[ed] that burden particularly well or particularly consistently." S. Ct. Tr. at A.215 (Deputy Solicitor General). Embroiling the federal government in a politicized battle with state prosecutors over the immunities that ought to be afforded foreign sovereigns and instrumentalities in criminal prosecutions should be welcomed by no one.

Regardless, it is hardly clear that the government's plan would work. Supreme Court precedent largely rejects the view that the Executive can impose its will on state courts in this way. *See, e.g.*, *Medellin*, 552 U.S. at 530-32. If a state declined to respect a federal suggestion of immunity, would federal review even be available? *See People v.*

55

*McLeod,* 1 Hill 377, 432-33 (N.Y. Sup. Ct. 1841) (refusing to dismiss prosecution despite the Executive's support for non-prosecution and diplomatic resolution to case); *see generally* R. Y. Jennings, The Caroline *and* McLeod *Cases*, 32 Am. J. Int'l L. 82, 92-96 (1938) (recounting the diplomatic engagement between Britain and the United States regarding the prosecution).

Nor could any branch of government control how *foreign* sovereigns react. The government told the Supreme Court in 1812 that exercising even civil jurisdiction over a sovereign instrumentality would "amount to a judicial declaration of war." *Schooner Exchange*, 11 U.S. at 126 (reporter's summary). How will the world respond to the first ever criminal prosecution of a foreign sovereign in a domestic court? There are no clear answers. *See* S. Ct. Op. at A.280.

What is clear, though, is that abrogating criminal sovereign immunity will have "ramifications beyond this case." S. Ct. Tr. at A.228 (Alito, J.). The decision whether to abrogate common-law criminal immunity, break with international law, and invite those ramifications belongs to Congress, not to the Executive.

3.      Leaving that decision to the Executive makes especially little sense given how little need it has shown for the power to indict sovereigns and instrumentalities. The Executive has ample powers to address disputes with foreign sovereigns without resorting to domestic criminal prosecutions. It has successfully done so for nearly 250 years. The United States has at its disposal a full arsenal of diplomacy, tariffs, investment blocks, visa limits, export controls, the grant or denial of economic

56

assistance, military aid, and sanctions. *See* S. Ct. Tr. at A.241 (Barrett, J.) (noting the government's tools besides prosecution). U.S. national interests have been served and the global order maintained without prosecutions of sovereign entities.

To the extent that the government requires resort to the courts, criminal prosecution of sovereign entities has ready substitutes. Individuals can be prosecuted. And, assuming an exception to sovereign immunity exists, civil process allows the government to seek monetary penalties. *See, e.g.*, 31 C.F.R. § 535.701 (2022) (imposing civil penalties for violations of Iran sanctions through Office of Foreign Assets Control). Nearly three years into litigating this issue, the government still has not explained why, suddenly, criminal prosecutions of foreign sovereigns are an important part of its toolkit.

## CONCLUSION

The district court's order denying Halkbank's motion to dismiss on foreign sovereign immunity grounds should be reversed, and this case should be remanded with instructions to dismiss the superseding indictment.

Respectfully submitted,

/s/ *Robert M. Cary*

ROBERT M. CARY
JOHN S. WILLIAMS
SIMON A. LATCOVICH
EDEN SCHIFFMANN
WILLIAMS & CONNOLLY LLP
*680 Maine Avenue S.W.*
*Washington, DC 20024*
*650 Fifth Avenue, Suite 1500*
*New York, NY 10019*
*Phone: (202) 434-5000*
*Fax: (202) 434-5029*
*Email: rcary@wc.com*

July 31, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Robert M. Cary, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Defendant-Appellant on Remand from the Supreme Court of the United States is proportionally spaced, has a typeface of 14 points or more, and contains 13,915 words.

July 31, 2023

/s/ *Robert M. Cary*
Robert M. Cary

**CERTIFICATE OF SERVICE**

I, Robert M. Cary, counsel for appellant and a member of the Bar of this Court, certify that, on July 31, 2023, a copy of the attached Brief of Defendant-Appellant on Remand from the Supreme Court of the United States was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all the parties required to be served have been served. In addition, I certify that copies of the brief will be sent, via third-party commercial carrier, to the Clerk and to the following counsel:

Michael Dennis Lockard
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

July 31, 2023                                    /s/ *Robert M. Cary*_____
                                                 Robert M. Cary