# 20-3499

IN THE

# United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

Appellee,

v.

REZA ZARRAB, AKA RIZA SARRAF, CAMELIA JAMSHIDY, AKA
KAMELIA JAMSHIDY, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB,
AKA CAN SARRAF, AKA KARTALMSD, MEHMET HAKAN ATILLA,
MEHMET ZAFER CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT
BALKAN, ABDULLAH HAPPANI,

Defendants,

TÜRKIYE HALK BANKASI A.Ş., AKA HALKBANK,

Defendant-Appellant.

On Appeal from the U.S. District Court for the Southern District of New York,
No. 1:15-cr-867-10, Judge Richard M. Berman, Presiding

**BRIEF FOR AMICI CURIAE REPUBLIC OF AZERBAIJAN,
ISLAMIC REPUBLIC OF PAKISTAN, AND STATE OF QATAR
IN SUPPORT OF APPELLANT AND REVERSAL**

AYŞE YÜKSEL MAHFOUD
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 408-1047

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466

August 4, 2023

Counsel for Amici Curiae

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF AMICUS CURIAE ........................................................1

BACKGROUND ......................................................................................3

SUMMARY OF ARGUMENT ...............................................................4

ARGUMENT ...........................................................................................6

    I.    FOR MORE THAN TWO CENTURIES, FOREIGN
           SOVEREIGNS HAVE CONTINUED TO POSSESS
           ABSOLUTE COMMON-LAW IMMUNITY AGAINST
           CRIMINAL PROSECUTION IN UNITED STATES COURTS.......6

        A.    Since *Schooner Exchange*, Foreign Sovereigns Have
                Possessed Absolute Common-Law Immunity From
                Criminal Prosecution ................................................................7

        B.    As An Instrumentality Of Türkiye, Halkbank Shares
                Türkiye's Absolute Sovereign Immunity ...............................15

    II.    ALLOWING CRIMINAL PROSECUTION OF FOREIGN
           SOVEREIGNS WOULD DISRUPT THE COMITY OF
           NATIONS ...............................................................................20

        A.    Criminal Prosecution Of Foreign Sovereigns Would
                Prompt Backlash And Foster International Discord...............21

        B.    Criminal Prosecution Of Foreign Sovereigns Would
                Politicize Judiciaries And Undermine The Rule Of Law ........24

    III.    COMMON-LAW FOREIGN SOVEREIGN IMMUNITY
           CANNOT BE ABROGATED BY EXECUTIVE FIAT ...................26

CONCLUSION .......................................................................................30

CERTIFICATE OF COMPLIANCE WITH WORD VOLUME
    LIMITATION

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Agent judiciare du Trésor v. Malta Maritime Authority and Carmel X*, Cour de cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004, Bull. crim., No. 04-84.265 (Fr.) ...................................19

*Arango v. Guzman Travel Advisors*, 761 F.2d 1527 (11th Cir. 1985) ...............18

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ............................12

*Berizzi Bros. v. The Pesaro*, 271 U.S. 562 (1926).......................................*passim*

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170 (2017)...................................................................21

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)...................................30

*Chem. Nat. Res., Inc. v. Republic of Venezuela*, 215 A.2d 864 (Pa. 1966) ................................................................................................................12

*Ex parte Republic of Peru*, 318 U.S. 578 (1943)..................................... 17, 28-29

*Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021) ........................8, 21

*Heaney v. Gov't of Spain*, 445 F.2d 501 (2d Cir. 1971)......................................17

*In re Investigation of World Arrangements*, 13 F.R.D. 280 (D.D.C. 1952) ...................................................................................................................9

*Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198 (2d Cir. 1971) ................................................................................................................29

*Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759 (2019) ............................................ 15-16

*Jones v. Ministry of Interior Al-Mamlaka Al-Arabiya AS Saudiya (the Kingdom of Saudi Arabia)*, [2006] UKHL 26 (appeal taken from Eng.).................................................................................................14

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ............................................................21

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ..............................18

*Mason v. Intercolonial Ry. of Canada*, 83 N.E. 876 (Mass. 1908) .....................18

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...........................................27

*People v. Weiner*, 378 N.Y.S.2d 966 (N.Y. Crim. Ct. 1976) ...............................8

*The Pesaro*, 277 F. 473 (S.D.N.Y. 1921) ...........................................................28

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) .....................................9, 16

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) ..........................................29

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016) ..............................21

*The Roseric*, 254 F. 154 (D.N.J. 1918) ...............................................................18

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ...................................8

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ....................................................3, 6, 16

*Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812)............*passim*

*Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435 (2019)......................................18

*Türkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940 (2023)............*passim*

*United States v. Türkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021), *vacated and remanded in part*, 143 S. Ct. 940 (2023)...................3, 26

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983)...................*passim*

*Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012)................................11, 28

## CONSTITUTION AND STATUTES:

U.S. Const. art. II, § 3 ..........................................................................................28

28 U.S.C. § 1330...............................................................................12

28 U.S.C. § 1330(a) ........................................................................9, 14

28 U.S.C. § 1441(d) ..........................................................................12

28 U.S.C. § 1602...............................................................................11

28 U.S.C. § 1603(a) ..........................................................................15

28 U.S.C. § 1603(b) ..........................................................................15

28 U.S.C. § 1605.................................................................................9

28 U.S.C. § 1605A.............................................................................15

28 U.S.C. § 1610...............................................................................14

28 U.S.C. § 1611...............................................................................14

Foreign States Immunities Act 87 of 1981 § 2(3) (S. Afr.)................13

State Immunity Act, R.S.C. 1985, c S-18, § 18 (Can.)......................13

State Immunity Act, ch. 313, § 19(2)(b) (1979) (Sing.)....................13

State Immunity Act 1978, c. 33, § 16(4) (UK),
    https://www.legislation.gov.uk/ukpga/1978/33/contents ..............14

State Immunity Ordinance, No. 6 of 1981, § 17(2)(b) (Pak.) ............13

**LEGISLATIVE AND EXECUTIVE MATERIALS:**

Anthony J. Blinken, Sec'y of State, U.S. Dep't of State, *Political
    Prisoners in Belarus* (Jan. 27, 2022)
    (https://tinyurl.com/2p8dsty5) .......................................................25

