# 20-3499

*To Be Argued By*:
MICHAEL D. LOCKARD

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 20-3499

━━◆◆◆━━

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

TURKIYE HALK BANKASI, A.S., also known as Halkbank,

*Defendant-Appellant*,

*(Caption continued on inside cover)*,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

MICHAEL D. LOCKARD,
DAVID W. DENTON JR.,
JONATHAN REBOLD,
GEORGE D. TURNER,
HAGAN SCOTTEN,
  *Assistant United States Attorneys*,
        *Of Counsel.*

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
        of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

REZA ZARRAB, also known as Riza Sarraf, CAMELIA JAMSHIDY, also known as Kamelia Jamshidy, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, also known as Can Sarraf, also known as Kartalmsd, MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,

*Defendants.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Halkbank's Motion to Dismiss Based on
        Foreign Sovereign Immunity . . . . . . . . . . . .  3

    B.  The District Court's Denial of Halkbank's
        Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

    C.  This Court's Affirmance of the District
        Court's Order. . . . . . . . . . . . . . . . . . . . . . . . .  5

    D.  The Supreme Court's Affirmance in Part and
        Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

ARGUMENT:

POINT I—Common-Law Foreign Sovereign Immunity
Does Not Extend Where the Executive
Determines that Immunity Should Not Be
Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  7

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        1.  Under the Common Law, Courts Defer to
           the Executive's Views on Whether to
           Extend Foreign Sovereign
           Immunity . . . . . . . . . . . . . . . . . . . . . . .  9

        2.  Halkbank Has Identified No Precedent
           for Ignoring the Executive's Views in this
           Case. . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

3.   Separation of Powers Principles Also
     Support Deference to the
     Executive . . . . . . . . . . . . . . . . . . . . . . .  21

4.   Halkbank's Policy Arguments Further
     Show the Importance of Deference to the
     Executive . . . . . . . . . . . . . . . . . . . . . . .  24

POINT II—Common-Law Immunity Would Not Apply
to Halkbank's Commercial Activity Even Absent
Deference to the Executive . . . . . . . . . . . . . . . . .  26

A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . .  27

B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  28

1.   This Court Correctly Determined that
     the Indictment Concerns Halkbank's
     Commercial Activity . . . . . . . . . . . . . .  28

2.   The Common Law Does Not Immunize
     State-Owned Corporations from
     Prosecution . . . . . . . . . . . . . . . . . . . . . .  30

3.   Halkbank's Claims of Public Purpose Do
     Not Defeat the Commercial Character of
     the Conduct in the Indictment . . . . . .  35

4.   Halkbank's Extraterritoriality
     Arguments Are Without Merit . . . . . .  38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

# TABLE OF AUTHORITIES

*Cases*:

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
   425 U.S. 682 (1976). . . . . . . . . . . . . . . . . . . . . . 19, 35

*Arango v. Guzman Travel Advisors,*
   761 F.2d 1527 (11th Cir. 1985) . . . . . . . . . . . . . 31

*Baker v. Carr,*
   369 U.S. 186 (1962). . . . . . . . . . . . . . . . . . . . . . . 11

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (1964). . . . . . . . . . . . . . . . . . . . . . . 17

*Bank Markazi v. Peterson,*
   578 U.S. 212 (2016). . . . . . . . . . . . . . . . . . . . 22, 34

*Bartlett v. Baasiri,*
   81 F.4th 28 (2d Cir. 2023) . . . . . . . . . . . . . . . . . 8

*Berizzi Bros. Co. v. The Pesaro,*
   271 U.S. 562 (1926). . . . . . . . . . . . . . . . . . . . . . . 18

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023). . . . . . . . . . . . . . . . . . . . . 31

*Coale v. Société Coop. Suisse des Charbons,*
   21 F.2d 180 (S.D.N.Y. 1921). . . . . . . . . . . . . . . . 32

*Coleman v. Tennessee,*
   97 U.S. 509 (1878). . . . . . . . . . . . . . . . . . . . . . . . 31

*The Divina Pastora,*
   17 U.S. 52 (1819). . . . . . . . . . . . . . . . . . . . . . . . . 10

PAGE

*Doe v. De Leon*,
　555 F. App'x 84 (2d Cir. 2014) . . . . . . . . . . . . 9, 11

*Dogan v. Barak*,
　932 F.3d 888 (9th Cir. 2019) . . . . . . . . . . . . . . . 17

*Dow v. Johnson*,
　100 U.S. 158 (1879). . . . . . . . . . . . . . . . . . . . . . . . 31

*F.H.A. v. Burr*,
　309 U.S. 242 (1940). . . . . . . . . . . . . . . . . . . . . . . 32

*F.W. Stone v. Eng'g Co. v. Petroleos Mexicanos of*
　*Mexico, D.F.*, 42 A.2d 57 (Pa. 1945). . . . . . . . . . . 31

*Fed. Land Bank of St. Louis v. Priddy*,
　295 U.S. 229 (1935). . . . . . . . . . . . . . . . . . . . . . . 32

*First Nat'l City Bank v. Banco Para El Comercio*
　*Exterior de Cuba*, 462 U.S. 611 (1983) . . . . . . . . 32

*Flores v. S. Peru Copper Corp.*,
　414 F.3d 233 (2d Cir. 2003) . . . . . . . . . . . . . . . . 12

*Galo-Garcia v. I.N.S.*,
　86 F.3d 916 (9th Cir. 1996) . . . . . . . . . . . . . . . . 12

*Garb v. Poland*,
　440 F.3d 579 (2d Cir. 2006) . . . . . . . . . . . . . . . . 39

*Goar v. Compania Peruana de Vapores*,
　688 F.2d 417 (5th Cir. 1982) . . . . . . . . . . . . . 15, 16

*Heaney v. Gov't of Spain*,
　445 F.2d 501 (2d Cir. 1971) . . . . . . . . . . . . . . 8, 24

*In re Grand Jury Investigation of the Shipping*
　*Indus.*, 186 F. Supp. 298 (D.D.C 1960) . . . . . 20, 33

PAGE

*In re Grand Jury Proceeding Related to M/V Deltuva,*
    752 F. Supp. 2d 173 (D.P.R. 2010) . . . . . . . . . . . 30

*In re Grand Jury Subpoena,*
    912 F.3d 623 (D.C. Cir. 2019) . . . . . . . . . . . . . . 30

*In re Investigation of World Arrangements,*
    13 F.R.D. 280 (D.D.C. 1952) . . . . . . . . . 19, 20, 33

*In re N. Sea Brent Crude Oil Futures Litig.,*
    2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016) . . . . 33

*In re Pangang Grp., Co.,*
    901 F.3d 1046 (9th Cir. 2018) . . . . . . . . . . . . . . . 30

*In re Sealed Case,*
    825 F.2d 494 (D.C. Cir. 1987) . . . . . . . . . . . . . . . 30

*Jesner v. Arab Bank, PLC,*
    138 S. Ct. 1386 (2018) . . . . . . . . . . . . . . . . . . . . . 14

*Kiobel v. Royal Dutch Petroleum Co.,*
    569 U.S. 108 (2013) . . . . . . . . . . . . . . . . . . . . . . . 39

*Lebron v. Nat'l R.R. Passenger Corp.,*
    513 U.S. 374 (1995) . . . . . . . . . . . . . . . . . . . . . . . 32

*The Maipo,*
    259 F. 367 (S.D.N.Y. 1919) . . . . . . . . . . . . . . . . . 38

*Mason v. Intercontinental Railway of Canada,*
    83 N.E. 876 (Mass. 1908) . . . . . . . . . . . . . . . . . . 31

*Matar v. Dichter,*
    563 F.3d 9 (2d Cir. 2009) . . . . . . . . . . . . . . . . 9, 11

*Medellin v. Texas,*
    552 U.S. 491 (2008) . . . . . . . . . . . . . . . . . . . . . . . 12

PAGE

*Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397 (N.J. 1918) . . . . . . . . . . . 32

*Munaf v. Geren*,
553 U.S. 674 (2008). . . . . . . . . . . . . . . . . . . . . 14, 24

*National City Bank of New York v. Republic of China*,
348 U.S. 356 (1955). . . . . . . . . . . . . . . . . . . . . . . . 39

