# 20-3499

# In the United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,
APPELLEE,

*v.*

REZA ZARRAB, AKA RIZA SARRAF, CAMELIA JAMSHIDY, AKA KAMELIA JAMSHIDY, HOSSEIN NAJAFZADEH, MOHAMMAD ZARRAB, AKA CAN SARRAF, AKA KARTALMSD, MEHMET HAKAN ATILLA, MEHMET ZAFER CAGLAYAN, ABI, SULEYMAN ASLAN, LEVENT BALKAN, ABDULLAH HAPPANI,
DEFENDANTS,

TÜRKIYE HALK BANKASI A.S., AKA HALKBANK,
DEFENDANT-APPELLANT.

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:15-CR-867-10 (THE HONORABLE RICHARD M. BERMAN, J.)*

**REPLY BRIEF OF DEFENDANT-APPELLANT ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES**

ROBERT M. CARY
JOHN S. WILLIAMS
SIMON A. LATCOVICH
EDEN SCHIFFMANN
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, DC 20024
650 Fifth Avenue, Suite 1500
New York, NY 10019
Phone: (202) 434-5000
Email: rcary@wc.com

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................1

ARGUMENT ...............................................................................................2

I.    The Executive Does Not Receive Deference in Criminal Cases. ..........................2

    A.    Criminal Deference Is Unprecedented. ...........................................3

    B.    History and Precedent Do Not Support the Government's Requested Deference. .................................................................4

    C.    The Executive's Policy Arguments Have All Been Discredited. ...................................................................................11

II.    This Prosecution Violates Türkiye's Sovereign Immunity. ...............................12

    A.    Unlike Civil Immunity, Criminal Immunity Remains Absolute. ..............13

    B.    The Sovereign's Corporate Instrumentalities Share the Sovereign's Immunity. ....................................................................14

    C.    Halkbank Would Be Immune in This Case Under the Restrictive Theory. .................................................................22

III.    Allowing This Prosecution To Proceed Would Open the Door to Destabilizing Prosecutions in State Courts and Around the Globe. ..................26

CONCLUSION ...........................................................................................29

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976) ............................7, 8

*Arkansas Game & Fish Commission v. United States*,
568 U.S. 23 (2012) ................................................................................9

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ....................................23

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ........................................9

*Bank of the United States v. Planters' Bank of Georgia*,
22 U.S. 904 (1824) ..............................................................................19

*Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926) ........................................7, 8

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ............................................16

*Brown v. United States*, 12 U.S. 110 (1814) ........................................ 6, 10

*Coale v. Société Co-op. Suisse des Charbons*,
21 F.2d 180 (S.D.N.Y. 1921) ................................................................19

*Coleman v. Tennessee*, 97 U.S. 509 (1878) ............................................13

*Dow v. Johnson*, 100 U.S. 158 (1879) ..................................................13

*Dunlap v. Banco Central Del Ecuador*, 41 N.Y.S.2d 650 (Sup. Ct. 1943) ............................15

*Ex parte Peru*, 318 U.S. 578 (1943) ..................................................2

*F. W. Stone Engineering Co. v. Petroleos Mexicanos of Mexico, D. F.*,
42 A.2d 57 (Pa. 1945)..........................................................................16

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) ........................................................................ 18, 19

*Garcia v. Akwesasne Housing Authority*, 268 F.3d 76 (2d Cir. 2001) ....................................19

*Guaranty Trust Co. of New York v. United States*, 304 U.S. 126 (1938) ..............................27

*Heaney v. Government of Spain*, 445 F.2d 501 (2d Cir. 1971) ..................................22, 25, 26

**Cases—continued:**

*In re Grand Jury Investigation of the Shipping Industry*,
186 F. Supp. 298 (D.D.C. 1960) ........................................ 3, 4, 21

*In re Grand Jury Proceeding Related to M/V Deltuva*,
752 F. Supp. 2d 173 (D.P.R. 2010) ........................................ 21

*In re Grand Jury Subpoena*, 912 F.3d 623 (D.C. Cir. 2019) ........................................ 21

*In re Investigation of World Arrangements*, 13 F.R.D. 280 (D.D.C. 1952) ........................................ 3, 17, 21

*In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987) ........................................ 21

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) ........................................ 16

*Miller v. Ferrocarrill Del Pacifico De Nicaragua*, 18 A.2d 688 (Me. 1941) ........................................ 16

*Molina v. Comision Reguladora del Mercado de Henequen*,
103 A. 397 (N.J. 1918) ........................................ 19, 20

*Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ........................................ 9

*People v. McLeod*, 1 Hill 377 (N.Y. Sup. Ct. 1841) ........................................ 28

*Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014) ........................................ 12

*Republic of Argentina v. Weltover*, 504 U.S. 607 (1992) ........................................ 24

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ........................................ 9

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) ........................................ 2, 7, 8

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ........................................ 23

*Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812) ........................................ *passim*

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*,
647 F.2d 300 (2d Cir. 1981) ........................................ 23, 25

*The Divina Pastora*, 17 U.S. 52 (1819) ........................................ 7

*The Nereide*, 13 U.S. 388 (1815) ........................................ 6

**Cases—continued:**

*The Paquete Habana*, 175 U.S. 677 (1900) ........................................................ 9, 10

*Türkiye Halk Bankasi A.Ş. v. United States*, 143 S. Ct. 940 (2023) ................................ 4, 23

*United States v. Deutsches Kalisyndikat Gesellschaft*,
31 F.2d 199 (S.D.N.Y. 1929) ........................................................22

*United States v. Lee*, 106 U.S. 196 (1882) ........................................................7

*United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997) ........................................4

*United States v. Pink*, 315 U.S. 203 (1942) ........................................................29

*United States v. Ravara*, 27 F. Cas. 714 (C.C.D. Pa. 1794) ........................................20

*United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336 (2d Cir. 2021) ........................24

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) ........................................5, 9

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*,
336 F.2d 354 (2d Cir. 1964) ........................................................ 9, 22, 25

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................................ 10, 11

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ........................................ 4, 11

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ........................................10

### FOREIGN CASES

*Agent judiciare du Trésor v. Malta Maritime Authority and Carmel X*, Cour de
cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004,
Bull. Crim., No. 04-84.265 (Fr.) ........................................................18