Anthony J. Blinken, Sec'y of State, U.S. Dep't of State, *Holding
    Accountable Nicaraguan Agents of Repression* (Jan. 10, 2022)
    (https://tinyurl.com/2phtwpua) ......................................................25

Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dep't of State
(May 19, 1952), *reprinted in* 26 Dep't State Bull. 971 (1952) ......9, 10, 11, 28

U.S. Dep't of State, *2021 Country Reports on Human Rights
Practices: Cuba* (Apr. 12, 2022) (https://tinyurl.com/3yfjbr5m)...................25

**OTHER AUTHORITIES:**

Restatement (Second) of Foreign Relations Law § 66(g) (1965)........................17

Georges R. DeLaume, *Transnational Contracts Applicable Law
and Settlement of Disputes* (1975).................................................................22

Andrew Dickinson et al., *State Immunity and State-Owned
Enterprises* (Dec. 2008), tinyurl.com/ye2xkznk .............................................13

Mark B. Feldman, *The United States Foreign Sovereign Immunities
Act of 1976 in Perspective: A Founder's View*, 35 Int'l & Comp.
L.Q. 302 (1986) ...............................................................................................22

Hazel Fox & Philippa Webb, *The Law of State Immunity* (3d ed.
2013) ..............................................................................................10, 11, 12, 14

Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction
of National Courts," *in Research Handbook on Jurisdiction and
Immunities in International Law* 205 (Alexander Orakhelashvili
ed., 2015) ........................................................................................................13

G.A. Res. 59/38, U.N. Doc. A/RES/59/38 (Dec. 2, 2004) ..................................12

Brandon Garrett, "International Corporate Prosecutions," *in The
Oxford Handbook of Criminal Process* 419 (Darryl K. Brown,
Jenia I. Turner & Bettina Weisser eds., 2019) ................................................18

Robert M. Jarvis, *The Tate Letter: Some Words Regarding Its
Authorship*, 55 Am. J. Leg. Hist. 465 (2015) ..................................................28

V.S. Khanna, *Corporate Criminal Liability: What Purpose Does It
Serve?*, 109 Harv. L. Rev. 1477 (1996)...................................................... 18-19

Kurt H. Nadelmann, *Jurisdictionally Improper Fora in Treaties on Recognition of Judgments: The Common Market Draft*, 67 Colum. L. Rev. 995 (1967).............................................................22

Responsibility of States for Internationally Wrongful Acts, art. 8, *annexed to* G.A. Res. 56/83 (2001) ..............................................17

María Manuela Márquez Velásquez, *The Argentinian Exercise of Universal Jurisdiction 12 Years After its Opening*, OpinioJuris (Apr. 2, 2022) (https://tinyurl.com/2bh96uju)...............................................23

vi

## INTEREST OF AMICI CURIAE[1]

The Republic of Azerbaijan is a transcontinental country of approximately 10 million people located at the boundary of Eastern Europe and Western Asia. It shares borders with Russia, Iran, the Republic of Türkiye, Georgia, and Armenia. Azerbaijan regained its independence in 1991 and has maintained close relations with the United States and NATO ever since. Azerbaijani forces risked their lives alongside U.S. and NATO servicemembers in Kosovo from 1999 through 2008, in Iraq from 2003 through 2008, and in Afghanistan from 2002 through 2021.

The Islamic Republic of Pakistan is the world's fifth most populous country, with roughly 230 million people. It maintains a close partnership with the United States, which lists it as a major non-NATO ally. Pakistani-U.S. relations are a significant factor in the United States' policy in the Middle East and South and Central Asia, including the United States' efforts to combat terrorism around the globe. Pakistan is committed to the cause of justice in relations between sovereign states and finds sovereign immunity to be a matter of fundamental importance in diplomatic relations.

---

[1] No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici or their counsel made a monetary contribution to this brief's preparation or submission. All parties have consented in writing to the filing of this brief.

1

The State of Qatar is a nation of more than 2.5 million residents occupying a strategically important location bordering both the Arabian Gulf and the Kingdom of Saudi Arabia. Also considered a major non-NATO ally, Qatar assists the United States with numerous important military and diplomatic efforts both in the region and abroad, and hosts the largest U.S. military facility in the Middle East, from which counter-terror operations have been launched over the years, including against ISIS.

Every sovereign nation in the world has an interest in this case, which is not merely about whether the United States may prosecute a particular foreign state-owned entity. Appellant Türkiye Halk Bankasi A.Ş. ("Halkbank") is majority-owned by the Republic of Türkiye, a key U.S. ally and NATO member. Under U.S. law, consistent with that of other nations, Halkbank is considered a foreign state with the same juridical status as Türkiye itself. Accordingly, if the United States can prosecute Halkbank, then it can also criminally prosecute Türkiye, the amici nations and their instrumentalities, or any other foreign nation. Conversely, other foreign nations could criminally prosecute the United States or any of its hundreds of agencies and instrumentalities. The result would be a dangerous disruption of international comity where nations seek to employ punitive criminal law—rather than traditional foreign policy tools—to resolve differences.

2

## BACKGROUND

In its earlier decision, *United States v. Türkiye Halk Bankasi A.S.* ("*Halkbank I*"), 16 F.4th 336 (2d Cir. 2021), *vacated and remanded in part*, 143 S. Ct. 940 (2023) ("*Halkbank II*"), this Court held that Halkbank, an instrumentality of Türkiye, was not immune from this criminal prosecution because (1) the district court had jurisdiction; (2) assuming *arguendo* that the Foreign Sovereign Immunities Act ("FSIA") confers immunity in criminal cases, Halkbank's alleged conduct would fall within the FSIA's commercial activity exception; and (3) Halkbank lacked common-law immunity. *Id.* at 347-51.

The Supreme Court, however, vacated in part and remanded. While holding that jurisdiction existed, the Court held that the FSIA does not govern the question of immunity in this case. Instead, that question is governed by foreign sovereign immunity principles—first enunciated by the Supreme Court in *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812)—that "'developed as a matter of common law.'" *Halkbank II*, 143 S. Ct. at 945-46 (quoting *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010)). The Supreme Court then vacated this Court's judgment that Halkbank had no common-law immunity, remanding for this Court to reconsider that question while "express[ing] no view on those issues…." *Id*. at 951-52.