*Oliver Am. Trading Co. v. Gov't of U.S. of Mexico*,
5 F.2d 659 (2d Cir. 1924) . . . . . . . . . . . . . . . 37, 38

*Opati v. Republic of Sudan*,
140 S. Ct. 1601 (2020). . . . . . . . . . . . . . 11, 13, 15

*The Paquete Habana*,
175 U.S. 677 (1900). . . . . . . . . . . . . . . . . . . . . . 12

*Pasquantino v. United States*,
544 U.S. 349 (2005). . . . . . . . . . . . . . . . . . 8, 9, 25

*Peninsula Asset Mgmt. v. Hankook Tire Co.*,
476 F.3d 140 . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*The Pesaro*,
277 F. 473 (S.D.N.Y. 1921) . . . . . . . . . . . . . . . 18

*Eric R. Co. v. Tompkins*,
304 U.S. 64 (1938). . . . . . . . . . . . . . . . . . . . . . . 12

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992). . . . . . . . . . . . . . . . . . . . 35, 39

*Republic of Austria v. Altmann*,
541 U.S. 677 (2004). . . . . . . . . . . . . . . . . . 8, 11, 24

*Republic of Mexico v. Hoffman*,
324 U.S. 30 (1945). . . . . . . . . . . . . . . . . . . . *passim*

PAGE

*Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui",*
    639 F.2d 872 (2d Cir. 1981) . . . . . . . . . . . . . 15, 16

*Wulfsohn v. Russian Socialist Federated Soviet Republic,* 138 N.E. 24 (N.Y. 1923) . . . . . . . . . . . 39

*Samantar v. Yousuf,*
    560 U.S. 305 (2010). . . . . . . . . . . . . . . . . . *passim*

*Schooner Exchange v. McFaddon,*
    11 U.S. 116 (1812). . . . . . . . . . . . . . . . . . . . *passim*

*Spacil v. Crowe,*
    489 F.2d 614 (5th Cir. 1974) . . . . . . . . . . . . . . . 21

*Texas Trading & Mill Corp. v. Fed. Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981) . . . . . . . . . 36

*Thacker v. TVA,*
    139 S. Ct. 1435 (2019). . . . . . . . . . . . . . . . . . . 32

*TMR Energy Ltd. v. State Prop. Fund of Ukraine,*
    411 F.3d 296 (D.C. Cir. 2005). . . . . . . . . . . . . . 12

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes,*
    336 F.2d 354 (2d Cir. 1964) . . . . . . . . . 23, 37, 38

*Turkiye Halk Bankasi A.S. v. United States,*
    598 U.S. 264 (2023). . . . . . . . . . . . . . . . . . *passim*

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 3

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936). . . . . . . . . . . . . . . . . . . . . 13

PAGE

*United States v. Deutsches Kalisyndikat Gesellschaft,*
  31 F.2d 199 (S.D.N.Y. 1929). . . . . . . . . . . . . . . . . 39

*United States v. Eireann,*
  89 Cr. 647 (S.D. Fla. Oct. 6, 1989) . . . . . . . . . . . 30

*United States v. Halkbank,*
  15 Cr. 867 (RMB), 2020 WL 5849512
  (S.D.N.Y. Oct. 1, 2020) . . . . . . . . . . . . . . . . . . . 4, 5

*United States v. Ho,*
  16 Cr. 46, 2016 WL 5875005
  (E.D. Tenn. Oct. 7, 2016) . . . . . . . . . . . . . . . . . . 30

*United States v. Jasin,*
  91 Cr. , 1993 WL 259436
  (E.D. Pa. July 7, 1993) . . . . . . . . . . . . . . . . . . . . 30

*United States v. Lee,*
  106 U.S. 196 (1882). . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Noriega,*
  117 F.3d 1206 (11th Cir. 1997) . . . . . . . . . . . . 9, 23

*United States v. Ravara,*
  27 F. Cas. 714 (C.C.D. Pa. 1794) . . . . . . . . . . . . 30

*United States v. Statoil, ASA,*
  06 Cr. 960 (S.D.N.Y. Oct. 13, 2006). . . . . . . . . . 30

*United States v. Turkiye Halk Bankasi A.S.,*
  16 F.4th 336 (2d Cir. 2021) . . . . . . . . . . . . . *passim*

*United States v. Yousef,*
  327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . 12, 17

PAGE

*United States v. Zarrab,*
  15 Cr. 867 (RMB), 2016 WL 6820737 (S.D.N.Y.
  Oct. 17, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Verlinden B.V. v. Cent. Bank of Nigeria,*
  461 U.S. 480 (1983). . . . . . . . . . . . . . . . . . . *passim*

*Waters v. Churchill,*
  511 U.S. 661 (1994). . . . . . . . . . . . . . . . . . . . . . . . 20

*Ye v. Zemin,*
  383 F.3d 620 (7th Cir. 2004) . . . . . . . . . . . . . . . . 13

*Zuza v. Off. of High Representative,*
  107 F. Supp. 3d 90 (D.D.C. 2015) . . . . . . . . . . . 21

*Statutes, Rules & Other Authorities:*

Curtis A. Bradley et al. *Sosa, Customary
  International Law, and the Continuing Relevance
  of Erie*, 120 Harv. L. Rev. 869 (2007) . . . . . . . . 13

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 20-3499

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

TÜRKIYE HALK BANKASI, A.Ş., also known as Halkbank,

*Defendant-Appellant,*

REZA ZARRAB, also known as Riza Sarraf, CAMELIA JAMSHIDY, also known as Kamelia Jamshidy, HOSSEIN NAJAFZADEJ, MOHAMMAD ZARRAB, also known as Can Sarraf, also known as Kartalmsd, MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,

*Defendants.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Türkiye Halk Bankasi, A.Ş. ("Halkbank") appeals from a decision and order entered on October 1, 2020, in the United States District Court for the Southern

District of New York by the Honorable Richard M. Berman, United States District Judge, denying Halkbank's motion to dismiss the indictment against it on grounds of sovereign immunity.

Superseding Indictment S6 15 Cr. 867 (RMB) (the "Indictment") was filed on October 15, 2019, in six counts. Count One charges Halkbank with conspiring to obstruct the lawful functions of the U.S. Department of the Treasury, in violation of 18 U.S.C. § 371. Count Two charges Halkbank with conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705. Count Three charges Halkbank with bank fraud, in violation of 18 U.S.C. § 1344. Count Four charges Halkbank with conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349. Count Five charges Halkbank with money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). Count Six charges Halkbank with conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h).

On August 10, 2020, Halkbank moved to dismiss the Indictment based on claims of sovereign immunity. On October 1, 2020, Judge Berman denied the motion.

Halkbank filed an interlocutory appeal. On October 22, 2021, this Court affirmed Judge Berman's order. The Court denied Halkbank's motion for rehearing or rehearing *en banc* by order dated December 15, 2021.

Halkbank filed a petition for certiorari on May 22, 2022, which the Supreme Court granted on October 3, 2022. On April 13, 2023, the Supreme Court affirmed

the Court's order in part and vacated in part, and remanded for further proceedings.

## Statement of Facts

As this Court has previously explained, the Indictment charges that Halkbank participated in a multi-year conspiracy to violate sanctions against the Government of Iran, launder money, and defraud other banks in order to provide the Government of Iran, the Central Bank of Iran, and the National Iranian Oil Company access to billions of dollars' worth of funds held in Halkbank accounts. *See United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 341 (2d Cir. 2021) ("*Halkbank I*"). Halkbank conspired with its own senior officers, with Turkish and Iranian government officials, and with Turkish and Iranian businessmen and bank officers to plan and execute this scheme. *Id.* During the course of the conspiracy, senior Halkbank officials lied to officials in the U.S. Treasury Department during in-person meetings and phone calls specifically addressing Iranian funds at Halkbank. *Id.*; *see also United States v. Atilla*, 966 F.3d 118, 122, 128-29 (2d Cir. 2020).

## A. Halkbank's Motion to Dismiss Based on Foreign Sovereign Immunity

On August 10, 2020, Halkbank moved to dismiss the Indictment based mainly on a claim of foreign sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602-11. (Dkt.