*Baccus Srl v. Servicio Nacional del Trigo*,
[1957] 1 Q.B. 438 (U.K.) ........................................................15

### STATUTES AND OTHER AUTHORITIES

28 U.S.C. § 1603 ........................................................15

**Statutes and Other Authorities—continued:**

28 U.S.C. § 1605 ............................................................................24

2 Op. Att'y Gen. 725 (1835) .........................................................20

Murray J. Belman, *New Departures in the Law of Sovereign Immunity*,
63 Am. Soc'y Int'l L. Proc. 182 (1969) ................................. 11, 27

David A. Brittenham, Note, *Foreign Sovereign Immunity and
Commercial Activity*, 83 Colum. L. Rev. 1440 (1983) .....................24

Ingrid (Wuerth) Brunk, *Foreign Official Immunity Determinations in
U.S. Courts*, 51 Va. J. Int'l L. 915 (2011) ..........................................5

Department of State, Digest of United States Practice in
International Law (1977) ...............................................................16

Edwin D. Dickinson, *The Law of Nations as National Law*,
104 U. Pa. L. Rev. 451 (1956) .........................................................11

Hazel Fox & Philippa Webb, *The Law of State Immunity* (3d ed. 2015) ............................13

Alexander Hamilton, Letters of Pacificus, No. 1 (1973), *reprinted in*
Works of Alexander Hamilton (1810).............................................5

Restatement (Second) of Foreign Relations Law § 69 (1965) .........................................23

Restatement (Second) of Foreign Relations Law § 72 (1965) .........................................11

# INTRODUCTION

Instead of addressing the legality of this prosecution head-on, the prosecution devotes most of its brief to urging this Court to grant it the unreviewable power to determine for itself whether sovereign immunity ever applies in a criminal case. That is not how our criminal justice system works. And it is not how sovereign immunity works, either in civil or criminal cases.

The prosecution cannot point to a single decision in which a court deferred to the Executive on whether sovereign immunity applied to a criminal prosecution. Not one. Nor can it point to a single federal appellate decision even in a *civil* case where the Executive received deference to *withhold* sovereign immunity. If sovereign immunity were left to prosecutors, there would be no defense. It would be entirely consumed by prosecutorial discretion. Any prosecutor could criminally charge a foreign sovereign without any review by the judiciary. That cannot be the law.

When the prosecution finally gets around to addressing the law of sovereign immunity, it makes no effort to respond to the *amici* who told the Court that this case violates common law and international law. And the prosecution makes no effort to explain why it should be allowed to depart from the centuries-old principle that one sovereign cannot bring criminal charges against another sovereign. Rather, the prosecution insists that the commercial-activities exception under the so-called restrictive theory of sovereign immunity applies to this criminal case. But the restrictive theory only ever applied to civil cases; it has never been applied to a criminal case. And

even if the restrictive theory applied, Halkbank could not be prosecuted for its conduct *in Türkiye*.

This Court should not accept the government's invitation to break with common law, rewrite the separation of powers, and detach the Court from a centuries-old international consensus that foreign sovereign instrumentalities are not prosecuted.

## ARGUMENT

### I. The Executive Does Not Receive Deference in Criminal Cases.

The government's request for deference in this case is unprecedented and unjustifiable. No court has ever deferred to the government on *criminal* sovereign immunity. Were such deference to exist, there would be no such thing as sovereign immunity in criminal cases.

Nor can the government point to a single case—even in the civil context—in which the Supreme Court, this Court, or any other federal court of appeals has deferred to the Executive's *denial* of foreign sovereign immunity. That also makes sense, because the Supreme Court has only ever endorsed deference in two narrow and inapposite circumstances: (i) when the Executive suggests immunity to *remove* claims from the courts, *see Ex parte Peru*, 318 U.S. 578, 587-89 (1943) (dicta); (ii) when the Executive objects to "extending" immunity to "new grounds" not based in common or international law, *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 & n.1 (1945); *see also* Halkbank Br. 43-53. The Supreme Court has never suggested that the Executive can

do what the government requests here: *abrogate* common-law immunity in violation of international law.

The government's arguments to expand deference beyond its narrow historical bounds are meritless, and have already been rejected by one circuit. Its historical argument repeatedly overreads case law. And its policy arguments cannot be reconciled with historical practice.

## A.    Criminal Deference Is Unprecedented.

The government cannot point to a single case in which any court has previously deferred to the Executive on whether a foreign sovereign has *criminal* immunity. To the contrary, in the few common-law criminal immunity cases that arose, the courts did not defer to the Executive. Halkbank Br. 44-45. Deferring to prosecutors would mean there is no such thing as sovereign immunity in a criminal case.

The government has no good answers to the two common-law criminal cases against foreign sovereign corporate instrumentalities. In both cases the courts refused to defer to the Executive's initiation of process. Halkbank Br. 27-28. The government (at 20) points out that in *In re Investigation of World Arrangements*, 13 F.R.D. 280 (D.D.C. 1952), the Executive did not specifically argue that initiating process was tantamount to the State Department's refusal to recognize immunity. But the court clearly was not troubled by applying sovereign immunity notwithstanding the Executive's contrary views. *Id.* at 291. Regardless, in *In re Grand Jury Investigation of the Shipping Industry*, 186 F. Supp. 298 (D.D.C. 1960), the State Department did expressly oppose immunity, and

the court still did not defer. *Id.* at 319-20. Here, of course, the State Department has not taken that step.

Nor does *United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997), support the government's argument that a prosecutor's charging decision alone strips sovereign immunity. The government can prosecute individuals—and has—if they are not entitled to personal immunity. In *Noriega*, the defendant "never served as the constitutional leader of Panama" and "Panama ha[d] not sought immunity for Noriega"—each of which independently foreclosed head-of-state immunity, which was the immunity at issue in that case. *Id.* at 1212. Head-of-state immunity also implicates the Executive's Article II recognition power, which is not at issue in this case. *See Yousuf v. Samantar*, 699 F.3d 763, 772 (4th Cir. 2012) (making this point); Halkbank Br. 44 n.5. The government offers no response to this distinction.

## B. History and Precedent Do Not Support the Government's Requested Deference.

The government vastly exaggerates the precedent supporting deference. The actual deference afforded was recent, short-lived, and would not apply where the government seeks to eliminate immunity in violation of common and international law.