3

This Court should now hold that Halkbank possesses absolute common-law immunity from criminal prosecution. For more than two centuries, foreign sovereigns and their instrumentalities have been absolutely immune from criminal prosecution, and that common-law immunity—unlike in the civil context—has never changed. To hold otherwise would be a major deviation from the international consensus followed by every other country, with potentially disastrous consequences for international comity.

## SUMMARY OF ARGUMENT

More than 200 years ago, the Supreme Court confirmed that foreign sovereign nations possessed absolute common-law immunity from all actions in U.S. courts. While that immunity was relaxed in *civil* cases, no statute or precedent ever abrogated or lessened foreign sovereigns' absolute immunity from *criminal* prosecution. That is not only the clear rule under U.S. law but also the universal practice under other countries' laws, and it remains a bedrock principle of customary international law. To amici's knowledge, no other country allows criminal prosecutions of foreign states. And both here and abroad, an agency or instrumentality of a foreign state possesses the same absolute immunity from criminal prosecution as the foreign state itself. Nor can prosecutors arrogate to themselves the power to change this longstanding common law by Executive fiat, particularly to benefit their litigation position in a case in which the United States

4

is itself a party.  Halkbank's common-law sovereign immunity is a pure question of law for this Court, not the Executive, to resolve.

Holding that prosecutors and courts may prosecute, convict and punish any sovereign foreign nation or instrumentality would not only upset longstanding sovereign immunity jurisprudence but also the foreign-policy principles it embodies.  It would destabilize the delicate diplomatic balance upon which foreign sovereign immunity rests.  The United States, like other nations, affords foreign nations immunity in its courts not just out of grace or gratuity, but principally because it desires, and should be entitled to, the same deferential treatment in those nations' courts.  Thus, if this Court holds that foreign sovereigns and their instrumentalities lack immunity from criminal prosecution, other countries—including those hostile to U.S. interests whose courts may not allow full and fair adjudications—will be emboldened to prosecute the United States and its instrumentalities.  The result will be a downward spiral of retaliation that will undermine international comity.  And once that spiral has begun, even Congress cannot stop it.

The continuing vitality of foreign sovereign immunity from criminal prosecution is critical to both American and international interests.  The decision below threatens those interests based on a fundamental misunderstanding of the law.  If the United States is to even consider taking the drastic step of breaching an

international law consensus and subjecting other sovereigns to criminal prosecution, such an action should be undertaken by Congress, not by this Court. Criminal prosecution of sovereigns would encourage biased law enforcement and threaten core values the United States promotes globally. If criminal prosecution of sovereigns becomes an available tool of foreign policy, nations would be far more disposed to brand their rivals as criminals than to impose that same opprobrium on allies. Diplomacy is a job for diplomats—not the judiciary. By blurring the line between politics and law enforcement, and allowing geopolitical concerns to influence prosecutions against other sovereign nations, affirmance of the decision below could undermine the rule of law worldwide. The judgment should be reversed.

## ARGUMENT

### I. FOR MORE THAN TWO CENTURIES, FOREIGN SOVEREIGNS HAVE CONTINUED TO POSSESS ABSOLUTE COMMON-LAW IMMUNITY AGAINST CRIMINAL PROSECUTION IN UNITED STATES COURTS.

In *Halkbank II*, the Supreme Court clarified that foreign sovereign immunity from criminal prosecution is neither a jurisdictional doctrine nor governed by the FSIA, which applies only to civil cases. Instead, non-statutory principles of foreign sovereign immunity "'developed as a matter of common law'" beginning with the 1812 decision in *Schooner Exchange*. *Halkbank II*, 143 S. Ct. at 945-56 (quoting *Samantar*, 560 U.S. at 311). The Supreme Court has now remanded for

6

this Court to reconsider whether foreign sovereigns, including instrumentalities

such as Halkbank, are immune from criminal prosecution under that common law.

The answer, following the holding in *Schooner Exchange*, should be yes.

*Schooner Exchange* held that foreign sovereigns possessed ***absolute*** common-law

immunity from all actions in U.S. courts. While that absolute immunity was

altered in the ***civil*** context—first judicially and then in the FSIA—no legal

precedent or statute ever altered foreign sovereigns' absolute immunity from

***criminal*** prosecution, and the same is true under international law. It is likewise

settled, under both U.S. and international law, that an agency or instrumentality of

a foreign government such as Halkbank is entitled to the same immunity as the

foreign sovereign that controls it.

### A. Since *Schooner Exchange*, Foreign Sovereigns Have Possessed Absolute Common-Law Immunity From Criminal Prosecution.

In *Schooner Exchange*, the Supreme Court held that given the "perfect

equality and absolute independence of sovereigns, and this common interest

impelling them to mutual intercourse, and an interchange of good offices with each

other," federal common law "exempt[s] ... the person of the sovereign from arrest

or detention within a foreign territory." 11 U.S. at 137. Unless the legal authority

to arrest or detain a foreign sovereign is expressed "in a manner not to be

misunderstood, the sovereign cannot be considered as having imparted to the

ordinary tribunals a jurisdiction, which it would be a breach of faith to exercise."

7

*Id*. at 146.  Thus, to permit any judicial action over a foreign sovereign, the law must provide for it "in a manner not to be misunderstood."  *See id*.