645, 646).[1] Halkbank argued that it is an instrumentality of the Government of Turkey and is thus absolutely immune from criminal prosecution under the FSIA. *See Halkbank I*, 16 F.4th at 342-43. Halkbank further argued that the FSIA's exceptions to immunity do not extend to criminal prosecutions at all but that, to the extent that the exceptions do extend to criminal cases, the FSIA's commercial activity exception does not apply under the facts of this case. *Id.* at 343. Finally, Halkbank argued that in the alternative common-law sovereign immunity barred the prosecution. *Id.*

## B. The District Court's Denial of Halkbank's Motion

The District Court denied Halkbank's motion to dismiss. The District Court held that the "FSIA does not appear to grant immunity in criminal proceedings." *United States v. Halkbank*, 15 Cr. 867 (RMB), 2020 WL 5849512, at *4 (S.D.N.Y. Oct. 1, 2020). The District Court further held that if the FSIA did apply, its "commercial activity exceptions would clearly apply and support the Halkbank prosecution." *Id.*

The District Court also rejected Halkbank's claim that it is entitled to immunity under the common law,

---

[1] "Br." refers to Halkbank's brief on remand to this Court; "A." refers to the appendix filed with that brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case quotations omit all internal citations, quotation marks, and alterations.

noting that "Halkbank cites no support for this argument." *Id.* at *6. Moreover, the District Court recognized that "[b]y pursuing Halkbank's prosecution, according to the Government, the U.S. Executive Branch has clearly manifested its clear sentiment that Halkbank should be denied immunity." *Id.*

## C. This Court's Affirmance of the District Court's Order

This Court affirmed. It saw no need to decide whether the "FSIA confers immunity on foreign sovereigns in the criminal context," because "even assuming *arguendo*" that it does, "the offense conduct with which Halkbank is charged falls within FSIA's commercial activities exception." *Halkbank I*, 16 F. 4th at 347. This Court explained that because the statutory text "plainly states that FSIA's exceptions to foreign sovereign immunity apply 'in any case,'" the commercial-activity exception would necessarily be "available in criminal proceedings" even if FSIA immunity applies to those proceedings. *Id.* at 347-48 n.48 (quoting 28 U.S.C. § 1605(a)).

This Court found that Halkbank's "offense conduct qualifies as commercial activity under all three [alternative] categories set forth in" the FSIA's commercial-activity exception, which encompass commercial activity in the United States, acts in the United States in connection with commercial activity abroad, and acts abroad in connection with commercial activity that cause a direct effect in the United States. *Id.* at 347. This Court further observed that "the 'gravamen' of the charges against" Halkbank consists of its

participation in schemes to "launder approximately $1 billion in Iranian oil and gas proceeds through the U.S. financial system" and its misrepresentations "to Treasury officials regarding the nature of these transactions." *Id*. at 349.

This Court also rejected Halkbank's argument for "immun[ity] from criminal prosecution under common law." *Id*. at 350. It explained that sovereign-immunity determinations at common law "were the prerogative of the Executive Branch," so "the decision to bring criminal charges would have necessarily manifested the Executive Branch's view that no sovereign immunity existed." *Id*. at 351.

## D. The Supreme Court's Affirmance in Part and Remand

The Supreme Court granted Halkbank's petition for a writ of certiorari and affirmed this Court's order in part and remanded in part. With respect to Halkbank's argument that it is immune from criminal prosecution under the FSIA, the Court held that "the FSIA does not grant immunity to foreign states or their instrumentalities in criminal proceedings." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 270-72 (2023).

With respect to Halkbank's claim of common-law immunity, the Supreme Court concluded that this Court "did not fully consider the various arguments regarding common-law immunity" or "whether and to what extent foreign states and their instrumentalities are differently situated for purposes of common-law immunity in the criminal context," and remanded to

this Court for consideration of the common-law immunity issues. *Id*. at 280-81.

## ARGUMENT

On remand, Halkbank elaborates on the same common-law immunity arguments this Court rejected in *Halkbank I*. Halkbank argues that the common law precludes the United States from bringing criminal charges against a foreign state-owned corporation for violations of U.S. law, notwithstanding the Executive Branch's determination that foreign sovereign immunity should not apply in this case. But in *Halkbank I* this Court correctly held that common-law foreign sovereign immunity has no application here because through the act of bringing this prosecution, the Executive Branch has determined that immunity is unwarranted. 16 F.4th at 351. And even if common-law sovereign immunity could apply despite the Executive's determination to bring charges, that common-law immunity would not apply here because the Indictment concerns Halkbank's commercial activity, as this Court also correctly held. *Id.*

## POINT I

## Common-Law Foreign Sovereign Immunity Does Not Extend Where the Executive Determines that Immunity Should Not Be Granted

### A. Applicable Law

Before the passage of the FSIA, questions of foreign sovereign immunity were "a matter of 'grace and

comity,' not power, and of 'common law,' not statute." *Bartlett v. Baasiri,* 81 F.4th 28, 31 (2d Cir. 2023) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983), and *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010)). Under the common law, "that entitlement was determined by the executive branch, not the judiciary." *Id.* at 31-32; *see also Turkiye Halk Bankasi*, 598 U.S. at 271 ("In determining whether to allow suits against foreign sovereigns . . . courts traditionally deferred to the decisions of the political branches—in particular, those of the Executive Branch."); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945) (the "rule of substantive law" in cases involving immunity claims has long been that courts "accept and follow the executive determination").

Courts defer to the Executive because the Executive, rather than the Judiciary, is best positioned to decide the questions of foreign policy at the heart of whether to extend immunity to a foreign sovereign. *See, e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 369 (2005); *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004) (immunity determinations reflect "political realities and relationships" and thus "[t]hroughout history, courts have resolved questions of foreign sovereign immunity by deferring to the decisions of the political branches on whether to take jurisdiction"); *Heaney v. Gov't of Spain*, 445 F.2d 501, 503 (2d Cir. 1971) ("[T]he contemporary rationale for sovereign immunity is the avoidance of possible embarrassment to those responsible for the conduct of the nation's foreign relations; in determining the scope of the immunity which a foreign sovereign enjoys, courts have therefore deferred to" the determinations of the Executive).

## B. Discussion

### 1. Under the Common Law, Courts Defer to the Executive's Views on Whether to Extend Foreign Sovereign Immunity

This Court need not determine the outer boundaries of common-law foreign sovereign immunity in this case because, as this Court has recognized in this case and others, the common law does not recognize such immunity where, as here, the Executive determines that immunity is unwarranted. *See Halbank I*, 16 F.4th at 350-51; *Matar v. Dichter*, 563 F.3d 9, 15 (2d Cir. 2009) (deferring to Executive's suggestion that civil suit be dismissed on immunity grounds); *Doe v. De Leon*, 555 F. App'x 84, 85 (2d Cir. 2014) (same).

"[B]y electing to bring this prosecution, the Executive has assessed this prosecution's impact" on foreign relations. *Pasquantino*, 544 U.S. at 369. The determination to prosecute thus necessarily implies the decision not to grant Halkbank foreign sovereign immunity. For example, the Eleventh Circuit has correctly declined to grant immunity to a foreign head of state in a federal criminal prosecution, because the very fact of that prosecution manifested the Executive's decision that immunity was not warranted. *See United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997), *cert. denied*, 523 U.S. 1060 (1998). For the same reason, the District Court properly "accept[ed] and follow[ed]" the Executive Branch's determination that Halkbank was not entitled to immunity in this case. *Hoffman*, 324 U.S. at 36.

The history of deference to the Executive Branch's immunity determinations dates back to the case on which Halkbank principally relies, *The Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812). In *Schooner Exchange*, the Supreme Court recognized a background "principle of public law that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted *by the consent of that power* from its jurisdiction." 11 U.S. at 145-46 (emphasis added). At the same time, the Court emphasized that "[w]ithout doubt, the sovereign of the place is capable of destroying this implication" of immunity, by "claim[ing] and exercis[ing] jurisdiction . . . by subjecting such vessels to the ordinary tribunals." *Id.* The Court made clear that this "right to demand redress" from foreign sovereigns "belongs to the executive department, which alone represents the sovereignty of the nation in its intercourse with other nations." *Id.* at 132.