1. The government is wrong that deference dates back to *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812). Gov't Br. 10. Deference "didn't appear until the 20th century." S. Ct. Op. at A.288 (Gorsuch, J., concurring in part and dissenting in part); Brunk & Dodge Amicus Br. 15-17 (collecting authorities). In *Schooner Exchange*, Chief

Justice Marshall extensively reviewed the history of foreign sovereign immunity, called immunity "a principle of public law," and independently "applied [it] to the case at bar." 11 U.S. at 135-47; *see* Ingrid (Wuerth) Brunk, *Foreign Official Immunity Determinations in U.S. Courts*, 51 Va. J. Int'l L. 915, 926 (2011) (deference "inconsistent with *Schooner Exchange* itself").

Certainly nothing in Marshall's opinion suggests the Executive could unilaterally *abrogate* common-law sovereign immunity. That would have shocked the Framers, who believed the "Executive is charged with the execution of all laws, [including] the laws of Nations." Alexander Hamilton, Letters of Pacificus, No. 1 (1793), *reprinted in* Works of Alexander Hamilton 322 (1810).

The government identifies two statements in *Schooner Exchange* as supporting the Executive's power to decide immunity questions. It misreads both. First, the government (at 10) points to Marshall's statement that "the sovereign of the place is capable of destroying" foreign sovereign immunity by "exercis[ing] jurisdiction" and rejecting the law of nations. *Schooner Exchange*, 11 U.S. at 146. But "the sovereign" there is Congress, not the Executive. *Id.* (considering whether "statutory provisions" show an intent to exercise jurisdiction contrary to law of nations); *see Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) ("Congress has the undisputed power to decide … whether and under what circumstances foreign nations should be amenable to suit in the United States.").

Marshall made that clear two years later in *Brown v. United States*, 12 U.S. 110 (1814). Although he reiterated that the law of nations is "a guide which the sovereign follows or abandons at his will," he expressly held that whether to reject international law is a "*consideration of the legislature, not of the executive or judiciary.*" *Id.* at 129 (emphasis added). The Executive and the Judiciary "can pursue only the law as it is written." *Id.*;[1] *see The Nereide*, 13 U.S. 388, 423 (1815) (Marshall, C.J.) (courts are bound by the law of nations until Congress "manifest[s] [its] will by passing an act" abrogating that law). Because common and international law bar criminal prosecutions of sovereigns, only Congress—not the Executive or the Judiciary—can authorize such actions.

The government also points to the statement in *Schooner Exchange* that the "'right to demand redress' from foreign sovereigns 'belongs to the executive department, which alone represents the sovereignty of the nation in its intercourse with other nations.'" Gov't Br. 10 (quoting *Schooner Exchange*, 11 U.S. at 132). The government is not quoting Marshall's opinion, but the summary of Attorney General Pinkney's argument. *See Schooner Exchange*, 11 U.S. at 132.[2] Regardless, Pinkney expressly agreed that "redress against the act of a foreign sovereign … cannot be submitted to a judicial

---

[1] Justice Story dissented, but agreed that the executive "cannot lawfully exercise powers or authorize proceedings which the civilized world repudiates and disclaims." *Brown*, 12 U.S. at 153.

[2] In fairness, the confusion stems from an error in Westlaw's electronic version of the opinion. Counsel has checked the U.S. Reports.

tribunal." *Id.* His reference to the Executive's authority over "intercourse with other nations" refers to diplomacy, not any power to dictate immunity decisions. *Id.*[3]

2. Turning to Twentieth Century authorities, the government cannot dispute that in *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562 (1926), the Supreme Court granted immunity despite the State Department's contrary suggestion. Gov't Br. 18-20 & n.5, 31 & n.7. So it calls the decision "anomalous" and "disavowed." Gov't Br. 18. But the government overreads subsequent criticisms of *Berizzi*. In *Hoffman*, the Court criticized *Berizzi* as improperly extending immunity "for the first time" to a new circumstance. 324 U.S. at 35 n.1. (Of course, the *Berizzi* Court thought precedent "strong[ly] support[ed]" its holding. 271 U.S. at 574.) In any event, the *Hoffman* opinion declined to criticize *Berizzi* further, saying only that it had "no occasion to consider the questions presented in the *Berizzi* case." 324 U.S. at 35 n.1.

Similarly, the Supreme Court's statement that *Berizzi* was "severely diminished by later cases" in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 699 (1976), was not focused on *Berizzi*'s refusal to defer. The *Alfred Dunhill* Court was speaking about a different point—that, with the restrictive theory's rise in civil cases, *Berizzi* "no longer correctly states the law" for civil cases as to "immunity … arising out of purely

---

[3] *The Divina Pastora*, 17 U.S. 52, 71 n.3 (1819), merely summarizes *Schooner Exchange*. And *United States v. Lee*, 106 U.S. 196, 209 (1882), simply notes that "the political branch" (i.e. Congress and the Executive) must adjust disputes with foreign states rather than the judiciary. *Contra* Gov't Br. 10-11.

commercial transactions." *Id.* at 703; *see id.* at 699, 701-02 (discussing *Berizzi*'s extension of immunity "to a commercial vessel"). *Berizzi* otherwise remains good law.

As expected, the government argues that *Hoffman* requires that courts obey the Executive's immunity determinations. Gov't Br. 11, 22-23. But *Hoffman* was a civil case. The government has no authority applying deference in criminal cases.

Regardless, *Hoffman* says only that courts should not "deny an immunity which our government has seen fit to allow, or to allow an immunity *on new grounds* which the government has not seen fit to recognize." 324 U.S. at 35 (emphasis added). It never says that when the Executive seeks to shrink immunity in contradiction of common and international law, courts are to acquiesce.

*Hoffman* itself involved a civil dispute in which Mexico asked the courts to *expand* immunity beyond the requirements of international law over the Executive's objection. Mexico sought immunity for a vessel it owned but did not possess. *Id.* at 33-34. "[T]he overwhelming weight of authority" required both ownership and possession, and the Executive objected to expanding immunity to ownership alone. *Id.* at 38. The case was not about whether the Executive can unilaterally *contract* immunity in violation of international law. *See id.* at 35. The government's contrary reading ignores both the Court's opinion and the case's posture.