This immunity—now clarified in *Halkbank II* to be a common-law rather than jurisdictional doctrine—has traditionally been called "absolute immunity." "Although the narrow holding of *The Schooner Exchange* was only that the courts of the United States lack jurisdiction over an armed ship of a foreign state found in our port, that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns."  *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983); *see also Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 713 (2021) ("Under the absolute or classical theory of sovereign immunity, foreign sovereigns are categorically immune from suit.").  Thus, for nearly 150 years after *Schooner Exchange*, as the government itself recognized, "foreign states enjoyed absolute immunity from ***all actions*** in the United States."  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018) (emphasis added).  "All" means all, including criminal prosecutions.  *See, e.g.*, *People v. Weiner*, 378 N.Y.S.2d 966, 974 (N.Y. Crim. Ct. 1976) (noting, in criminal case, that sovereign immunity of foreign states "is absolute" and "cannot be questioned or challenged").  Indeed, amici are aware of ***no*** prior case in which any court has held

8

that an objecting foreign sovereign government, agency, or instrumentality lacks

immunity from criminal prosecution.[2]

In the ***civil*** context, Congress has abrogated that absolute immunity in the

FSIA, which provides exceptions to immunity. *See* 28 U.S.C. § 1605. But the

FSIA governs only "civil action[s]." 28 U.S.C. § 1330(a). Thus, "the FSIA does

not apply to criminal proceedings." *Halkbank II*, 143 S. Ct. at 948. And even

before the FSIA, courts—following a U.S. government suggestion in the 1952

"Tate Letter"—began to adopt the "restrictive" common-law theory of foreign

sovereign immunity for civil cases, which allowed exceptions to the absolute

immunity rule. *See Republic of Austria v. Altmann*, 541 U.S. 677, 690-91 (2004);

Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dep't of State (May 19,

1952), *reprinted in* 26 Dep't State Bull. 971, 984-85 (1952).

---

[2]      The government, however, may still prosecute foreign ***individuals*** who lack
personal immunities like diplomatic or head-of-state immunity. Thus, the United
States has successfully prosecuted individuals for acts alleged in this very case.
Moreover, cases have addressed whether criminal subpoenas can be enforced
against objecting foreign sovereigns—a far less grave affront to international
comity than a prosecution like this one. But even there, a state-owned
instrumentality has been afforded common-law sovereign immunity. *Cf. In re
Investigation of World Arrangements*, 13 F.R.D. 280, 291 (D.D.C. 1952) (refusing
to enforce criminal subpoena against British-controlled oil company, and holding
that prosecuting the company "would in reality be to charge and find the British
Government guilty of violating a law of the United States," which would be
"contrary to the law of nations").

The FSIA codified those principles in 1976. But the FSIA, the Tate Letter, and pre-FSIA cases following the restrictive theory were all based on the changing common law and international practice regarding *civil* immunities. The Tate Letter made this clear. It noted that the Executive's new position suggesting relaxation of the "classical or absolute theory of sovereign immunity" would be consistent with changes in international law and the U.S. government's actions "in subjecting itself to suit in [its own courts] in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels." 26 Dep't State Bull. at 984-85.

These civil law developments thus "left untouched the position in criminal proceedings." Hazel Fox & Philippa Webb, *The Law of State Immunity* 89 (3d ed. 2013). In other words, "[t]he adoption of a restrictive doctrine has not been treated as having any relevance in relation to the [a]bsolute [i]mmunity of the foreign State from criminal proceedings." *Id.* at 92. Nor has Congress ever enacted any law restricting absolute sovereign immunity in the criminal context.

Under the logic of the Tate Letter itself, there is no basis for this Court—without a clear statement by Congress—to abrogate foreign nations' absolute common-law immunity from criminal prosecution. The Tate Letter was based on the evolution of international law and the United States' transition to a restrictive theory for civil cases given the United States' decision to waive its own civil

immunity in certain contract, tort, and admiralty cases.  26 Dep't State Bull. at 984-85.  But international law never similarly evolved to discard criminal immunity.  Nor has the United States ever waived or abrogated its immunity from criminal prosecution, and amici submit it never would do so.

If this Court affirms the district court's holding that foreign sovereigns and their instrumentalities lack immunity from criminal prosecution, amici believe it would be the ***first court in the world*** ever to do so.  The distinction between the immunities accorded in civil and criminal cases is based not only on tradition and common law, but on basic principles of international law.  *Cf.* 28 U.S.C. § 1602 (emphasizing United States' adherence to "international law" in foreign sovereign immunity context); *Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012) (common-law immunity decisions "turn upon principles of customary international law").  As the leading treatise cited above observes, "[t]he exercise of criminal jurisdiction directly over another State ... contravenes international law in two ways."  Fox & Webb, *supra*, at 89.  "First, it seeks to make another State subject to penal codes based on moral guilt; and, secondly, it seeks to apply its criminal law to regulate the public governmental activity of the foreign State."  *Id.*  Given that subjecting foreign states even to civil suit raises "delicate and important" diplomatic issues, *Schooner Exchange*, 11 U.S. at 135, allowing federal and state

11

prosecutors and juries to brand other nations as criminals raises even greater foreign policy and international comity concerns.[3]

Reflecting that view, the United Nations' model Convention on sovereign immunity adopts the restrictive theory of immunity only in the ***civil*** context while leaving intact absolute immunity from criminal proceedings. A U.N. resolution adopted the Convention, which contains a restrictive version of civil immunities similar to the FSIA's, but expressly states that the Convention "***does not cover criminal proceedings***." *See* G.A. Res. 59/38, U.N. Doc. A/RES/59/38, at 2 (Dec. 2, 2004) (emphasis added). That position is "in line with the received position of jurists and courts that ... an independent State cannot be held criminally liable under the ... law of another State and hence enjoys absolute immunity in respect of criminal proceedings." Fox & Webb, *supra*, at 311. Under international custom and law, "[a] state can be liable under civil law, but it cannot be prosecuted"

---

[3]     If this Court holds that foreign sovereigns lack common-law immunity from criminal prosecution, state and local prosecutors—not just federal ones—could bring such actions, raising grave foreign policy concerns. Before the FSIA allowed foreign sovereigns to litigate all civil (but not criminal) actions in federal court, *see* 28 U.S.C. §§ 1330, 1441(d), *Schooner Exchange*'s absolute immunity rule applied in both state and federal courts. *See, e.g.*, *Chem. Nat. Res., Inc. v. Republic of Venezuela*, 215 A.2d 864, 869 (Pa. 1966). And because that absolute immunity was never abrogated in criminal cases, foreign sovereigns retain absolute criminal immunity in state courts under federal common law. *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427-28, 436-37 (1964) (federal common-law "act of state doctrine" is "a principle of decision binding on federal and state courts alike"). But if this Court rules otherwise here, that common-law immunity from state prosecution would disappear.

criminally.  Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction of National Courts," *in Research Handbook on Jurisdiction and Immunities in International Law* 205, 207 (Alexander Orakhelashvili ed., 2015); *see also* Andrew Dickinson et al., *State Immunity and State-Owned Enterprises* 18 (Dec. 2008) (tinyurl.com/ye2xkznk) ("It is generally accepted that, … under the present state of customary international law, criminal proceedings cannot be brought in a municipal jurisdiction against a foreign State.").