In the two centuries since *Schooner Exchange*, the Supreme Court has continued to defer to Executive Branch determinations of when foreign sovereign immunity applies or does not apply. In 1819, the Supreme Court emphasized the Executive's power to "claim and exercise jurisdiction" over foreign sovereigns, explaining that the presumption against jurisdiction over foreign sovereigns lasts only "until such power be expressly exerted." *The Divina Pastora*, 17 U.S. 52, 71 n.3. In 1882, the Supreme Court made clear that in foreign sovereign immunity cases, "the judicial department of this government follows the action of the political branch, and will not embarrass the latter by assuming an antagonistic jurisdiction." *United*

*States v. Lee*, 106 U.S. 196, 209. In 1945, the Supreme Court explained that just as courts must not "deny an immunity which our government has seen fit to allow," they also must not "allow an immunity on new grounds which the government has not seen fit to recognize" because doing so "may be equally embarrassing" to "the political department of government." *Hoffman*, 324 U.S. at 35-36; *see also Baker v. Carr*, 369 U.S. 186, 213 (1962) (noting that "judicial action . . . occurs in cases involving the immunity from seizure of vessels owned by friendly foreign governments" only "in the absence of a recognizedly authoritative executive declaration").

More recently, the Supreme Court has frequently cited *Schooner Exchange* for the principle of deference to Executive Branch immunity determinations. *See, e.g.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020); *Republic of Austria*, 541 U.S. at 688-89; *Verlinden*, 461 U.S. at 486. This Court, too, has explicitly recognized that "in the common-law context, we defer to the Executive's determination of the scope of [foreign sovereign] immunity." *Matar*, 563 F.3d at 15; *see also Doe*, 555 F. App'x at 85 (" '[U]nder our traditional rule of deference to such Executive determinations,' the United States' submission is dispositive" as to common-law foreign sovereign immunity of former President of Mexico) (quoting *Matar*, 563 F.3d at 13).

Deference to the Executive Branch's determinations as to the application of common-law foreign sovereign immunity flows from the principle behind that immunity. The "principle of public law" recognized in *Schooner Exchange* derived from the "common usage"

and "common opinion" of nations, 11 U.S. at 136, a type of rule commonly referred to as "customary international law." *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 248 (2d Cir. 2003) ("[C]ustomary international law—as the term itself implies—is created by the general customs and practices of nations."). But the circumstances under which a court may resort to customary international law have historically been circumscribed. "It has long been established that customary international law is part of the law of the United States to the limited extent that 'where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations.'" *United States v. Yousef*, 327 F.3d 56, 92 (2d Cir. 2003) (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). But where, as here, "a controlling executive . . . act does exist, customary international law is inapplicable." *Galo-Garcia v. I.N.S.*, 86 F.3d 916, 918 (9th Cir. 1996); *see also TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 302 (D.C. Cir. 2005) (noting that the "political branches have the final say about whether and how [customary international law] applies in the United States").[2]

---

[2] As Justice Gorsuch's partial concurrence noted in this case, "whether customary international law survives as a form of federal common law after *Erie* [*R. Co. v. Tompkins*, 304 U.S. 64 (1938)] is a matter of considerable debate among scholars." 598 U.S. at 287 (Gorsuch, J., concurring in part and dissenting in part); *see also Medellin v. Texas*, 552 U.S. 491, 504-06 (2008) ("international law commitments . . . do not by

The limited role of customary international law is displaced when the Executive has made a controlling determination as to the application of foreign sovereign immunity, given the Executive's primacy in the field of foreign relations. "In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936). Assessing the application of "foreign sovereign immunity . . . so often implicates judgments the Constitution reserves to the political branches." *Opati*, 140 S. Ct. at 1605. To state the obvious, "[t]he determination to grant (or not grant) immunity can have significant implications for this country's relationship with other nations." *Ye v. Zemin*, 383 F.3d 620, 627 (7th Cir. 2004). The Executive's initiation of this prosecution is

─────────

themselves function as binding federal law . . . in the absence of implementing legislation"). This Court need not resolve this question, because even if the customary international law of sovereign immunity can, in some cases, provide rules of substantive law after *Erie*, it does not apply here, because there is a "controlling executive . . . act"—the commencement of this prosecution. *See* Curtis A. Bradley et al., *Sosa, Customary International Law, and the Continuing Relevance of Erie*, 120 Harv. L. Rev. 869, 922 (2007) ("Around the time of *Erie*, the Supreme Court stopped applying the [customary international law] of immunity on its own authority, as it had done under the general common law regime, and began to justify its application on the basis of executive branch authorization.").

therefore dispositive, and common-law immunity has no application in this case. *See Munaf v. Geren*, 553 U.S. 674, 701 (2008) ("[A]s Chief Justice Marshall explained in the *Schooner Exchange,* 'exemptions from territorial jurisdiction must be derived from the consent of the sovereign of the territory' and are 'rather questions of policy than of law, that they are for diplomatic, rather than legal discussion.' " (quoting *Schooner Exchange*, 11 U.S. at 143, 146)).[3]

## 2. Halkbank Has Identified No Precedent for Ignoring the Executive's Views in this Case

Halkbank asserts that questions of "the scope and application of common-law immunity" are purely questions of law that are the province of the courts to determine without regard to the determinations of the political branches. (Br. 44-46). This assertion ignores both the limited role that customary international law plays in the application of the common law in the United States, and the repeated holdings of courts rejecting Halkbank's position.

---

[3] By contrast, there are other areas in which courts have been called on to decide questions of customary international law that, although potentially having significant effects on the foreign relations of the United States, do not directly affront the Executive Branch's Article II powers. *See, e.g., Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) (discussing customary international law regarding theories of corporate liability).

For example, Halkbank repeatedly relies on *Schooner Exchange*, claiming that "Chief Justice Marshall acknowledged the Executive's views as to the immunity in question only after first independently determining that, based on the law of nations, the vessel was entitled to immunity." (Br. 45). But in that case, where the Executive filed a suggestion of immunity, *see* 11 U.S. at 117 (describing submission of the U.S. Attorney for the District of Pennsylvania), the Supreme Court explained that, notwithstanding its conclusions that customary international law provided for immunity for the vessel in question, "[w]ithout doubt, the sovereign of the place is capable of destroying this implication . . . by subjecting such vessels to the ordinary tribunals." *Id.* at 146. Put another way, *Schooner Exchange* is not, as Halkbank depicts it, a decision suggesting that courts should apply foreign sovereign immunity contrary to the wishes of the Executive. It is very nearly the opposite: A decision holding that courts will accede to the Executive Branch's determination that foreign sovereign immunity should apply, thus defeating a suit that courts would otherwise entertain. *See id.* at 145-47; *Opati*, 140 S. Ct. at 1605 (describing *Schooner Exchange* as a case in which "accepting a suggestion from the Executive Branch, the Court agreed as a matter of comity to extend that same immunity to a foreign sovereign in the case at hand").

That interpretation is consistent with the two circuit cases Halkbank invokes in tandem with *Schooner Exchange*, *Goar v. Compania Peruana de Vapores*, 688 F.2d 417 (5th Cir. 1982), and *Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui"*, 639 F.2d

872, 879 (2d Cir. 1981). (Br. 1, 22). In *Ruggierio*, Judge
Friendly, writing for this Court, explained that:

> [I]n the 1940's the Court began to recog-
> nize that the decision whether to recog-
> nize immunity for liabilities arising out of
> commercial transactions by states or
> state-owned entities should depend on
> whether the State Department consid-
> ered that disallowance of sovereign im-
> munity for state commercial transac-
> tions would adversely affect the foreign
> relations of the United States.

*Ruggiero*, 639 F.2d at 878-79 (citing, among other
cases, *Hoffman*). *Goar* relied on *Ruggiero* and *Hoff-
man*, and reiterated that before the FSIA questions of
extending foreign sovereign immunity generally
turned on "executive statements of policy." *Goar*, 688
F.2d at 426.[4]

That holding is consistent with this Court's recog-
nition that "customary international law is part of the
law of the United States to the limited extent" of serv-
ing a gap-filling function in the absence of a

---

[4] Halkbank thus somewhat misses the point in
quoting *Ruggiero* concerning the state of "the common
law in 1791" (Br. 22). Whatever the best reading of the
common law in 1791, *Ruggiero* agrees that the state of
the law in the 1940s—which is to say before the FSIA,
when the law was the common law—required defer-
ence to the Executive's determinations on foreign sov-
ereign immunity.