3.	The government cites dicta in which the Supreme Court and this Court broadly describe common-law immunity determinations as Executive prerogative.[4] But those dicta—usually giving historical background about sovereign immunity before discussing the FSIA, *e.g.*, *Verlinden*, 461 U.S. at 486—are neither binding nor correct. The Supreme Court's summaries of prior decisions are not the law. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 34-35 (2012). The actual common-law cases do not support the government's requested deference.

4.	The government also cites dictum in *The Paquete Habana*, 175 U.S. 677 (1900), that courts apply customary international law "where there is … no controlling executive or legislative act or judicial decision." *Id.* at 700; *see* Gov't Br. 11-13. The government reads *Paquete Habana* and related cases to say that a "controlling executive … act" "displace[s]" customary international law—and thus, that courts must defer to Executive suggestions even if they violate international law. Gov't Br. 12-13.

The government has no argument that this prosecution is consistent with customary international law; and *Paquete Habana* does not let the government disregard it. It actually says the opposite. The case arose from the U.S. Navy's seizure of fishing vessels as prizes of war during a blockade of Cuba. 175 U.S. at 678-79. The fishermen

---

[4] *E.g.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020); *Bank Markazi v. Peterson*, 578 U.S. 212, 235-36 (2016); *Republic of Austria v. Altmann*, 541 U.S. 677, 688-89 (2004); *Verlinden*, 461 U.S. at 486; *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 358 (2d Cir. 1964).

sued, arguing the law of nations exempted peaceful fishing vessels from capture. *Id.* at 686. The Supreme Court agreed, holding over U.S. objection that the Navy had violated international law and ordering the condemnation proceeds returned to the fishermen. *Id.* at 686, 708; *see* Br. for United States 11, *The Paquete Habana*, 175 U.S. 677 (Nos. 395, 396) (arguing that "the discretion lodged in the Executive has been exercised"). The Executive's seizure of the fishing vessels did not "displace" international law—it violated it.

To say that any action by the Executive displaces customary international law would work a profound change to the separation of powers. "[W]hether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). It is for "the legislature, not … the executive," to decide whether to "follow[] or abandon[]" customary international law. *Brown*, 12 U.S. at 128-29. The government nowhere argues that this prosecution is consistent with customary international law, as cited by Halkbank and *amici* who have filed in this case. The Executive cannot break with common and customary international law merely by bringing a prosecution.

5. The government fails to grapple with the authorities that refute its deference claims. It says nothing about the Fourth Circuit's decision in 2012 that expressly rejected the government's argument that "under long-established Supreme Court precedent, the State Department's opinion on any foreign immunity issue is

binding upon the courts." *Yousuf*, 699 F.3d at 769; *see id.* at 769-73. That court concluded that the Executive receives deference only in exercising enumerated, exclusive powers, such as recognition of diplomats and heads of state. *Id.* at 773. Outside those narrow categories, courts should "respect, but … not automatically follow" the Executive. *Id.*; *see* Restatement (Second) of Foreign Relations Law § 72 (1965). Nor does it adequately address the few criminal cases that declined to defer to the government. *See supra* pp.3-4.

### C. The Executive's Policy Arguments Have All Been Discredited.

Without any precedent for deference in criminal cases, the government resorts to policy arguments, claiming that deference is required because of separation-of-powers concerns or to avoid "embarrassing the executive." Gov't Br. 21-24 (cleaned up). Those arguments have things backwards.

As noted above, it is this prosecution that causes separation-of-powers problems. *See Youngstown*, 343 U.S. at 587. And it was the transition *to deference* that "*embarrassed*" the Executive "with responsibilities for which [it was] quite unprepared and which it cannot properly assume." Edwin D. Dickinson, *The Law of Nations as National Law*, 104 U. Pa. L. Rev. 451, 477 (1956) (emphasis added). By the 1960s, the State Department Legal Adviser's office was publicly announcing that the Executive had concluded that "the State Department is the wrong organ to be deciding questions of sovereign immunity," was "ill-suited" to the work, and that such legal judgments "can more satisfactorily be decided using judicial procedures." Murray J. Belman, *New Departures*

*in the Law of Sovereign Immunity*, 63 Am. Soc'y Int'l L. Proc. 182, 184 (1969).  Congress agreed, and "abated the bedlam" that the limited civil deference had created by enacting the FSIA and removing the Executive from any role in sovereign immunity determinations.  *See Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141 (2014).

In other words, when the Executive Branch had actual experience with deference in civil cases, it stated that separation-of-powers issues counseled for *judicial* resolution because it was incapable of doing so itself.  The government's attempt to rewrite history to support its policy arguments therefore falls flat.

## II.  This Prosecution Violates Türkiye's Sovereign Immunity.

The indictment charges a sovereign Turkish instrumentality for actions taken in Türkiye, at the direction of the Turkish government, in order to, among other things, improve Turkish export figures.  Halkbank is an arm of the state created and controlled by Türkiye.  Türkiye Amicus Br. 7-14; Halkbank Br. 5-7, 33-36.  And the indictment targets conduct directed by the Turkish government and exercising sovereign authority for sovereign purposes.  Türkiye Amicus Br. 14-16; O'Keefe Amicus Br. 16-18; Halkbank Br. 8-10, 36-37, 40-41.  Fundamental principles of sovereign immunity shield Türkiye and Halkbank from those charges.

The government tries to get around those principles by claiming that (1) the restrictive theory applies in criminal cases; (2) the common law did not immunize state-owned corporations; and (3) Halkbank engaged in commercial activities.  *First*, common law afforded absolute criminal immunity; the restrictive theory has never applied to

criminal cases. *Second*, the government's argument that state-owned corporations are not immune under common law are contrary to a mountain of precedent—including State Department suggestions of immunity. *Third,* the restrictive theory and its exceptions for commercial activity—as understood at civil common law—would foreclose this prosecution even if the restrictive theory did apply.