Given that international consensus, it is unsurprising that domestic laws of many foreign states expressly endorse absolute immunity from criminal process, even as most countries, like the United States, have adopted the restrictive view of civil immunity.  For example, amicus Pakistan, as well as South Africa, Canada, Singapore, and the U.K., have all expressly limited their statutes adopting the restrictive theory to civil, not criminal, cases.  *See* State Immunity Ordinance, No. 6 of 1981, § 17(2)(b) (Pak.); Foreign States Immunities Act 87 of 1981 § 2(3) (S. Afr.) ("The provisions of this Act shall not be construed as subjecting any foreign state to the criminal jurisdiction of the courts of the Republic."); State Immunity Act, R.S.C. 1985, c S-18, § 18 (Can.) (excluding criminal actions from scope of restrictive theory); State Immunity Act, ch. 313, § 19(2)(b) (1979) (Sing.) (same); State Immunity Act 1978, c. 33, § 16(4) (UK) (https://www.legislation.gov.uk/ ukpga/1978/33/contents) (same).

13

As English courts have explained, "[a] state is not criminally responsible in international or [domestic] law, and therefore cannot be directly impleaded in criminal proceedings." *Jones v. Ministry of Interior Al-Mamlaka Al-Arabiya AS Saudiya (the Kingdom of Saudi Arabia)*, [2006] UKHL 26, [31] (appeal taken from Eng.). And "*[w]ithout exception*, the legislation in common law countries introducing the restrictive approach of immunity in civil proceedings excludes its application to criminal proceedings." Fox & Webb, *supra*, at 90 (emphasis added). Amici are aware of *no* country—whether friend or foe of the United States— whose law permits it to criminally prosecute and convict another sovereign nation.

Finally, although the FSIA does not govern this case, *Halkbank II*, 143 S. Ct. at 948, its civil provisions nonetheless confirm that foreign sovereigns continue to possess absolute immunity from criminal prosecution. In the FSIA, Congress took immense care to ensure that foreign sovereigns would never face civil jury trials and carefully circumscribed their attachment liability. 28 U.S.C. §§ 1330(a), 1610, 1611. Those limitations are incompatible with a rule that foreign sovereigns have always been subject to criminal jury trials and criminal penalties based on the same conduct. Moreover, while the FSIA's "terrorism exception" allows for circumscribed non-jury civil liability against a limited number of foreign states— currently just four countries—that the Executive designates as state sponsors of terrorism, *see* 28 U.S.C. § 1605A, the United States' position here would allow

14

prosecution of *any* foreign state or instrumentality not only for criminal terrorism but any alleged crime, and allow any court to impose the full punishment allowed. Thus, while not governing here, the FSIA confirms that foreign sovereigns still retain their common-law absolute immunity from criminal prosecution.

In sum, foreign sovereigns retain the absolute immunity from criminal prosecution recognized more than 200 years ago in *Schooner Exchange* because neither Congress nor any recognized evolution in the common law has abrogated that immunity. And as next explained, that common law immunity extends as well to Halkbank as an agency or instrumentality of Türkiye.

### B.     As An Instrumentality Of Türkiye, Halkbank Shares Türkiye's Absolute Sovereign Immunity.

An instrumentality owned or controlled by a foreign state is itself entitled to the same immunity from criminal prosecution as the foreign state. That is the rule for civil cases under the FSIA, which contains Congress's only statement on what constitutes a "foreign state" for purposes of foreign sovereign immunity. *See* 28 U.S.C. § 1603(a), (b). Under that definition, instrumentalities like Halkbank are themselves foreign states possessing immunity. *Id*.; *see also* Halkbank Remand Br. 5-7, 33-36 (noting Türkiye's control of Halkbank). The FSIA "codified" the law of foreign sovereign immunity as of 1976. *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 766 (2019); *see also, e.g.*, *Altmann*, 541 U.S. at 691 (citing *Verlinden*, 461 U.S. at 488). Thus, although its exceptions govern only civil cases, the FSIA's

15

definition of what constitutes a "foreign state" is relevant to the scope of *Schooner Exchange*'s rule—which still applies in criminal cases—since that analysis involves the pre-FSIA legal regime Congress intended to codify. *Cf. Samantar*, 560 U.S. at 320 (FSIA's purpose was to "codify[] ***state*** sovereign immunity") (emphasis in original). The FSIA carried forward the common-law rule that instrumentalities have their sovereigns' immunity.

Congress's understanding is also entirely consistent with the Supreme Court's pre-FSIA cases. In *Berizzi Bros. v. The Pesaro*, 271 U.S. 562 (1926), the Court decided whether *Schooner Exchange*'s absolute immunity rule, first announced in a warship case, applied equally to a commercial vessel owned by a foreign government. The Court held the distinction was immaterial:

> We think the principles are applicable alike to all ships held and used by a government for a public purpose, and … when, for the purpose of advancing the trade of its people or providing revenue for its treasury, a government acquires, mans, and operates ships in the carrying trade, they are public ships in the same sense that war ships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace of any less a public purpose than the maintenance and training of a naval force.

*Id.* at 574.

The Court therefore held that, "in keeping with" *Schooner Exchange*, immunity would be accorded to a commercial vessel that is an instrumentality of a foreign country. *Id*. at 576. The Court, adopting a government suggestion, held the same in *Ex parte Republic of Peru*, 318 U.S. 578, 589-90 (1943). And Section

16

66 of the pre-FSIA Restatement (Second) of Foreign Relations Law (1965)—
which this Court endorsed in *Heaney v. Government of Spain*, 445 F.2d 501, 504
(2d Cir. 1971)—likewise provided that "[t]he immunity of a foreign state …
extends to … a corporation created under its laws and exercising functions
comparable to those of an agency of the state." *Id.* at § 66(g).[4]

Halkbank thus possesses Türkiye's immunity from criminal prosecution.
Türkiye controls Halkbank just as Italy and Peru controlled the commercial vessels
in *Berizzi Bros.* and *Peru*. And although the immunity recognized in those cases
was later relaxed for ***civil*** cases both before and by the FSIA, no court or
legislation ever recognized any departure from the rule of absolute immunity for
***criminal*** prosecutions of foreign instrumentalities. Thus, as in those cases,
because neither Congress nor Türkiye has ever waived Türkiye's absolute
sovereign immunity, the absolute immunity recognized in *Schooner Exchange*
continues to apply. In the words of *Schooner Exchange*, there can be no serious
question that Halkbank—just like the vessels at issue there and in *Berizzi Bros.* and
*Peru*—is "under the immediate and direct command of the sovereign." 11 U.S. at

---

[4]     The indictment below shows the United States' belief that high-level
officials of Türkiye control Halkbank's actions. *See* A.20, 37-38, 43-44, 51-52.
This would make Halkbank's actions attributable to the Republic of Türkiye as a
matter of public international law. *See* Responsibility of States for Internationally
Wrongful Acts, art. 8, *annexed to* G.A. Res. 56/83 (2001).