"controlling executive or legislative act." *Yousef*, 327 F.3d at 92. "Although it is, of course, true that United States courts apply international law as part of our own in appropriate circumstances, the public law of nations can hardly dictate to a country which is in theory wronged how to treat that wrong within its domestic borders." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964). Here, a grand jury has found probable cause to believe that Halkbank has violated the criminal laws of the United States—committing wrongs against this country. And the Executive has decided to prosecute those crimes. Customary international law provides no basis for a court to nullify that decision. After all, common-law foreign sovereign immunity is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden*, 461 U.S. at 486. It is thus entirely appropriate for the political branches to determine when criminal violations pose such a threat to the security of this nation that "grace and comity" is not warranted.

Moreover, even if customary international law had some role to play here, that would not help Halkbank. As discussed below, there is no historical or customary-international-law pedigree for Halkbank's claim that a commercial bank receives immunity for its commercial activity simply because it is owned by a foreign state. (*See infra* at 30-38). Thus, this Court need not decide the degree of deference warranted to an Executive determination that is at odds with a long-recognized form of common-law immunity, because here the lack of historical support for Halkbank's claim supports the Executive's views. See, *e.g.*, *Dogan* v. *Barak*,

932 F.3d 888, 893 (9th Cir. 2019) (reserving issue of absolute deference because Executive common-law immunity determination could be upheld on substantial deference grounds).

Halkbank illustrates the weakness of its argument by invoking an anomalous decision, since disavowed, in *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926). (Br. 45). In that case, the Supreme Court held that a merchant ship of a friendly foreign government was immune from suit, 271 U.S. at 576, even though the Executive had previously informed the district court that it did not recognize the ship's immunity claim, *see The Pesaro*, 277 F. 473, 480 n.3 (S.D.N.Y. 1921). In reaching its conclusion, the Supreme Court did not address the Executive's determination. And although the Supreme Court cited *Schooner Exchange*, *see Berizzi Bros.*, 271 U.S. at 574-76, it did not discuss the *Schooner Exchange*'s recognition that the Executive Branch may "destroy[]" the implication of immunity by asserting that jurisdiction is proper. 11 U.S. at 146.

In *Hoffman*, the Supreme Court concluded that *Berizzi Bros.* had improperly ignored the longstanding practice of deferring to Executive Branch immunity determinations. It made clear that "[t]his salutary principle was not followed in *Berizzi Bros.*" and that "[t]he propriety of . . . extending the immunity where the political branch of the government had refused to act was not considered" in *Berizzi Bros. Hoffman*, 324 U.S. at 35 n.1. In a concurrence, Justice Frankfurter (joined by Justice Black) wrote that he "heartily welcome[d]" the Court's "implied recession from the decision in *Berizzi Bros.*," which rested on "considerations

[that] have steadily lost whatever validity they may then have had." *Id.* at 40 (Frankfurter, J., concurring). In a later decision, the Supreme Court observed that *Berizzi Bros.* was "severely diminished by later cases," including *Hoffman. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 699 (1976). More recently, in concluding that the FSIA did not displace common-law principles regarding the sovereign immunity of foreign officials, the Supreme Court expressly endorsed "the State Department's role in determinations regarding individual immunity." *Samantar*, 560 U.S. at 323. Halkbank's reliance on *Berizzi Bros.* thus further shows that their interpretation of the common law is an aberration.

Halkbank similarly invokes a district court case that did not in fact grapple with the issue in dispute here. (*See* Br. 44-45). A district court quashed a grand jury subpoena on grounds of foreign sovereign immunity in *In re Investigation of World Arrangements*, 13 F.R.D. 280, 288-291 (D.D.C. 1952). The court appeared to treat the absence of a suggestion specifically from the State Department as the same as Executive Branch silence on the matter, as it would have in a civil case involving private parties. *Id.* at 283 ("the court will not hesitate in future proceedings to seek advice and clarification of the Government's position by calling in government officials capable of advising the court"); *id.* at 290 ("The foreign government may adopt the procedure of asking the State Department to allow immunity . . . ."); *id.* at 291 (noting that a letter from the British Foreign Minister "passed through the State Department without comment or instructions"). And the court acknowledged that the Judiciary

determines whether to apply foreign sovereign immunity only in the absence of an Executive determination. *See id.* at 290 ("Where the political branch of the government declines to assert an opinion as to the status of a foreign sovereign . . . the courts may decide for themselves . . . .").

The *World Arrangements* opinion did not, however, discuss the possibility that by pursuing the subpoena the Executive had already provided its position. Halkbank describes the absence of any discussion on this point—that is, the point in dispute in this case—as "[t]he court disregarded entirely that the government was the party that had served the subpoena." (Br. 44). But "disregarded entirely" and "never examined" do not mean the same thing. *See Waters v. Churchill*, 511 U.S. 661, 678 (1994) ("These cases cannot be read as foreclosing an argument that they never dealt with.").[5] By contrast, here this Court has reached that question, and correctly found that "at common law, sovereign immunity determinations were the prerogative of the Executive Branch; thus, the decision to bring criminal charges would have necessarily manifested the

---

[5] Halkbank also relies on *In re Grand Jury Investigation of the Shipping Indus.*, 186 F. Supp. 298 (D.D.C 1960). But that case reached no conclusion as to whether foreign sovereign immunity required it to quash a grand jury subpoena, and to the extent it suggest such a result was possible, it relied on *Berizzi Brothers* and *World Arrangements. Id.* at 319-20.

Executive Branch's view that no sovereign immunity existed." *Halkbank I*, 16 F.4th at 351.

### 3. Separation of Powers Principles Also Support Deference to the Executive

Halkbank invokes the separation of powers to assert that the political branches' ultimate responsibility for the application of customary international law somehow "is not consistent with fundamental notions of fairness." (Br. 46-48). But the separation of powers is precisely why courts are reluctant to make proclamations overriding the Executive in cases with implications for foreign affairs. After all, "[s]eparation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy. And the degree to which granting or denying a claim of immunity may be important to foreign policy is a question on which the judiciary is particularly ill-equipped to second-guess the executive." *Spacil v. Crowe*, 489 F.2d 614, 618-19 (5th Cir. 1974). "[T]his delegation does not run afoul of the separation of powers doctrine; rather, it recognizes and incorporates the broad discretion historically enjoyed by the Executive Branch in granting immunity to foreign sovereigns." *Zuza v. Off. of High Representative*, 107 F. Supp. 3d 90, 97 (D.D.C. 2015) (discussing executive discretion to modify statutory immunity under the International Organizations Immunities Act), *aff'd*, 857 F.3d 935 (D.C. Cir. 2017). And under the common law, federal courts regularly accepted "as binding" the Executive's "case-specific determinations whether sovereign immunity should be recognized," which was

"never perceived as an encroachment on the federal courts' jurisdiction." *Bank Markazi v. Peterson*, 578 U.S. 212, 235-36 (2016).

Halkbank also suggests that the Executive's discretion to "determine claims of immunity" somehow undermines the principle "that defendants are able to meaningfully contest the government's accusations against them." (Br. 48). That is plainly wrong. Halkbank has every right to contest the allegations that it has violated U.S. law, with the same protections as any other defendant. The Executive Branch's decision here denies Halkbank only a special privilege—sovereign immunity—to which other defendants have no recourse, and which the United States sometimes extends solely as a "matter of grace and comity," *Verlinden*, 461 U.S. at 486, not any defendant's rights.

Halkbank asserts that deference "to the Executive's immunity determinations [is] only [warranted] when the government has urged the Court to grant immunity." (Br. 51). But the one-way street Halkbank proposes has no basis in law. The Supreme Court made clear in *Hoffman* that for the same reasons "that it is an accepted rule of substantive law governing the exercise of the jurisdiction of the courts that they accept and follow the executive determination that the vessel shall be treated as immune[, . . .] recognition by the courts of an immunity upon principles which the political department of government has not sanctioned may be equally embarrassing to it in securing the protection of our national interests." 324 U.S. at 36. Halkbank suggests that *Hoffman* is "limited to the unique circumstance of a court applying immunity in ways

foreign to existing law." (Br. 53). But that is not what *Hoffman* says, and that is not how this Court has read *Hoffman*, instead stating "we think it means at least that the courts should deny immunity where the State Department has indicated, either directly or indirectly, that immunity need not be accorded." *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 358 (2d Cir. 1964).