### A.      Unlike Civil Immunity, Criminal Immunity Remains Absolute.

No court anywhere, ever, has applied a commercial-activity exception or restrictive theory of sovereign immunity to a criminal prosecution. Courts and commentators are unanimous that the adoption of the restrictive theory *in civil cases* "left untouched" absolute sovereign immunity *in criminal cases*. Hazel Fox & Philippa Webb, *The Law of State Immunity* 91 (3d ed. 2015); *see* Halkbank Br. 19-22. Absolute immunity remains the law in criminal cases both here and abroad—as the lack of criminal cases against sovereign entities demonstrates.

The government does not really assert otherwise. Although it leaves open the possibility that it could choose to indict a state qua state, *see* Gov't Br. 34, the government largely accepts that there is absolute immunity for sovereigns and entities under their control and possession. Gov't Br. 30-31; *see, e.g.*, *Dow v. Johnson*, 100 U.S. 158, 165 (1879); *Coleman v. Tennessee*, 97 U.S. 509, 515 (1878) (both noting foreign armies are "exempt" from "criminal jurisdiction").

## B. The Sovereign's Corporate Instrumentalities Share the Sovereign's Immunity.

The government's argument that Halkbank's corporate status deprives it of immunity is singularly odd. Gov't Br. 30-35. The government concedes that *non-incorporated* commercial instrumentalities "directly under the ownership and control" of a foreign sovereign, such as railroads and commercial carriers, receive immunity. Gov't Br. 31. There is no reason for a corporation to be different. Indeed, before the Supreme Court, the Deputy Solicitor General conceded that it was "obvious" that "foreign government-owned corporations" would receive criminal immunity at least "for their sovereign actions." S. Ct. Tr. at A.201.

The government's argument is also wrong. Halkbank is "an integral part of the Republic of Türkiye that acts in accordance with state purposes." Türkiye Amicus Br. at 8. The government (at 35) asserts that "Halkbank misses the point in arguing that it performs some public functions" because the restrictive theory turns on an entity's conduct in a particular case, not on its general functions. It is the government that "misses the point." Halkbank's general purposes and functions are relevant to its sovereign character at common law, which entitles it to *absolute* criminal immunity regardless of the nature of its conduct. Halkbank Br. 22-36. Türkiye's creation and use of Halkbank reflects why it is a fundamental principle of sovereign immunity that corporate instrumentalities share in the sovereign's immunity. O'Keefe Amicus Br. 10-

16; Brennan Amicus Br. 10-13. That principle has been followed in every criminal case to address the question.

1. Source after source confirms that common-law immunity attached to corporations, in both civil and criminal contexts. Halkbank Br. 22-33.

In Restatements of Foreign Relations Law extending back to the first edition in 1965, sovereign-owned and controlled corporations received immunity at common law. Halkbank Br. 25. Corporate instrumentalities' entitlement to immunity was therefore well established when the FSIA expressly codified that principle. 28 U.S.C. § 1603(a)-(b); Halkbank Br. 24. The government (at 36-37) otherwise argues that the FSIA sought to codify common-law immunity. In this regard, the FSIA did so.

As one would expect, the Restatements reflected a significant body of caselaw. The government ignores many of the cases that recognized corporate immunity. *See, e.g.*, *Dunlap v. Banco Central Del Ecuador*, 41 N.Y.S.2d 650, 652 (Sup. Ct. 1943) (defendant corporation five-elevenths owned by government and "engaged in private banking transactions" could be immune at least for work for Ecuador); Halkbank Br. 31-32 (citing additional cases). And other countries extend foreign sovereign immunity to corporate agencies and instrumentalities as well. *See, e.g.*, *Baccus Srl v. Servicio Nacional del Trigo*, [1957] 1 Q.B. 438, 466, 468 (U.K.) (corporate instrumentality receives absolute immunity because foreign instrumentality's corporate status is "purely a matter of governmental machinery"); Brennan Amicus Br. 10-11; Halkbank Br. 25-26 & n.2.

The State Department itself repeatedly acknowledged corporate immunity. *See, e.g.*, *Miller v. Ferrocarrill Del Pacifico De Nicaragua*, 18 A.2d 688, 689, 691 (Me. 1941) (Nicaraguan railway and steamship corporation). In *F. W. Stone Engineering Co. v. Petroleos Mexicanos of Mexico, D. F.*, for example, the Department suggested the absolute immunity of a corporation "wholly owned and controlled by [the Mexican] Government … for the purpose of operating and developing for oil properties in Mexico," and the Pennsylvania courts acceded. 42 A.2d 57, 59 (Pa. 1945).

The government tries to discount this authority because the State Department urged immunity. Gov't Br. 31. But that is the point: the State Department urged immunity notwithstanding that the "separate corporation" "conduct[ed] a commercial enterprise." 42 A.2d at 60. Indeed, in the Department's consideration of 100-plus requests for immunity suggestions from 1952 to 1976, during the restrictive-theory era, it never relied on numerous claimants' corporate status to decline to suggest immunity. Dep't of State, Digest of United States Practice in International Law 1017-81 (1977) (State Department Sovereign Immunity Decisions: May 1952 to January 1977).

Nor can the government explain why *foreign* sovereign-owned corporations should not receive immunity when *domestic* federal- and state-owned corporations receive immunity at common law (absent waiver). The government states that domestic sovereign immunity is a distinct issue. Gov't Br. 31-32 n.7. It is, but a highly relevant one. The Supreme Court has squarely held that corporate instrumentalities are "part of the Government." *Biden v. Nebraska*, 143 S. Ct. 2355, 2367 (2023) (quoting *Lebron v.*

*Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)). That is no less true for foreign sovereigns than for U.S. federal and state governments. *See* Halkbank Br. 32-33 & n.4. The government makes no attempt to justify a double standard that immunizes *domestic* state-owned corporations but not *foreign* ones.

2. Although corporate-instrumentality immunity mostly arose in civil cases, the government's brief does not explain why the result should be different in criminal cases. The fundamental principle that the acts of sovereign agencies and instrumentalities are the sovereign's acts does not turn on any civil/criminal distinction. *See* Brennan Amicus Br. 10-15; O'Keefe Amicus Br. 10-16; Azerbaijan, Pakistan, & Qatar Amicus Br. 15-20. And the two criminal cases to squarely address whether corporate instrumentalities are entitled to absolute immunity extended immunity to the corporations.