144. Thus, before the FSIA, lower courts regularly extended sovereign immunity to instrumentalities of foreign governments.[5]

Moreover, U.S. courts apply the same sovereign immunity rule for the federal Government's own agencies and instrumentalities. Corporations owned or controlled by the United States "are part of the Government," *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 395-99 (1995), and share the Government's immunity absent waiver, *see Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435, 1442 (2019). It would be contradictory and hypocritical for U.S. law to afford corporate instrumentalities of foreign states, like Halkbank, less immunity in U.S. courts than it affords the United States' own, similarly situated, instrumentalities.

Finally, unlike with civil immunities, no international consensus allows criminal prosecution of foreign instrumentalities like Halkbank. Indeed, outside the United States, most nations historically have not allowed criminal prosecutions of ***any*** corporations. *See, e.g.*, Brandon Garrett, "International Corporate Prosecutions," *in The Oxford Handbook of Criminal Process* 419, 421-22 (Darryl K. Brown, Jenia I. Turner & Bettina Weisser eds., 2019); V.S. Khanna, *Corporate Criminal Liability: What Purpose Does It Serve?*, 109 Harv. L. Rev. 1477, 1490-

---

5    *See, e.g.*, *Arango v. Guzman Travel Advisors*, 761 F.2d 1527, 1534 (11th Cir. 1985) (describing pre-FSIA practice); *The Roseric*, 254 F. 154, 159 (D.N.J. 1918); *Mason v. Intercolonial Ry. of Canada*, 83 N.E. 876, 877 (Mass. 1908)

91 (1996). And in the only foreign decision of which amici are aware that considered the criminal-law immunity of a foreign state's agency or instrumentality, the court held that such entities are entitled to the same immunity as the state itself. France's highest criminal court has held that the Malta Maritime Authority, a state corporation of Malta, was immune from French criminal court jurisdiction. The Court reasoned that "the international custom which opposes the prosecution of States before the criminal courts of a State foreign extends to the organs and entities which constitute the emanation of the State as well as to their agents by reason of acts which, as in the present case, fall within the sovereignty of the State concerned." *Agent judiciare du Trésor v. Malta Maritime Authority and Carmel X*, Cour de cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004, Bull. crim., No. 04-84.265 (Fr.).[6]

Accordingly, an instrumentality of a foreign state such as Halkbank is entitled to the same immunity as the state itself. And because Türkiye is entitled to absolute immunity from criminal prosecution, so is Halkbank. Under absolute immunity, as distinguished from the restrictive theory that governs civil cases, it is

---

[6] The original French is "la coutume internationale qui s'oppose à la poursuite des Etats devant les juridictions pénales d'un Etat étranger s'étend aux organes et entités qui constituent l'émanation de l'Etat ainsi qu'à leurs agents en raison d'actes qui, comme en l'espèce, relèvent de la souveraineté de l'Etat concerné." *Agent judiciare du Trésor*, No. 04-84.265 (describing Court's "Motivation"). The English was obtained via Google Translate (https://translate.google.com/).

immaterial whether the instrumentality is engaging in a commercial activity. *See, e.g.*, *Berizzi Bros.*, 271 U.S. at 574 (noting that vessel was "in the carrying trade"). Although civil immunity evolved to include a commercial activity exception, absolute immunity still prevails in the criminal context.

## II.  ALLOWING CRIMINAL PROSECUTION OF FOREIGN SOVEREIGNS WOULD DISRUPT THE COMITY OF NATIONS.

Foreign sovereign immunity is a "very delicate and important" issue even in the civil context. *Schooner Exchange*, 11 U.S. at 135. That is because "[a]ctions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States." *Verlinden*, 461 U.S. at 493. If this Court were to permit the United States to criminally prosecute foreign sovereigns, those sensitive and delicate issues would be magnified. Other nations would follow suit, causing a downward spiral where foreign prosecutors could criminally prosecute the United States and its instrumentalities, or any foreign state. And once that cycle of retaliation begins, not even Congress can stop it. The Court should not start that conflict where Congress—which carefully debated and delineated civil immunities in the FSIA—never engaged in any similar debate over the serious ramifications of abrogating foreign sovereigns' criminal immunity.

### A. Criminal Prosecution Of Foreign Sovereigns Would Prompt Backlash And Foster International Discord.

Foreign sovereign immunity is based on reciprocity: the United States affords other countries immunity in its courts because it desires the same treatment abroad.[7] "After all, in the law, what is sauce for the goose is normally sauce for the gander." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 349 (2016) (citation omitted). Thus, "[t]o grant … sovereign entities an immunity from suit in our courts both recognizes the absolute independence of every sovereign authority and helps to induce each nation state, as a matter of international comity, to respect the independence and dignity of every other, including our own." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 179 (2017) (cleaned up; citations omitted). Foreign sovereign immunity is also predicated on the understanding that disputes between nations should generally be addressed diplomatically through state-to-state negotiations, rather than by courts and juries. As noted in *Schooner Exchange*, "wrongs committed by a sovereign" raise issues that are "rather [ones] of policy than of law," and "are for diplomatic, rather than legal discussion." 11 U.S. at 146.

---

[7] *See, e.g.*, *Philipp*, 141 S. Ct. at 714; *Lauritzen v. Larsen*, 345 U.S. 571, 582 (1953) ("[N]or should we forget that any contact which we hold sufficient to warrant application of our law to a foreign transaction will logically be as strong a warrant for a foreign country to apply its law to an American transaction").