That is a correct interpretation not only of *Hoffman*, but the whole thrust of the common law's deference to executive determinations in these matters. The United States has done in this case precisely what Chief Justice Marshall held that it could: "destroy[ed] this implication" of immunity, by "claim[ing] and exercis[ing] jurisdiction . . . by subjecting [Halkbank] to the ordinary tribunals." *Schooner Exchange*, 11 U.S. at 146. As the Eleventh Circuit explained in the prosecution of a foreign head of state:

> The Executive Branch has not merely refrained from taking a position on this matter; to the contrary, by pursuing Noriega's capture and this prosecution, the Executive Branch has manifested its clear sentiment that Noriega should be denied head-of-state immunity. Noriega has cited no authority that would empower a court to grant head-of-state immunity under these circumstances.

*Noriega*, 117 F.3d at 1212. It would be utterly at odds with the established principle that courts must avoid "embarrass[ing] the executive arm in its conduct of foreign affairs," *Hoffman*, 324 U.S. at 35, for a court to

determine that Halkbank's self-interested assessment of its own immunity trumps the determination of "the executive arm" that Halkbank should be prosecuted for serious crimes that imperiled the national security of the United States.

### 4. Halkbank's Policy Arguments Further Show the Importance of Deference to the Executive

Halkbank gets it backwards in insisting that deferring to the Executive's determination on sovereign immunity "thrusts courts into foreign policy matters." (Br. 53). It is inherent in the concept of deference that courts *avoid* making foreign policy decisions, by allowing the Executive to do that instead. *See, e.g.*, *Republic of Austria*, 541 U.S. at 696; *Heaney*, 445 F.2d at 503. By contrast, Halkbank asks this Court to decide whether the United States should be barred from prosecuting it based on factors such as whether the United States could address Halkbank's crimes through other means, such as "diplomacy, tariffs, investment blocks, visa limits, export controls, the grant or denial of economic assistance, military aid, and sanctions." (Br. 56-57). Those questions lay far outside the Judiciary's wheelhouse. By deferring to the Executive's determination that criminally prosecuting a bank better accords with our foreign policy than, for example, imposing tariffs or denying military aid, this Court avoids embroiling itself in matters outside its expertise and responsibility. *See Munaf*, 553 U.S. at 703 (stressing that the Executive Branch "possess[es] significant diplomatic tools and leverage the judiciary lacks," making

it better equipped to "consider sensitive foreign policy issues").

The folly of Halkbank's approach becomes particularly clear in its discourse on possible foreign policy implications of this case. (Br. 54-57). It is not difficult to understand why the Executive might wish to treat Halkbank's crimes against this country as the acts of a bank and its officers, rather than a sovereign state. But Halkbank claims that the Executive must be compelled to treat the matter as a conflict between states, redressable only by more drastic measures. For example, before the Supreme Court Halkbank argued that dismissing this prosecution would not leave the Executive without recourse, given that "countries kill people" and "engage in extrajudicial killing all the time." (A. 190). In response, Justice Kavanaugh questioned whether the Court should tell the Executive "if you want to go after this bank, you can't use this tool"— referring to the instant prosecution—"you have to use a more extreme tool." (A. 190). That is not a dilemma that the law requires, or that this Court should be asked to create. *See Pasquantino*, 544 U.S. at 369 ("The greater danger . . . would lie in our judging this prosecution barred based on the foreign policy concerns animating the revenue rule, concerns that we have neither aptitude, facilities nor responsibility to evaluate.").[6]

---

[6] For similar reasons, Halkbank fails to advance its case by claiming that courts and juries should not be called upon to assess the "moral guilt" of a foreign sovereign. (Br. 53-54). The Executive Branch has

Finally, Halkbank's fear of state prosecutors run amok (Br. 54-55) fights a strawman. The Government's argument is that a *federal* prosecution, authorized and conducted by the Executive, merits deference, because it necessarily evinces the Executive's determination on the impropriety of extending immunity. A state prosecution quite obviously does not imply the same thing. And the question before this Court is whether "the common law does not provide for foreign sovereign immunity when, as here, the Executive Branch has commenced a federal criminal prosecution of a commercial entity like Halkbank." *Turkiye Halk Bankasi¸* 598 U.S. at 280. This Court can thus answer that question in the affirmative, consistent with two centuries of precedent, and leave the separate question of state prosecutions for another day. (*See* A. 223-27 (discussing means by which the Executive could forestall a state prosecution of a foreign sovereign)).

### POINT II

### Common-Law Immunity Would Not Apply to Halkbank's Commercial Activity Even Absent Deference to the Executive

This Court need not reach Halkbank's additional arguments, because the Executive's initiation of this prosecution warrants deference, and that is dispositive

---

made the foreign policy determination that Halkbank can be treated like a bank rather than a foreign state. And courts and juries are the appropriate entities to examine the guilt of a bank charged with federal crimes.

of Halkbank's claim of immunity. Even if, however, common-law sovereign immunity from criminal prosecution could apply despite the Executive's determination to bring charges, that common-law immunity would not apply here. Halkbank, though state-owned, is a commercial bank, and the charges in the Indictment concern Halkbank's commercial activity—activity to which immunity under the common law does not extend.

## A. Applicable Law

As the Supreme Court observed, prior to the enactment of the FSIA—when courts determined sovereign immunity in civil suits under the common law—courts "consistently deferred" to the Executive's decisions about the applicability of sovereign immunity. *Verlinden*, 461 U.S. at 486. In the middle of the twentieth century, the Executive adopted a policy of confining immunity to a foreign sovereign's public acts and removing immunity from its commercial acts—often referred to as the "restrictive theory" of sovereign immunity. *Id.* at 487. Thereafter, courts continued to defer to the State Department's suggestion, when made, as to the applicability of foreign sovereign immunity, and in the absence of any such suggestion from the State Department, courts sought to apply prior State Department decisions. *Id.*

That the FSIA does not extend immunity to commercial activities is thus not a statutory invention, but rather a codification of the state of the common law at the time of its adoption. *See Samantar*, 560 U.S. at 319. For that reason, this Court has held that "any

foreign sovereign immunity at common law also had an exception for a foreign state's commercial activity, just like FSIA's commercial activity exception." *Halkbank I* at 351 (citing *Verlinden*, 461 U.S. at 487-88).

## B. Discussion

### 1. This Court Correctly Determined that the Indictment Concerns Halkbank's Commercial Activity

This Court has already held that the Indictment concerns Halkbank's commercial acts. As it explained:

> The gravamen of the Indictment is not that Halkbank is the Turkish Government's repository for Iranian oil and natural gas proceeds in Turkey, *i.e.*, the purpose for which it held these funds. Rather, it is Halkbank's participation in money laundering and other fraudulent schemes designed to evade U.S. sanctions that is the core action taken by [Halkbank] ... And because those core acts constitute an activity that could be, and in fact regularly is, performed by private-sector businesses, those acts are commercial, not sovereign, in nature.

*Halkbank I*, 16 F.4th at 350. Whatever Halkbank's claimed purpose for engaging in the charged sanctions-evasion, money-laundering, and bank-fraud scheme, it carried out that scheme through ordinary banking activity: opening and maintaining deposit accounts, executing wire transfers, and meeting with

regulators. Even Halkbank's executives' receipt of millions of dollars' worth of bribes and Halkbank's participation in designing fraudulent documents to promote and conceal the scheme are the kinds of activity that "could be, and in fact regularly is, performed by private-sector businesses[.]" *Id*. Halkbank's attempt to characterize its executives' actions as "internal administrative acts by the Turkish state" or "acts concerning diplomatic activity" (Br. 40-41), have thus already—and correctly—been rejected by this Court.