In *World Arrangements*, 13 F.R.D. 280, the court quashed a criminal subpoena against a corporate instrumentality. It held that "the corporation, Anglo-Iranian Oil Company, is indistinguishable from the Government of Great Britain," and prosecuting it "would in reality be to charge and find the British Government guilty." *Id.* at 291. The government never addresses this aspect of the court's reasoning. *See* Gov't Br. 19-20, 33 n.8.

The only national supreme court to squarely reach the criminal immunity of a corporate instrumentality reached the same conclusion. In 2004, the highest French criminal court dismissed the prosecution of a Maltese corporate instrumentality,

holding that "the rule of customary international law which bars proceedings against States before the criminal courts of a foreign State extends to organs and entities that constitute emanations of the State." *Agent judiciare du Trésor v. Malta Maritime Authority and Carmel X*, Cour de cassation [Cass.] [supreme court for judicial matters] crim., Nov. 23, 2004, Bull. Crim., No. 04-84.265 (Fr.); *see* Halkbank Br. 27 & n.3.

The government ignores this case altogether—just as it ignores the substance of customary international law. *See* Gov't Br. 17 (directing the Court to pages 30-38 to address "historical or customary-international-law" issues); *id.* at 30-38 (not addressing customary international law). Customary international law is foundational to common-law immunity. *See, e.g.*, *Schooner Exchange*, 11 U.S. at 137-44. And this prosecution is contrary to that law. Azerbaijan, Pakistan, & Qatar Amicus Br. 11-14, 18-20; Brennan Amicus Br. 6-21; O'Keefe Amicus Br. 5-18; Halkbank Br. 19-22, 25-27.

3.    The government instead cites three civil cases to support its view that courts "traditionally distinguished between a sovereign and corporations it owns." *See* Gov't Br. 32. None helps the government.

The government quotes *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983)—a case that had nothing to do with common-law immunity—for the proposition that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626-27. But that case stated that a state-owned corporation "is not to be regarded as legally separate from its owners in all circumstances," and then

held that the instrumentality's corporate veil could be pierced to seize its assets to satisfy the debts of its sovereign owner. *Id.* at 629, 632-33.

Next the government cites *Coale v. Société Co-op. Suisse des Charbons*, 21 F.2d 180 (S.D.N.Y. 1921), which denied immunity to a corporation. But that corporation was neither owned nor controlled by the Swiss government. *Id.* at 181. Even then, the court recognized that immunity might have applied if the corporation "had contracted as agent for the Swiss government." *Id.* It is no surprise that a court denied immunity to a corporation that flunked every aspect of the common-law test for instrumentality status. *See* Halkbank Br. 29-33. Here, by contrast, Halkbank is owned and controlled by Türkiye, and acted on Türkiye's behalf (both in general and in regards to the alleged events here). Türkiye Amicus Br. 7-16; Halkbank Br. 5-10, 34-37.

The government's final case, *Molina v. Comision Reguladora del Mercado de Henequen*, 103 A. 397 (N.J. 1918), admittedly states in dicta that sovereign-owned corporations should not receive immunity. *Id.* at 399. But that case cited *Bank of the United States v. Planters' Bank of Georgia*, 22 U.S. 904 (1824), which held that when a *U.S. State* creates a corporation with a "sue and be sued" clause, it "voluntarily strips itself of its sovereign character." *Molina*, 103 A. at 400 (quoting *Planters' Bank*, 22 U.S. at 907-08). As Halkbank has already explained, Halkbank Br. 32 n.4—and the government does not address—the *Planters' Bank* line of cases turn on a corporation's sue-and-be-sued clause, which this Court has explained "constitutes a waiver of immunity (if at all) *only in the courts of the sovereign*," and is therefore irrelevant to foreign sovereign immunity. *Garcia*

*v. Akwesasne Hous. Auth.*, 268 F.3d 76, 86-87 (2d Cir. 2001) (collecting cases). "Türkiye declines to waive Halkbank's immunity." Türkiye Amicus Br. 23. *Molina* is thus both aberrant and inapposite.

4.     The government also argues that "prosecutions of entities that were, or claimed to be, arms of a foreign sovereign are as old as the Republic." Gov't Br. 30. But it has little authority to support that statement. The government does not point to a single, prior criminal prosecution in all of history, anywhere in the world, in which a court denied an agency or instrumentality's immunity claim.

The government's only case before 1960 did not involve any sovereign "entity" whatsoever—it involved an individual consul. Gov't Br. 30 (citing *United States v. Ravara*, 27 F. Cas. 714, 715 (C.C.D. Pa. 1794)). But unlike sovereigns, diplomats, and instrumentalities, consuls were never understood to receive *any* immunity under common or international law. 2 Op. Att'y Gen. 725 (1835).

After that single, inapposite citation, there is a 195-year gap in the government's narrative of supposed criminal prosecutions of "sovereign entities." And the remaining examples—the earliest of which dates to 1989—are no more persuasive. In three, a corporate instrumentality *waived* sovereign immunity to enter a deferred prosecution or plea agreement. *See* Joint Plea Mem. 4-6, *United States v. Armaments Corp. of S. Afr.*, 91-cr-602-1 (E.D. Pa. Feb. 18, 1997) (referred to by government as *Jasin*); *United States v. Aerlinte Eireann*, 89-cr-647, D. Ct. Doc. 12 (S.D. Fla. Oct. 6, 1989); *United States v. Statoil, ASA*, 06 Cr. 960, D. Ct. Docs. 2, 6 (S.D.N.Y. Oct. 13, 2006). Another two are *currently*

*pending*. In one, the sovereign immunity issue remains sub judice. *See United States v. Pangang Grp. Co.*, Case No. 22-10058 (9th Cir.). In the other, the Chinese corporate instrumentality only days ago entered an appearance and has not yet raised any defenses. *See United States v. China Gen, Nuclear Power Co.*, 3:16-cr-46-TAV-DCP-2 (E.D. Tenn.) (referred to by government as *Ho*).