21

Abrogating immunity here would invite the sort of retaliatory political actions by foreign nations that the foreign sovereign immunity doctrine seeks to avoid. Given the longstanding and universal consensus that foreign sovereigns are immune from criminal prosecution, a defection from that consensus by a global leader like the United States could prompt other countries to follow with unanticipated and negative results. Just as other countries followed the United States' lead when it enacted the FSIA's restrictive civil immunity, *see, e.g.*, Mark B. Feldman, *The United States Foreign Sovereign Immunities Act of 1976 in Perspective: A Founder's View*, 35 Int'l & Comp. L.Q. 302, 303 (1986), the same can be expected in the criminal arena.

Indeed, scholars have noted that some nations codified the principle of asserting jurisdiction over a foreign sovereign to the same extent that foreign sovereign would assert jurisdiction over them. *See, e.g.*, Kurt H. Nadelmann, *Jurisdictionally Improper Fora in Treaties on Recognition of Judgments: The Common Market Draft*, 67 Colum. L. Rev. 995, 999 (1967); Georges R. DeLaume, *Transnational Contracts Applicable Law and Settlement of Disputes* §§ 8.08-8.09 (1975). Accordingly, if this Court finds no immunity, any such statutes could automatically prompt a reprisal in the guise of reciprocity, allowing foreign nations to criminally prosecute the United States or its instrumentalities. And other nations would likely follow suit, particularly those hostile to United States interests.

22

Abandoning the universal norm against criminal prosecution of foreign sovereigns would thus come with significant costs. Such a decision raises a threat that the United States and its agencies and instrumentalities could be adjudicated as criminals by hostile—or even friendly—foreign powers. Given the worldwide reach of U.S. government activity, the risk of such retaliatory actions is not merely hypothetical. And nations' criminal prosecution of other nations—which would be spurred by an affirmance of the decision below—would constitute a new tool to generate international strife. That problem will be exacerbated by many nations' federal systems, which often allow local prosecutorial officials and courts to bring cases against foreigners under "universal" jurisdictional grants without central government directives. *See, e.g.*, María Manuela Márquez Velásquez, *The Argentinian Exercise of Universal Jurisdiction 12 Years After its Opening*, OpinioJuris (Apr. 2, 2022) (https://tinyurl.com/2bh96uju) (documenting reciprocal actions by local Spanish and Argentinian courts). Although such actions have thus far been limited to non-state individual actors, subjecting foreign states to criminal jurisdiction would open a new and uncontrollable judicial battlefront over issues that have historically been resolved diplomatically.

Nor would any benefits outweigh those costs. There is no purpose criminal prosecution of a foreign sovereign or instrumentality might serve that cannot be accomplished by other, less extraordinary and divisive means. Individual officials

23

without diplomatic or head-of-state immunity who commit crimes (outside of their official capacity) can be prosecuted if within the jurisdiction of the prosecuting state. *Supra* note 2. And foreign states and state-owned entities can be, and often are, subject to a wide-ranging panoply of U.S. diplomatic and statutory sanctions. But such sanctions are authorized and dispensed only after careful consideration both by Congress in enacting the governing statutes and by the Executive in enforcing them. By contrast, endorsing wide-ranging criminal jurisdiction would allow both federal and state prosecutors and juries to brand any foreign sovereign a criminal felon and exact criminal penalties without any required oversight by political actors.

Once this Court opens that door, it cannot be closed. If foreign nations reciprocate by prosecuting the United States or its instrumentalities, even Congress cannot reverse that process. That is a principal reason the Supreme Court recognized the doctrine of foreign sovereign immunity so long ago. This Court should abstain from traveling this perilous path, where Congress has never even considered this momentous issue, much less established the rules of the road.

## B. Criminal Prosecution Of Foreign Sovereigns Would Politicize Judiciaries And Undermine The Rule Of Law.

The decision below also threatens to undermine the rule of law around the globe. Depoliticization of domestic law is a bedrock value the United States has espoused internationally. Tools of foreign relations, by contrast, are designed for

24

political aims. *See Schooner Exchange*, 11 U.S. at 146. Whether one nation can employ prosecutors, courts and juries to brand another nation a felon and impose criminal penalties against it thus has immense implications. If domestic criminal law can be wielded against foreign sovereigns for political reasons, it will only encourage the use of criminal law for geopolitical purposes.

That result would be unfortunate. And it would be particularly anomalous for the United States to bring it about. The United States has long stressed the need to depoliticize law throughout the world. This country regularly emphasizes that foreign nations should not wield domestic criminal law based on political concerns. *See, e.g.*, Anthony J. Blinken, Sec'y of State, U.S. Dep't of State, *Political Prisoners in Belarus* (Jan. 27, 2022) (https://tinyurl.com/2p8dsty5); Anthony J. Blinken, Sec'y of State, U.S. Dep't of State, *Holding Accountable Nicaraguan Agents of Repression* (Jan. 10, 2022) (https://tinyurl.com/2phtwpua); U.S. Dep't of State, *2021 Country Reports on Human Rights Practices: Cuba* (Apr. 12, 2022) (https://tinyurl.com/3yfjbr5m) Subjecting foreign sovereigns to domestic prosecutorial discretion would introduce into the criminal context— where they are the most corrosive—the "case-by-case diplomatic pressures" and "political considerations" that the law on sovereign immunity has sought to eliminate. *Verlinden*, 461 U.S. at 487-88.

25

Criminal prosecutions embody the view that the defendants being prosecuted—normally by governments—have committed moral wrongs that warrant punitive action. Such actions against foreign sovereigns or their instrumentalities, even more so than private civil suits, therefore, directly implicate the foreign policy and international comity considerations that underlie foreign sovereign immunity, which Congress has carefully regulated by statute for civil cases. If one sovereign nation is to break with international law to brand another as a criminal, such a momentous act should be taken by political leaders wielding legislative authority, rather than by prosecutors, courts, and juries unversed in, and unguided by, the "delicate" and "sensitive" foreign policy considerations such prosecutions entail. *Schooner Exchange*, 11 U.S. at 135; *Verlinden*, 461 U.S. at 493. This Court should therefore hold that foreign sovereign nations and their instrumentalities cannot be subject to criminal prosecution, and leave it to Congress to debate and decide, after considering the foreign policy ramifications, whether the United States should become the first nation to do so.