Nothing in the Supreme Court's opinion gives this Court reason to reconsider its prior holding. Justice Gorsuch reached the same conclusion as this Court in his partial concurrence. *See Turkiye Halk Bankasi*, 598 U.S. at 282-83 ("In this case, the indictment sufficiently alleges that Halkbank has engaged in just those kinds of commercial activities"). The Supreme Court majority did not analyze this question directly, because it found the FSIA inapplicable, but nothing in its opinion creates room to doubt that the Indictment alleges commercial activity, given that it concerns the type of activity in which banks, including privately owned banks, routinely engage. *See id*. at 277 (rejecting "Halbank's view" that "a purely commercial business that is directly and majority-owned by a foreign state could engage in criminal conduct affecting U.S. citizens and threatening U. S. national security while facing no criminal accountability at all in U S. courts"). Thus, because the common law does not extend foreign sovereign immunity to commercial activity, and the charges in the Indictment plainly stem from Halkbank's commercial activity, the common law does not extend immunity to Halkbank in this case.

### 2. The Common Law Does Not Immunize State-Owned Corporations from Prosecution

Halkbank's account of the common law errs from the start, by depicting this case as historically unique. (*See* Br. 1). In fact, prosecutions of entities that were, or claimed to be, arms of a foreign sovereign are as old as the Republic. *See, e.g.*, *United States v. Ravara*, 27 F. Cas. 714, 715 (C.C.D. Pa. 1794) (prosecution of consul of the Republic of Genoa notwithstanding assertion of privilege based on his consular appointment). And when criminal actions against corporations generally became more common in the twentieth century, there were also such actions against corporations wholly or partly owned by foreign states. *See, e.g.*, *In re Grand Jury Investigation of the Shipping Industry*, 186 F. Supp.at 318-320; *In re Sealed Case*, 825 F.2d 494, 495 (D.C. Cir.) (per curiam), *cert. denied*, 484 U.S. 963 (1987); *United States v. Eireann*, 89 Cr. 647, D. Ct. Doc. 12 (S.D. Fla. Oct. 6, 1989); *United States v. Jasin*, 91 Cr. 602, 1993 WL 259436, at *1 (E.D. Pa. July 7, 1993); *United States v. Statoil, ASA*, 06 Cr. 960, D. Ct. Doc. 2 (S.D.N.Y. Oct. 13, 2006); *In re Grand Jury Proceeding Related to M/V Deltuva*, 752 F. Supp. 2d 173, 176-80 (D.P.R. 2010); *United States v. Ho*, 16 Cr. 46, 2016 WL 5875005, at *6 (E.D. Tenn. Oct. 7, 2016); *In re Grand Jury Subpoena*, 912 F.3d 623, 626 (D.C. Cir. 2019); *In re Pangang Grp., Co.*, 901 F.3d 1046, 1049 (9th Cir. 2018).

Halkbank further errs in claiming that it enjoys the absolute immunity of a sovereign state by dint of its status as an instrumentality of a foreign state. (Br. 16-

26). Halkbank relies heavily on cases that do not involve corporations like itself, and instead involve property directly under the ownership and control of the head of state, like *Schooner Exchange*, 11 U.S. at 136 (a warship) and *Mason v. Intercontinental Railway of Canada*, 83 N.E. 876 (Mass. 1908) (a railroad directly operated by the government of Canada, not organized as a corporation), as well as military officers acting during wartime, as in *Dow v. Johnson*, 100 U.S. 158 (1879), and *Coleman v. Tennessee*, 97 U.S. 509 (1878). And Halkbank only aids the Government's case in citing *F.W. Stone v. Eng'g Co. v. Petroleos Mexicanos of Mexico, D.F.,* 42 A.2d 57, 58 (Pa. 1945). That case turned not on any theory of absolute common-law immunity, but rather on the Executive's determination that immunity should be extended. *See id.* at 59. The only case Halkbank identifies that purported to apply absolute immunity to a commercial enterprise owned by a foreign government is *Berizzi Brothers*, the rationale of which has since been disavowed by the Supreme Court. (*Supra* at 18-19).[7]

___

[7] Halkbank's other citations on this point are simply inapposite. The discussion of state instrumentalities in *Biden v. Nebraska* was a standing question, not an immunity question. 143 S. Ct. 2355, 2386-87 (2023). *Arango v. Guzman Travel Advisors* did not concern the extent of immunity under the common law, and its single sentence equating the immunity enjoyed by sovereign states with the immunity extended to their commercial instrumentalities is based solely on the discredited reasoning of *Berizzi Bros.* 761 F.2d 1527, 1534 (11th Cir. 1985). Most of its other cases

Halkbank finds little precedent to fit its facts because "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626-627 (1983). Courts have thus traditionally distinguished between a sovereign and corporations it owns. *See, e.g., Coale v. Société Coop. Suisse des Charbons*, 21 F.2d 180, 181 (S.D.N.Y. 1921) (denying immunity to a corporation created, owned, and partially controlled by Swiss government); *Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397, 398-399 (N.J. 1918) (denying immunity to corporate "governmental agency of the state of Yucatan" and noting "that no authority can be found in the books for the proposition that foreign corporations which happen to be governmental agencies are immune from judicial process").

Similarly, the Executive Branch has historically declined to afford absolute immunity to separate juridical entities performing non-sovereign functions, such as state-owned corporations. As a result, both before

--------

concern the sovereign immunity of the United States in its own courts. *See Thacker v. TVA*, 139 S. Ct. 1435 (2019); *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995); *FHA v. Burr*, 309 U.S. 242 (1940); *Fed. Land Bank of St. Louis v. Priddy*, 295 U.S. 229 (1935). Those precedents rest on an entirely different principle of immunity: The United States is immune in its own courts because it does not permit itself to be sued there without its consent. *Burr*, 309 U.S. at 489.

the FSIA's passage and since, the United States has criminally prosecuted and served criminal process on commercial enterprises that are majority-owned by foreign governments, as listed above. (*See supra* at 30). That includes criminal prosecutions of the same companies that have successfully claimed immunity under the FSIA when sued civilly. *Compare Statoil,* No. 06-cr-960, *with In re N. Sea Brent Crude Oil Futures Litig.*, 2016 WL 1271063, at *1 (S.D.N.Y. Mar. 29, 2016). Halkbank's status as a state-owned bank thus does not grant it immunity on par with a foreign nation's warship, much less the foreign nation itself.

Halkbank's attempts to diminish the import of prior criminal proceedings against foreign government instrumentalities have little merit. Halkbank notes, for example, that state-owned instrumentalities who pleaded guilty "waived sovereign immunity." (Br. 29). But waiving a theoretical defense in the course of entering a guilty plea hardly indicates that the defense was meritorious in the first place. Halkbank also dismisses proceedings to enforce grand jury subpoenas, but surely a sovereign instrumentality immune from criminal prosecution would also be immune from criminal process. *Cf. Peninsula Asset Mgmt. v. Hankook Tire Co.*, 476 F.3d 140, 143-44 (2d Cir. 2007) (an agency or instrumentality of a foreign state entitled to immunity under the FSIA was immune from a civil subpoena *duces tecum*).[8]

---

[8]   Halkbank's misreading of *In re Investigation of World Arrangements*, 13 F.R.D. 280, and *In re Grand*

For similar reasons, Halkbank's selective quotation from the Government's arguments before the Supreme Court in this case (*see* Br. 10-11, 16, 23) do not support its claims here. When the Government stated that it "would not endeavor" to indict a "state qua state," it was explaining that indicting a state-owned corporation like Halkbank is a different matter. (A. 199-200). So too in explaining that indicting a foreign state itself would be "in derogation of the common law." (A. 207). Those arguments emphasized—and plainly did not abandon—"the well-recognized difference between a corporation and the state, which . . . dates back prior to the founding." (A. 215-16; *see also id.* at 217-20 (arguing that under both *Banco Nacional de Cuba* and founding-era precedents the law "makes clear that corporations are presumptively separate juridical entities" from their state owners)).

Halkbank thus lacks support for its sweeping assertion that the "restrictive theory of immunity in civil cases . . . had no effect whatsoever on the immunities owed sovereigns and their instrumentalities from criminal process." (Br. 38). Moreover, courts did not begin "applying the restrictive theory of immunity in civil cases" (Br. 38), of their own initiative. The Executive began applying the restrictive theory, and because the common law embraced judicial deference to the Executive's decisions on foreign sovereign immunity, the common law came to embody that theory. *See Samantar*, 560 U.S. at 319; *Verlinden*, 461 U.S. at 486.