The government's four remaining cases involve criminal subpoenas, not prosecutions. *Shipping Industry*, 186 F. Supp. 298; *In re Sealed Case*, 825 F.2d 494 (D.C. Cir. 1987) (per curiam), *In re Grand Jury Proceeding Related to M/V Deltuva*, 752 F. Supp. 2d 173 (D.P.R. 2010); *In re Grand Jury Subpoena*, 912 F.3d 623, 626 (D.C. Cir. 2019) (per curiam). And only in two of these cases—in 2010 and 2019—were the subpoenas enforced against the corporate instrumentality. In *Shipping Industry*, the court declined to enforce the subpoena, reserved decision and required the government to adduce additional evidence on immunity issues before ruling. 186 F. Supp. at 319-20. But neither the government nor the court suggested corporate status was relevant. *Id.* In *Sealed Case*—which did not consider any immunity issue—the D.C. Circuit *reversed* the district court's civil contempt order against a foreign instrumentality for refusing to comply with the subpoena. 825 F.2d at 497-98. And the government's list of subpoena cases omits *World Arrangements*, which held that a foreign sovereign corporation was immune from a criminal subpoena at common law. 13 F.R.D. at 291.

*     *     *

The government's cases confirm this prosecution is unprecedented. The government has not identified any case, anywhere, in which a court has rejected a corporate instrumentality's claim of immunity from prosecution. Because foreign sovereign immunity remains absolute in criminal cases, the indictment should be dismissed.

### C. Halkbank Would Be Immune in This Case Under the Restrictive Theory.

The government spends most of its argument regarding immunity trying to reshape the restrictive theory for civil cases into the law of criminal cases. But, even under the restrictive theory, Halkbank would remain immune. Halkbank Br. 38-43. First, at common law, the civil restrictive theory applied only to foreign sovereigns' "ordinary commercial transactions *in the United States.*" *United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 200 (S.D.N.Y. 1929) (emphasis added). Second, in its cases applying the restrictive theory to civil disputes, this Court rejected a strict governmental/commercial distinction, holding that in certain categories of core sovereign concern, commercial acts taken for a governmental purpose remained immune. Those categories included, among others, "internal administrative acts" and "diplomatic activity." *Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964); *see Heaney v. Gov't of Spain*, 445 F.2d 501, 503-04 (2d Cir. 1971). Halkbank's alleged conduct occurred in Türkiye and involved what would

constitute internal administrative and diplomatic acts under this Court's restrictive-theory precedents. Halkbank Br. at 38-43. The government's contrary arguments fail.

1.     First, the government urges this Court to ignore its own common-law cases and apply the FSIA standards instead. Gov't Br. 28-29, 36-37. The government, pointing to dicta that the FSIA sought to "codify the restrictive theory," *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010), argues that "the FSIA [therefore] did not differ from the common law." Gov't Br. 36-37.

The government reads too much into the Supreme Court's statement in *Samantar*. The common-law restrictive theory *was not* the same as the FSIA. The FSIA "overruled" "aspect[s] of prior American law" of foreign sovereign immunity, and "*expanded*" the scope of the commercial-activity exception beyond its common-law antecedent. *Tex. Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 n.27 (2d Cir. 1981) (emphasis added)); *contra* Gov't Br. 36-37.

On remand, the Supreme Court has directed this Court to examine Halkbank's "common-law immunity." S. Ct. Op. at A.281. The common-law cases, not the FSIA, therefore apply.

2.     As Halkbank has explained, the common-law restrictive theory removed immunity only for a sovereign's "commercial activity *outside [the sovereign's] territory*." Restatement (Second) of Foreign Relations Law § 69 (emphasis added); *cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964) ("[T]he courts of one country will not sit in judgment on the acts of the government of another, done within its own

territory." (citation omitted)).  Under the common-law restrictive theory, Halkbank is therefore immune for *all* conduct within Türkiye, whether or not that conduct is commercial.  Halkbank Br. 41-42 (collecting authorities).

In response, the government cites only *Republic of Argentina v. Weltover, Inc.*, which found a sovereign lacked immunity for breaching a contract in its own territory when doing so caused a "'direct effect' in the United States."  504 U.S. 607, 618-19 (1992).  But that case arose under the FSIA, which contains a "'direct effect' provision" that "represents a major expansion of the traditional territorial basis for jurisdiction" at common law.  David A. Brittenham, Note, *Foreign Sovereign Immunity and Commercial Activity*, 83 Colum. L. Rev. 1440, 1466 (1983); *see id.* at 1460; 28 U.S.C. § 1605(a)(2).  The common law had no "direct-effect provision."

Alternatively, the government asserts that at least *some* of Halkbank's alleged conduct occurred in the United States.  But Halkbank's only alleged conduct occurring in the United States was communications with Treasury officials in Washington, D.C. about Halkbank's actions in Türkiye.  *See* 2d Cir. Op. at A.143.  Those meetings only implicate Count 1 of the indictment, and the government cannot allege this conduct was illegal without addressing immune conduct within Türkiye.  All the charges accordingly should be dismissed.  At a minimum, however, this Court should order the district court to dismiss the indictment to the extent it seeks to prosecute Halkbank for conduct within Türkiye.

3.     Finally, quoting one snippet it likes from *Victory Transport*, the government argues that Halkbank's alleged acts were not immune because Halkbank's acts were "conducted through private channels of trade."  Gov't Br. 37 (quoting 336 F.2d at 361). But this Court's common-law cases did not establish a "private channels of trade" test. *Contra* Gov't Br. 37.   The Second Circuit held that *all* acts falling within certain "categories … about which sovereigns have traditionally been quite sensitive" are immune, regardless whether they take outwardly commercial form.  *Heaney*, 445 F.2d at 503 (quoting *Victory Transp.*, 336 F.2d at 360).

In *Heaney*, for example, Spain contracted to generate adverse publicity against the British Government.  *Id.* at 501-02.  When Spain refused to pay, the contractor sued on the contract.  *Id.* at 502.  Although public-relations-services contracts doubtless use private channels of trade, this Court held that the contract was not a "commercial transaction" within the restrictive theory's meaning.  *Id.* at 503-04.  Instead, the contract related to "diplomatic activity" (which this Court understood "in the broad sense of the word"), and was therefore a sovereign act even if it took commercial form.  *Id.* at 503-04 & n.3.  By way of analogy, the Court explained that "a contract by a foreign government for the purchase of bullets for its army" would not fall within the restrictive theory because they were "acts concerning the armed forces."  *Id.* at 503-04.[5]

---

[5] The government (at 36) points out that this Court has referred to the contract-for-bullets sentence as "[d]ictum," and that the FSIA later abrogated this conception of the restrictive-immunity test.  *See Tex. Trading*, 445 F.2d at 310 n.27.  But while that specific metaphor might have been dictum, *Heaney*'s conclusion that a contract for public-

Halkbank's conduct falls within two categories of "particularly sensitive" sovereign conduct that are categorically immune under the common-law test. The indictment focuses on "internal administrative acts" and "diplomatic activity" (in the same, broad sense that term was used in *Heaney*). The "internal administrative acts" include Türkiye's decision to use its instrumentality to administer bilateral trade with Iran, and Türkiye's instructions to its instrumentality to increase Turkish exports using these funds. The "diplomatic activity" includes discussions between U.S. officials and a Turkish instrumentality allegedly operating under the sovereign's control and express direction. Halkbank Br. 40-41.