## III.  COMMON-LAW FOREIGN SOVEREIGN IMMUNITY CANNOT BE ABROGATED BY EXECUTIVE FIAT.

At the end of *Halkbank I*, this Court briefly stated that "at common law, sovereign immunity determinations were the prerogative of the Executive Branch; thus, the decision to bring criminal charges would have necessarily manifested the Executive Branch's view that no sovereign immunity existed." 16 F.4th at 351. In

26

the Supreme Court, the government made a similar argument. *Halkbank II*, 143 S.

Ct. at 951. But the Court did not accept that argument, instead remanding because

this Court "did not fully consider" common-law immunity. *Id.*

The Court should now reject that argument upon fuller consideration. The

Supreme Court remanded for this Court to consider "common-***law*** arguments"

regarding immunity. *Id.* at 952 (emphasis added). "It is emphatically the province

and duty ***of the judicial department*** to say what the law is." *Marbury v. Madison*,

5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). Thus, courts, not the

Executive, decide what the law is. And while this Court can consider the

persuasive effect of the Government's position in appropriate cases involving

foreign sovereigns—where the Government is not itself a party—it remains this

Court's duty to declare the law. The Court should not abdicate that duty by

allowing the law to be determined by Executive fiat.

The Government has long made its views on foreign sovereign immunity

known to courts. But those views have generally been styled and treated as

"suggestions," not legal dictates. For example, in *Schooner Exchange* the

Executive, "suggest[ed]" the vessel should be released. *See* 11 U.S. at 118-19.

But Chief Justice Marshall did not reflexively adopt this suggestion, instead

announcing the governing common-law principle and applying it to the facts. Only

thereafter did the Court note that its decision was supported by the Executive's

27

view. *Id.* at 147. And in *Berizzi Bros.*, the Executive stated that a merchant ship

should ***not*** have immunity, *see The Pesaro*, 277 F. 473, 479 n.3 (S.D.N.Y. 1921),

but the Supreme Court held otherwise. *See Berizzi Bros.*, 271 U.S. at 576.

Thus, on questions related to foreign sovereign immunity, "the courts

respect, but do not automatically follow, the views of the Executive Branch."

*Yousuf*, 699 F.3d at 773.[8] This principle was confirmed in the 1952 Tate Letter,

which stated that its new policy with respect to civil immunity was based on the

State Department's views on changes in customary international law and expressly

"realized that ***a shift in policy by the executive cannot control the courts***." 26

Dep't State Bull. at 985 (emphasis added); *see also* Robert M. Jarvis, *The Tate

Letter: Some Words Regarding Its Authorship*, 55 Am. J. Leg. Hist. 465, 470-71

(2015) (speech by Mr. Tate noting that the question "is it International Law?"

motivated the change in policy and that "the letter points out that it is realized that

a shift in policy by the executive cannot control the courts").

And while pre-FSIA courts sometimes deferred to Executive views that

sovereign immunity ***should*** be recognized in civil cases, *see, e.g.*, *Peru*, 318 U.S.

---

8    For certain other doctrines, however, the Constitution entrusts decisions to
the Executive. For example, the Executive will be afforded conclusive deference
on recognizing head-of-state or diplomatic immunity, based on the Constitution's
delegation to the President of the power to "receive Ambassadors and other public
Ministers," U.S. Const. art. II, § 3. *See Yousuf*, 699 F.3d at 772. This case
involves no such doctrines.

at 589, amici are aware of no case where the Supreme Court or this Court ever deferred to an Executive suggestion that immunity ***should not*** be recognized.[9]  A court may reasonably be concerned by an Executive decision that proceeding with a civil case would undermine the Executive's foreign policy.  *Cf. Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198, 1201 (2d Cir. 1971) (noting "[t]he potential harm or embarrassment resulting to our government from a judicial finding of jurisdiction, in the face of an Executive recommendation to the contrary").  But no similar concern is raised by prosecutors' self-serving declaration that a party they are already prosecuting lacks common-law immunity.

Finally, regardless of whether the Executive receives deference on common-law civil immunity decisions, there is no precedent for this Court deferring to an Executive branch decision in a ***criminal*** case to which the United States is the initiating party.  That would improperly allow the Executive to determine the law that governs its own actions.  Moreover, deference is not normally accorded "to agency litigating positions that are wholly unsupported by regulations, rulings, or

---

[9]    Dicta in *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945), states that "[i]t is … not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize."  This was pure dicta because in *Hoffman*, the Executive "took no position" on immunity.  *Id.* at 31-32.  And *Hoffman*'s dicta states only that courts should not allow immunity on "new grounds" the government has not recognized.  *Id.* at 35.  Halkbank's absolute immunity is not a "new ground"; rather, the law has mandated it for more than two centuries.

29

administrative practice." *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). Amici are aware of no regulation, ruling, or administrative practice supporting the United States' immunity position in this case. Rather, it appears to be a *post hoc* justification for a prosecutorial decision made long ago. That self-serving view, engineered to advance a litigating position, warrants no deference.

## CONCLUSION

For these reasons, and those in appellants' briefs, the Court should reverse the judgment.

Respectfully submitted,

/*s*/ *Jonathan S. Franklin*

Ayşe Yüksel Mahfoud
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 408-1047

Jonathan S. Franklin
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466

August 4, 2023

Counsel for Amici Curiae

**CERTIFICATE OF COMPLIANCE
WITH WORD VOLUME LIMITATION**

This brief complies with the type-volume limitations of Fed. R. App. P.

29(a)(5) and Second Circuit Rules 29.1(c) and 32.1(a)(4)(A) because this brief

contains 6972 words, excluding the parts of the brief exempted by Fed. R. App. P.

32(f).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in 14-point Times New Roman typeface.

August 4, 2023

                                        */s/ Jonathan S. Franklin*
                                        Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I filed the foregoing brief through

the Court's CM-ECF system, which served the brief on counsel for the parties.


<u>        */s/ Jonathan S. Franklin*        </u>
Counsel for Amici Curiae