---

*Jury Investigation of the Shipping Indus.*, 186 F. Supp. 298, is discussed above. (*See supra* at 19-20 & n.5).

Thus, even if the common law did not require deference to the Executive in the case at hand, the common law's prior adoption of the restrictive theory would leave Halkbank without immunity.

### 3. Halkbank's Claims of Public Purpose Do Not Defeat the Commercial Character of the Conduct in the Indictment

Halkbank misses the point in arguing that it performs some public functions. Whether Halkbank "serves public purposes" generally (Br. 35-36) is not the relevant issue. At pre-FSIA common law, the relevant question (in the absence of a position from the Executive) was "whether *the conduct in question* was the public act of those with authority to exercise sovereign powers." *Alfred Dunhill of London*, 425 U.S. at 694 (emphasis added). As the Supreme Court explained, "foreign sovereigns were not immune from the jurisdiction of American courts in cases '*arising out of* purely commercial transactions.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 613 (1992) (quoting *Dunhill*, 425 U.S. at 703) (emphasis added). Thus, in *Halkbank I*, this Court rejected Halkbank's public purpose arguments, because regardless of what Halkbank did beyond the conduct in the Indictment, and regardless of why it committed the acts in the Indictment, the acts in the Indictment were commercial activities that "literally anyone can do." 16 F.4th 349-50.[9]

---

[9] Halkbank's attempts to portray itself as a ministry of finance in corporate form (Br. 5-7, 33-37) also differ dramatically from how it presents itself outside

Halkbank argues that this Court applied the common law differently, relying on the purpose rather than the character of the acts at issue to determine immunity. (Br. 39-40). In support of that argument, it cites *Heaney* and *Victory Transport*. But this Court has characterized the portions of those decisions on which Halkbank relies as dicta, later overruled by the FSIA. *See Texas Trading & Mill Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 310 n.27 (2d Cir. 1981). And the Supreme Court eliminated any ground for relying on that dicta as evidence of the common law when it clarified that the FSIA did not differ from the common law, but rather codified the restrictive theory of foreign

---

this Court. For example, Halkbank represents itself to investors as "a full-service commercial and retail banking group," providing banking services to "retail, small and medium-sized enterprise ('SME'), and commercial and corporate customers across Turkey and select international markets." Halkbank, *Offering Memorandum* at 1 (May 29, 2014). Halkbank's principal lines of business are banking services for SMEs, including deposits, investment and working capital loans, specialized loans, non-cash loans, treasury products, and cash management services; corporate and commercial banking; retail banking; treasury management; and international banking. *Id.* at 1-2. As of its 2022 Annual Report, Halkbank had 1,032 branches, 4,075 ATMs, 20,781 employees, 1.06 billion Turkish lira in deposits, and 842.6 billion Turkish lira in cash loans. Halkbank, *Annual Report* at 11 (2022). In short, Halkbank is a commercial bank, and does what commercial banks do.

sovereign immunity that existed under the common law. *See, e.g.*, *Samantar*, 560 U.S. at 319 ("one of the primary purposes of the FSIA was to codify the restrictive theory of sovereign immunity").

Even under the test for public purpose as articulated by *Heaney* and *Victory Transport*, Halkbank's argument would fail. "Public purpose" under those cases was "generally limited to the following categories: (1) internal administrative acts, such as expulsion of an alien. (2) legislative acts, such as nationalization. (3) acts concerning the armed forces. (4) acts concerning diplomatic activity. (5) public loans." *Victory Transport*, 336 F.2d at 360. And a foreign sovereign's mere articulation of a connection to public purpose does not make a commercial activity public in nature. In *Victory Transport*, for example, a contract for hiring a vessel to transport wheat was commercial even if the purpose was to help feed the people of Spain, because it was "conducted through private channels of trade" and the state agency "acted much like any private purchaser of wheat." *Id.* at 361. Halkbank's sanctions evasion, money laundering, and bank fraud, too, were conducted through private banking channels, and Halkbank acted much like any private bank in carrying out those transactions.

Nor is Halkbank correct that this Court should defer to a foreign government's claim of public purpose. (*See* Br. 30-31). That is not the holding, or even the implication, of the case it cites. *See Oliver Am. Trading Co. v. Gov't of U.S. of Mexico*, 5 F.2d 659 (2d Cir. 1924). That suit directly named the Government of Mexico as its lead defendant. *Id.* And although it also

"nominally" named the national railways, "it [wa]s in reality a suit only against the Mexican government." *Id.* at 661. Correspondingly, the dismissal of that suit did not turn on deference to a foreign sovereign's view, but rather the fact after the suit was initiated, the Executive recognized the Government of Mexico, and the two governments entered a treaty providing that claims by U.S. citizens against Mexico would be resolved by a commission, thus depriving the district court of jurisdiction. *Id.* at 666.

Halkbank draws even less support from *The Maipo*, 259 F. 367, 368 (S.D.N.Y. 1919). The district court there deferred to a foreign state's assertion that one of its ships served a sovereign function. *Id.* at 368. But it stressed that it was declining to second-guess that assessment because that "must" be done "through diplomatic channels, and not through the judiciary." *Id.* *The Maipo* thus confirms that the Executive can, as it has here, determine that a particular commercial activity does not merit sovereign immunity. *See also Victory Transport*, 336 F.2d at 360 (noting that the Executive can effect a "contraction" of the categories of sovereign activity previously recognized by courts "[s]hould diplomacy require").

### 4. Halkbank's Extraterritoriality Arguments Are Without Merit

Halkbank misapprehends both the Indictment and the law in arguing that it enjoys immunity for the offenses alleged in the Indictment because, it claims, Halkbank's participation in those offenses took place in Turkey (Br. 41-42). As this Court has already found,

Halkbank carried on commercial activity in the United States, engaged in acts performed in the United States in connection with its commercial activity, and acted outside the United States in connection with commercial activity that caused a direct effect in the United States. *Halkbank I* at 348-49. Indeed, Halkbank's actions were less internal than were those of the Government of Argentina when it made the decision, by presidential decree within its own territory, to unilaterally extend the payment schedule on sovereign bonds. *Weltover*, 504 U.S. at 609-10, 618-19.

The cases that Halkbank cites do not contradict these principles. A district court found jurisdiction over an antitrust suit where, among other things, the Department of Justice (by bringing suit) and the Secretary of State (by letter to the Attorney General) agreed there was no immunity in *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 200 (S.D.N.Y. 1929). The Supreme Court denied immunity to China in a dispute over a bank deposit account, because by suing in United States courts China had rendered itself amenable to counterclaims, in *National City Bank of New York v. Republic of China*, 348 U.S. 356 (1955). In *Wulfsohn v. Russian Socialist Federated Soviet Republic*, the New York Court of Appeals found that the New York State courts lacked jurisdiction over the Soviet Republic's confiscation of property within Russia, 138 N.E. 24, 25-26 (N.Y. 1923). But that conduct has long been recognized as immune because it is non-commercial. *See Garb v. Poland*, 440 F.3d 579, 586-88 (2d Cir. 2006). Lastly, the Supreme Court held that the Alien Tort Statute did not apply extraterritorially in *Kiobel v. Royal Dutch Petroleum Co.* 569 U.S.

108, 124-25 (2013). *Kiobel* had nothing to say about foreign sovereign immunity, and Halkbank does not—and could not reasonably—argue that the presumption against extraterritoriality has any bearing on the charges here. *See United States v. Zarrab*, 15 Cr. 867 (RMB), 2016 WL 6820737, at *8-10 (S.D.N.Y. Oct. 17, 2016) (explaining why that presumption does not apply to the charges in this case).

Because Halkbank has been indicted for crimes against the United States, in violation of the United States Code and to the detriment of the United States, it—like any other bank that did the same—has no immunity from prosecution.

## CONCLUSION

**The District Court's order denying Halkbank's motion to dismiss the Indictment should be affirmed.**

Dated:    New York, New York
          November 20, 2023

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                            *of America.*

MICHAEL D. LOCKARD
DAVID W. DENTON JR.,
JONATHAN REBOLD,
GEORGE D. TURNER,
HAGAN SCOTTEN,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 9,418 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: HAGAN SCOTTEN,
*Assistant United States Attorney*