The government nowhere contests that Halkbank's conduct involves internal administrative and diplomatic acts under this Court's precedents—certainly it provides no substantive rebuttal. *See* Gov't Br. 37. Under this Court's restrictive-theory cases, Halkbank is therefore immune notwithstanding that some conduct took the form of bank transactions. *See Heaney*, 445 F.2d at 503-04.

## III. Allowing This Prosecution To Proceed Would Open the Door to Destabilizing Prosecutions in State Courts and Around the Globe.

If the Court permits the criminal prosecution of Halkbank, it would place the Judiciary at the center of foreign policy controversies and expose the United States and

---

relations services was not commercial because of its diplomatic purpose was unquestionably a holding. 445 F.2d at 503-04. And because this Court is applying its common law, not the FSIA, that holding remains binding here.

its instrumentalities to prosecution around the globe. Halkbank Br. 53-57. The government's responses miss the mark.

1. It is no answer to say that deferring to the Executive would solve the problem of thrusting courts into foreign policy matters. Gov't Br. 24. The Republic of Türkiye has been clear that "this *case* concerns" and "is an affront to Türkiye's sovereignty." Türkiye Amicus Br. 6 (emphasis added). Federal courts, not prosecutors, would decide actual cases and enter actual sentences.

2. The government also contends that making immunity decisions would require courts to delve into matters beyond their ken. Gov't Br. 24. But Halkbank's entitlement to sovereign immunity is a traditional legal question. *See supra* pp.4-5. As the State Department Legal Adviser's office stated, it is the Judiciary, not the Executive, that is well-suited to making these legal determinations. Belman, *supra*, at 184. Questions like whether the Executive has other means to achieve its foreign policy goals are irrelevant to it. Even in cases implicating the Executive's recognition powers, courts "draw for themselves [that recognition's] legal consequences." *Guar. Tr. Co. of N.Y. v. United States*, 304 U.S. 126, 138 (1938).

3. The government takes out of context statements by Halkbank's counsel in the Supreme Court to suggest that Halkbank's position is that countries may resort to "extrajudicial killing" if they cannot criminally charge sovereigns. Gov't Br. 25. That is not at all what counsel said. Counsel's point was simply that the Executive's position is "ahistorical" in that, faced with foreign sovereigns' objectionable conduct (like

extrajudicial killings), the United States used tools other than criminal prosecution. S. Ct. Tr. at A.189-90. Those include tools more extreme than criminal prosecution (like war), and less extreme (like visa limits and investment blocks). Halkbank Br. 55-57.

The fact that the United States has pursued American foreign policy for nearly 250 years *without* prosecuting its co-equal sovereigns confirms that such prosecutions are not among the core tools of international statecraft.

4.      The government assures the Court that it need not trouble itself with one of the most troubling consequences of this prosecution—the door it opens to prosecutions around the world and by state and local prosecutors in this country. Gov't Br. 26.  By toppling the international consensus that sovereigns and their instrumentalities are absolutely immune from criminal prosecution, the government would invite similar prosecutions not only in states and municipalities across the United States, but around the globe—beyond the Executive's or Congress's reach to regulate.

Indeed, despite receiving repeated questions on this issue in the Supreme Court, S. Ct. Tr. at A.201-03, 210-11, 224-30, the government lacks a clear answer as to how it can restrain a state prosecution in state courts. In the Nineteenth Century, New York courts refused to dismiss a state prosecution despite the Executive's support for a diplomatic resolution of the case. *See People v. McLeod*, 1 Hill 377, 432-33, 437 (N.Y. Sup. Ct. 1841). Such prosecutions would have consequences.

Imagine if a local prosecutor indicted China or its instrumentalities over the environment or Mexico or its agencies over immigration issues. It is no answer for this

Court to "leave … for another day" the problems those prosecutions would create. Gov't Br. 26. Our "nation as a whole would be held to answer if a State created difficulties with a foreign power." *United States v. Pink*, 315 U.S. 203, 232 (1942).

## CONCLUSION

Application of common law requires that the district court's order denying Halkbank's motion to dismiss be reversed. The case should be remanded with instructions to dismiss the superseding indictment.

Respectfully submitted,

/s/ *Robert M. Cary*
ROBERT M. CARY
JOHN S. WILLIAMS
SIMON A. LATCOVICH
EDEN SCHIFFMANN
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue S.W.
  Washington, DC 20024
  650 Fifth Avenue, Suite 1500
  New York, NY 10019
  Phone: (202) 434-5000
  Fax: (202) 434-5029
  Email: rcary@wc.com

January 12, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Robert M. Cary, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4), that the attached Reply Brief of Defendant-Appellant on Remand from the Supreme Court of the United States is proportionally spaced, has a typeface of 14 points or more, and contains 6,999 words.


January 12, 2024                          */s/ Robert M. Cary*
                                          Robert M. Cary

**CERTIFICATE OF SERVICE**

I, Robert M. Cary, counsel for appellant and a member of the Bar of this Court, certify that, on January 12, 2024, a copy of the attached Reply Brief of Defendant-Appellant on Remand from the Supreme Court of the United States was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all the parties required to be served have been served. In addition, I certify that copies of the brief will be sent, via third-party commercial carrier, to the Clerk and to the following counsel:

    Michael Dennis Lockard
    United States Attorney's Office
    Southern District of New York
    One St. Andrew's Plaza
    New York, NY 10007

January 12, 2024                    */s/ Robert M. Cary*
                                      Robert M. Cary